HUMAN RIGHTS DEFENSE CENTER,
a not-for-profit corporation,

       Plaintiff,

    v.

MILWAUKEE COUNTY, WISCONSIN;
DENITA R. BALL, Sheriff, individually and in
her official capacity; and JOHN AND JANE
DOES 1-10, Staff, individually and in their
official capacities,

       Defendants.

Case No.  2:24-cv-00981

JURY TRIAL DEMANDED

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT**

Plaintiff Human Rights Defense Center ("HRDC" or "Plaintiff") moves for a preliminary injunction under Federal Rule of Civil Procedure 65 and the associated Local Rules and guidelines, to enjoin Milwaukee County, Wisconsin and Sheriff Denita R. Ball (collectively, the "Defendants") from unconstitutionally censoring HRDC's publications sent to incarcerated persons. Further, the Court should order Defendants to provide Constitutionally required due process notice when rejecting publications sent to incarcerated persons.

## INTRODUCTION

HRDC seeks to provide incarcerated persons with reading materials about their legal and civil rights and options for accessing education while incarcerated. On numerous occasions since January 2021, Defendants refused to deliver books and magazines HRDC sent to persons incarcerated at the Milwaukee County Jail (the "Jail" or "Facility"), directly violating HRDC's First Amendment right to communicate information to these individuals. In addition, Defendants

have failed to provide HRDC adequate notice and an opportunity to challenge censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment. Defendants' violations of the Constitution are causing HRDC irreparable harm. As a settled matter of First Amendment law, the continued deprivation of HRDC's free-speech rights is precisely the type of irreparable harm that justifies preliminary injunctive relief.

HRDC's publications pose no threat to the safety and security of the Jail and, in fact, are distributed in jails and prisons all over the United States, including the State of Wisconsin. HRDC has no alternative means of communicating with persons incarcerated at the Jail, and because of Defendant's arbitrary policies, individuals incarcerated in the Jail have limited access to reading and educational materials.

To remedy these constitutional violations, HRDC requests that this Court enter a preliminary injunction, (1) prohibiting Defendants from continuing to arbitrarily and illegally censor HRDC's publications sent to incarcerated persons in the Jail; and (2) requiring that Defendants satisfy due process by providing HRDC with adequate notice of the reasons for any rejections of its publications sent to persons incarcerated in the Jail and an opportunity to be heard.

## I. STATEMENT OF FACTS

### A. Jurisdiction and the Parties

1. This Court has jurisdiction because this suit is brought under 42 U.S.C. § 1331 (federal question), as this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 (civil rights), as this action seeks redress for civil rights violations under 42 U.S.C. § 1983. (Complaint ¶ 2).

2. The HRDC is a not-for-profit charitable organization incorporated in the state of Washington and with principal offices in Lake Worth, Florida. (Paul Wright Declaration ("Wright Decl.") ¶ 2).

3. For more than 34 years, HRDC has focused its mission on public education, advocacy, and outreach on behalf of, and for the purpose of assisting, incarcerated persons who seek legal redress for infringements of their constitutional guaranteed and other basic human rights. (*Id*. at ¶ ¶ 2, 7).

4. HRDC accomplishes this mission through advocacy, litigation, and publication and distribution of books, magazines, and other information about prisons and the rights of incarcerated persons. (*Id*. at ¶ 2).

5. Defendant Milwaukee County, Wisconsin ("County"), is a unit of government organized and existing under the laws of the State of Wisconsin. The County operates the Jail, and is and was responsible for adopting and implementing policies governing incoming mail and publications for prisoners at the Facility. (Complaint, ¶ 8.)

6. Defendant Denita R. Bell is the elected Sheriff of Milwaukee, Wisconsin. She has held the position since November 2022. Defendant Ball is employed by and is an agent of the County, and is responsible for the overall management of the Jail. She has ultimate responsibility for the promulgation and enforcement of all Jail policies, practices, and procedures, including the policies, practices, and procedures relating to mail and reading material that is available to prisoners. (*Id*. at ¶ 9.)

**B.      HRDC's Publications**

7. HRDC publishes and distributes a softcover monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights* ("*Prison Legal News*"), which contains news and

analysis about prisons, jails, and other detention facilities, incarcerated persons' rights, management of prison facilities, prison conditions, and other matters pertaining to the rights and interests of incarcerated individuals. (Wright Decl. ¶ 4).

8. HRDC has thousands of subscribers to its monthly magazine in the United States and abroad, including incarcerated persons, attorneys, journalists, public libraries, judges, and members of the general public. (*Id*. at ¶ 10).

9. From its inception in 1990, HRDC has sent its publications to prisoners and librarians in more than 3,000 correctional facilities across the United States. This includes death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado—the most secure prison in the United States. (*Id*. at ¶ 11).

10. *Prison Legal News* is distributed to prisons and jails within the correctional system of all 50 states, including facilities in the State of Wisconsin, such as FCI Oxford, the Taylor County Jail, and numerous prisons run by the Wisconsin Department of Corrections. (*Id*.)

11. More recently, HRDC also began publishing a second monthly magazine, *Criminal Legal News*. This magazine focuses on review and analysis of individual rights, court rulings, and news about criminal justice related issues. *Criminal Legal News* is published and distributed in the same manner as *Prison Legal News*. (*Id*. at ¶ 5).

12. HRDC also distributes a number of different softcover books on subjects of interest to incarcerated persons and others who are interested in the criminal justice system. HRDC is the publisher for some of these books. These books are designed to facilitate a better understanding of criminal justice policies and to allow incarcerated persons to educate themselves about the law

4

and issues related to their imprisonment and their pending cases, such as legal research, incarcerated persons' rights, education, healthcare issues, and similar topics. (*Id*. at ¶ 7).

13. HRDC also publishes and distributes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Guerilla Handbook*"), which provides prisoners information on enrolling at accredited higher educational, vocational, and training schools. HRDC is also the sole national distributor and publisher of *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections, and legal remedies available to prisoners concerning their incarceration. (*Id*. at ¶ 8).

## C. Defendants' Unconstitutional Mail and Book Policies and Practices

14. Defendants maintain a policy and practice of denying books and magazines sent to prisoners through the mail, if the books and magazines are not sent by publisher, Penguin Random House. (Exhibit A, Milwaukee County Webpage titled Detention Services, Occupant Mail Section.)

15. Without the ability to send its publications to incarcerated persons in the Jail by mail, HRDC has no alternative means of exercising its right to communicate with these persons. (*Id*. at ¶ 33).

16. HRDC's publications do not actually interfere with a correctional facility's penological interests, or cause security problems. (*Id*. at ¶ 12).

## D. Defendants' Censorship of HRDC's Mail

17. In January 2022 HRDC received information from an incarcerated individual in the Jail that staff would not allow him to receive *Prisoners Self Help Litigation Manual*, that a family member had ordered for him, because Prison Legal News is not an authorized publisher. (*Id*. at ¶ 17).

5

18. Between January 2022 and July 2024 HRDC sent mail, including books, magazines, and letters, to prisoners held at the Jail. Each item was individually addressed and separately mailed. (*Id*. at ¶ 18).

19. Defendants censored HRDC's publications by failing to deliver them to the intended prisoner-recipients at the Jail. Plaintiff can identify at least fifty-eight (58) items rejected by Defendants, including forty-three (43) *PYHS*; eight (8) *Prisoners' Guerilla Handbook*; one (1) Prisoners' Self-Help Litigation Manual; two (2) copies of *Prison Legal News*; one (1) copy of *Criminal Legal News*; two (2) Info Packs; and one (1) piece of correspondence inquiring about potential censorship. (*Id*. at ¶ 19).

20. Many of the rejected items were returned to HRDC's offices marked "RETURN TO SENDER." Others were not returned, and HRDC received no notice from the Jail that they had been rejected. (*Id*. at ¶ 20).

21. Additionally, Defendants' censorship of HRDC's mail was done without adequate notice of any opportunity to challenge the censorship decisions. (*Id*. at ¶¶ 23-24).

22. HRDC continues, and will continue, to try to communicate with incarcerated persons confined in the Jail. (*Id*. at ¶ 25).

23. Thus, Defendants' vague and overbroad policies and practices will violate HRDC's free speech rights in the future without due process, causing irreparable harm.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction on notice to the adverse party. *See* Fed. R. Civ. P. 65. To obtain a preliminary injunction, a plaintiff must show that: "(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its

6

claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Once a plaintiff makes such a showing, the court proceeds to a balancing analysis where the court must weigh the harm a denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court granted the injunction. *Id*. The balancing analysis involves a "sliding scale approach." *Id*. Under the sliding scale approach, the more likely the plaintiff is to win on the merits, the less the balance of the harms needs to weigh in plaintiff's favor, and vice versa. *Id*. The Seventh Circuit has said, in cases involving the First Amendment, "the likelihood of success on the merits will often be the determinative factor." *Higher Society of Indiana v. Tippecanoe City., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (reasoning that because even a short deprivation of First Amendment rights constitute irreparable harm, the balance of harms normally favors granting a preliminary injunction because the public interest is not harmed by enjoining the enforcement of a policy that is probably unconstitutional).

### III.    ARGUMENT

HRDC respectfully moves the Court to enter a preliminary injunction prohibiting Defendants from continuing to violate Plaintiff's constitutional rights of free speech and due process. The Court should grant HRDC's motion because: (1) HRDC is likely to succeed on the merits of its claims; (2) HRDC is currently suffering, and will continue to suffer, irreparable harm in the absence of preliminary relief; and (3) traditional legal remedies are inadequate to compensate HRDC for the harm it is suffering. Further, issuing a preliminary injunction would cause little, if any, harm to the Defendants, while preventing further violations of HRDC's constitutional rights.

### A. HRDC is Likely to Succeed on the Merits of Its Claims

#### 1. *First Amendment Claim*

A publisher's right to send publications and other correspondence to incarcerated persons is clearly established – the purpose of this right is violated when the correspondence sent, is not received. "[T]here is no question that publishers who wish to communicate with those who… willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *see also Van den Bosch v. Raemisch*, 658 F.3d 778, 787 (7th Cir. 2011); *Massey v. Wheeler*, 221 F.3d 1030, 1036 (7th Cir. 2000) (acknowledging the First Amendment right of publishers to communicate with inmates); *Howard v. Braemer*, 2021 WL 1979496 *2 (E.D. Wis. 2021) ("Those outside of prison have an interest in corresponding with incarcerated persons") (citing *Raemisch*). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), nor do they bar others who are not incarcerated "from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407.

The interests of the senders and their intended recipients are "inextricably meshed," and censorship of prisoner mail creates "a consequential restriction on the First and Fourteenth Amendment rights of those who are *not* prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974) ("Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result…."), overruled in part on other grounds by *Thornburgh*, 490 U.S. at 413-14 (emphasis added). "Whatever the status of a prisoner's claim

to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. *Id*. at 408.

As such, to withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four *Turner* factors: (1) whether there is a valid, rational connection between the prison regulation or action and the interest asserted by the government, or whether the interest is so remote as to render the policy arbitrary or irrational; (2) whether there exist alternative means to exercising the constitutional right in question; (3) what impact the desired accommodation would have on the prison's security staff, inmates, and allocation of resources; and (4) whether there exists any obvious, easy alternatives to the challenged regulation or action, which may suggest that it is not reasonable, but instead an exaggerated response to prison concerns. *See Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006) (quoting *Turner*, 482 U.S. at 89-92). While this case involves free speech rights of free persons, not incarcerated persons, for purposes of this motion, HRDC assumes that the Court will employ the *Turner* four-factor test as a means of ensuring that any injunctive relief incorporates due deference for the demands of jail operation. As discussed below, HRDC is highly likely to prevail on each of the *Turner* factors with regard to Defendants' censorship.

> **a)**      **Defendants' Publication Policy and Practices Are Not Rationally Related to Any Legitimate Penological Objectives.**

The first factor established by *Turner* to determine the validity of a prison regulation is whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. This factor is a threshold inquiry. *Singer v. Raemisch*, 593 F.3d 529 F.3d 529, 534 (7th Cir. 2010); *see also Rudebush v. Lenski*, 2016 WL 5415924 *5 (W.D. Wis. 2016) ("Defendant's failure to make a showing under the first *Turner* factor is enough to doom his motion for summary judgment."). If a prison fails to

9

show that its regulation is rationally related to a legitimate penological objective, the Court does not consider the other factors. *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003); *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (concluding that the prison restriction was not rationally related to a legitimate penological objective and declining to consider the other *Turner* factors).

The logical connection between the prison regulation and the penological objective cannot be sustained where it is "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Additionally, the governmental objective must be a legitimate and neutral one. *Id*. To make a showing under *Turner* prison authorities must show more than "a formalistic logical connection between a regulation and a penological objective," *Beard v. Banks*, 548 U.S. 521, 535 (2006). Once a plaintiff presents evidence to refute a "common-sense connection" between a legitimate interest and a prison policy, the defendant "must present enough counter evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999). "Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the *specific* penological interests involved and then demonstrate both that those specific interests are the action bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point." *Walker v. Summer*, 917 F.2d 382, 386 (9th Cir. 1990) (emphasis added); *see also Caldwell v. Miller*, 790 F.2d 589, 598 (7th Cir. 1986) ("the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation in question and its effect on the inmate's asserted rights").

*Turner* allows for deference to prison officials while providing an avenue for judicial review to ensure prison officials are not encroaching on individual's First Amendment rights. *See Beard*, 548 U.S. at 535; *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); and *Jackson v. Thurmer*, 748 F.Supp.2d 990, 1001 (W.D. Wis. 2010). As such, "in order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Beerhide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002); *see also Riker v. Lemon*, 798 F.3d 546, 553 (7th Cir. 2015) ("prison officials must still articulate their legitimate governmental interest in the regulation and provide some evidence supporting their concern").

Here, Defendants fail the first prong of *Turner*. Defendants' policy of censoring publications and letters advances no legitimate penological objective. To the contrary, Defendants' censorship of HRDC's publications hampers the Supreme Court's recognized penological objective of rehabilitating incarcerated persons. *See McKune v. Lile*, 536 U.S. 24, 36 (2002) (recognizing that because "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody"). Further, inmate access to reading material and freedom to correspond with non-incarcerated persons has been found to benefit, not hinder, the goal of rehabilitation. *See Martinez*, 416 U.S. at 412; *see also Cline v. Fox*, 319 F. Supp. 2d 685, 694 (N.D. W. Va. 2004).

The first *Turner* factor weighs in HRDC's favor because Defendants' mail and publication policy and practices are not rationally related to any legitimate penological objectives. In fact, Defendants' depravation of access to materials published by the HRDC, and others, has and will continue to harm incarcerated persons at the Jail by frustrating the critical penological objective of rehabilitation. Because the first *Turner* factor is a threshold inquiry which Defendants cannot satisfy, the Court need not consider the remaining factors. However,

11

even if the Court believes that Defendants can satisfy the threshold, first *Turner* factor, HRDC still prevails because the remaining *Turner* factors also weigh in favor of the HRDC.

      **b)**      **There Are No Alternative Avenues for HRDC to Exercise Its First Amendment Right to Communicate Information to Persons Incarcerated in the Jail.**

The second factor relevant in determining the reasonableness of a prison restriction is whether there are alternative means available to exercise the constitutional right in question. *Turner*, 482 U.S. at 90. Absence of an alternative means may be seen as evidence that the prison restriction in question is unreasonable. *Beard*, 548 U.S. at 532 (holding that no alternative means of communication can be seen as "some evidence" that the prison regulations in question were "unreasonable"). In an analogous case to the one here, involving a jail's policy of prohibiting incarcerated persons from receiving books or magazines through the mail, a district court found that the second *Turner* factor "clearly favor[ed Plaintiff, Prison Legal News]." *Prison Legal News v. Nw. Reg'l Jail Auth.,* 2017 WL 4415659 at *6 (W.D. Va. Sept 29, 2017). In that case, the Court found that the defendant's policy "was effectively a complete ban on any prisoner being able to obtain [Prison Legal News] publications, whether through a subscription or a gift subscription"; and "[Prison Legal News was] being denied total access to the prisoners at the jail and [did] not have an adequate alternative method for reaching prisoners." *Id*. The same is true here with respect to HRDC.

Here, Defendants do not provide HRDC with any alternative means of effectively communicating its books and magazines to incarcerated persons in the Jail. Defendants ban prisoners from receiving books and magazines not published by Penguin Random House. Penguin Random House does not publish any of HRDC's books or magazines, (Wright Decl. ¶ 16), therefore HRDC's message can *only* be conveyed by HRDC's print publications. *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if there are other means by which a prisoner can

12

obtain general information, those avenues "should not be considered a substitute for reading news papers and magazines"). HRDC's monthly issues of *Prison Legal News* and *Criminal Legal News* provide prisoners with timely, in-depth coverage of judicial decisions and other recent events related to the criminal justice system in a manner that would be impossible to attain through other means of communication, including publications by Penguin Random House that, to HRDC's knowledge, does not provide similar or the same substantive content. (Wright Decl. ¶ 16). This is also true for HRDC's *Prisoners' Guerilla Handbook*, which provides prisoners information on enrolling at accredited higher educational, vocational, and training schools; and *PYHS* which describes rights, protections, and legal remedies available to prisoners. (*Id.*). Under Defendants' current policy and practices, HRDC has no practical way to reach its intended audience. Thus, the second *Turner* factor weighs in favor of HRDC.

**c)**      **Accommodating HRDC's First Amendment Rights Would Impose No Significant Burden on Jail Officials, Other Incarcerated Persons, or Defendants' Allocation of Resources.**

The third *Turner* factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. When evaluating this factor, the Supreme Court has noted that the policies followed at other institutions are instructive and relevant to a determination of the need for the particular type of restriction. *Martinez*, 416 U.S. at 414 n.14. Therefore, if other institutions are able to effectively accommodate the constitutional right and the particular publications in question, it can be understood by the Court that the particular prison restriction is unnecessary.

For more than 30 years, HRDC has sent its publications and materials to thousands of incarcerated persons nationwide and beyond. (Wright Decl. ¶¶ 10-11). HRDC distributes its publications to correctional facilities across the United States, including the Federal Bureau of

13

Prisons, which houses over one-hundred thousand inmates, without censorship. (*Id*. at ¶ 11). HRDC is unaware of any state or federal prison where HRDC's books have created a security problem or burden on prison officials or resources. (*Id*. at ¶ 12). Some correctional facilities that previously followed publication bans have recognized, after rescinding the problematic publication policies, that allowing incarcerated persons to read books and magazines has generated a "win-win" for everyone involved. *Prison Legal News v. Northwestern Reg'l Jail Auth.*, Case No. 5:15-cv-00061, Dkt. 122, p. 6 (W.D. Va. 2019). That thousands of institutions nationwide accommodate HRDC's free speech rights and allow HRDC publications without censorship is strong evidence that Defendants' policy is unnecessary and that the third *Turner* factor weighs in favor of HRDC.

> **d)      Defendants' Mail Policy is an Exaggerated Response to Perceived Security Concerns.**

The fourth and final *Turner* factor is whether the prison restriction is an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90. The Court has stated that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable…" *Id*. When a claimant can provide an alternative that fully accommodates the constitutional rights in question, at a *de minimis* cost to valid penological interests, a court may consider that evidence that the prison regulation does not satisfy the reasonable relationship standard. *Id*. at 91. Once a court finds that a restriction is an "exaggerated response" to prison concerns, the restriction cannot stand. *See id* at 91, 97-99.

Similar to what is described above, that thousands of correctional facilities nationwide allow prisoners to receive HRDC's publications and other mail pieces, without creating security or other penological problems, is evidence that there are available alternatives to bans on HRDC's publications. *See, e.g. Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (the

14

Court found that the final *Turner* factor favored the publisher challenging the county jail regulation because it was undisputed that the publisher's magazine was already being distributed in other California county jails). The distribution of HRDC's books, magazines, and other communications in other facilities, including facilities in Wisconsin, demonstrates that Defendants' publisher censorship policy and practice is both unnecessary and unreasonable—an "exaggerated response" to perceived prison concerns, and as such, cannot stand. The fourth factor too, weighs in favor of HRDC.

The above analysis demonstrates that each of the *Turner* factors weigh in Plaintiff's favor. Accordingly, Defendants' mail policy is an illegal infringement on HRDC's First Amendment rights, and Plaintiff is likely to succeed on this claim.

### 2. Due Process Claim

For decades the Supreme Court has recognized that a publisher's right to communicate with incarcerated persons is as grounded in the First Amendment as it is in the Fourteenth Amendment. *Martinez*, 416 U.S. at 418. The Seventh Circuit has repeatedly reaffirmed this principle and recognized that there is a liberty interest in correspondence under both the First and Fourteenth Amendments. *See, e.g.*, *Larkin v. Murphy*, 1 F.3d 1244, *4-5 (7th Cir. 1993) (prisoners have a limited liberty interest in their mail under both the First and Fourteenth Amendments) (unpublished); *Owen v. Lash*, 682 F.2d 648, 652-653 (7th Cir. 1982) (the right to correspond is protected by both the First and Fourteenth Amendments). The Fourteenth Amendment requires that a correctional institution provide – to both the incarcerated person and the sender of the correspondence – notice and an opportunity to challenge the censorship each time that it censors an incoming publication or correspondence. *See Martinez*, 416 U.S. at 418; *see also Moyler v. Fannin*, 2023 WL 2541131 *8 (W.D. Va. 2023).

15

In *Montcalm Publishing Corporation v. Beck,* 80 F.3d 105, 109 (4th Cir. 1996), having recognized that the Plaintiff publisher had a constitutional interest in communicating with its inmate subscribers, the Fourth Circuit held senders of publications are entitled procedural protections when prisons prevent inmate-recipients from receiving the publications. The *Montcalm* Court stated that providing notice and opportunity to an incarcerated person alone does not suffice because "[a]n inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold the publication," adding that while a prisoner can ask for help from the publisher in challenging the prison authorities' decision, "the publisher's First Amendment right *must not depend on that.*" *Montcalm Publishing Corporation v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). "Without notifying the free citizen of impending rejection, he would not be able to challenge the decision which may infringe his right to free speech." *Martin v. Kelley*, 803 F.2d 236, 244 (6th Cir. 1986); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004); *see Prison Legal News v. Cook*, 238 F.3d 1145, 1153 (9th Cir. 2001).

Courts have upheld Plaintiff's due process rights in circumstances similar to this case. For example, in *Human Rights Defense Center v. Southwest Virginia Jail Authority*, the Court held "HRDC was entitled to notice and opportunity to be heard regarding the defendants' interference with its First Amendment right to communicate with prisoners," stating that the undisputed facts show defendants violated HRDC's due process rights "by failing to give notice of confiscations, giving inadequate notice, and not providing reasonable opportunity to appeal." *Human rights Defense Center v. Southwest Virginia Jail Authority,* Case No. 1:18-cv-00013, Dkt. 96, p. 32 (W.D. Va. 2019). In *Prison Legal News v. Northwestern Regional Jail Authority*, the court held that the defendant violated Plaintiff's due process rights by failing to consistently, and with sufficient explanation, provide Plaintiff notice that its mail was being rejected, and by

failing to advise Plaintiff of any way to appeal the rejection. *See Prison Legal News v. Northwestern Regional Jail Authority*, 2017 WL 4415659 *12 (W.D. Va. 2017).

It is not only crucial, but also constitutionally mandated for publishers to have an opportunity to be heard and challenge censorship decisions that affect their First Amendment rights. It is also important for publishers to receive notice and an opportunity to be heard because it allows publishers to assist subscribers, who might not otherwise be aware of the substance of the rejected correspondence, in filing challenges to such violations within their correctional grievance system. *See Montcalm*, 80 F.3d at 108-109. It would be impossible for publishers and incarcerated persons to know what correspondence is not being delivered and then effectively challenge the correspondence's rejection, if correctional facilities can reject items with no notice. *Id*. HRDC simply asks Defendants to provide due process to HRDC and incarcerated persons at the Jail when Defendants refuse to deliver publications or other correspondence—like correctional facilities nationwide provide HRDC, other publishers, and incarcerated persons.

Defendants are constitutionally mandated to afford due process protections to publishers when censoring prisoner mail. They have plainly failed to do so here. To date, for all rejected material at issue, HRDC received no notice, or inadequate notice, when its publications were censored. (Wright Decl. ¶ 23). HRDC was not provided any reason for the censorship, nor an avenue or opportunity to challenge the rejection of its mail by the Jail. (*Id*. at ¶ 24). As a result, Defendants have repeatedly violated HRDC's due process rights under the Fourteenth Amendment.

### 3. Vagueness and Overbreadth

The Jail's mail policy is both vague and overbroad. A regulation is "void for vagueness if it does not define an offense with sufficient clarity to allow people of ordinary intelligence to

understand what conduct is prohibited or if it is so vague as to allow for arbitrary or discriminatory enforcement. *United States v. Turcotte*, 405 F.3d 515, 531 (7th Cir. 2005) (abrogated on different grounds). While unduly vague laws violate due process regardless of whether speech is implicated, courts are "particularly wary" when dealing with laws that regulate speech given the concern that an overly vague law may chill speech that is constitutionally permissible. *United States v. Nat'l Training & Info. Ctr. Inc.*, 532 F.Supp.2d 946, 956 (N.D. Ill. 2007).

Here, the Jail's policy is overbroad because it creates an arbitrary distinction that serves as a basis for rejecting non-problematic speech, such as HRDC's publications and other correspondence. The HRDC does not dispute, and readily acknowledges, that some written materials may be censored, such as materials that threaten the safety of the Jail and persons in it. However, there is no justification or rationale for the authorization of a *single* "approved publisher," Penguin Random House, to distribute books while banning all other publishers, including HRDC, from doing the same. HRDC, like Penguin Random House, is a publisher and distributor of books and magazines, however, only Penguin Random House publications may be accepted by the Jail. The Jail's policy is silent on the reason Penguin Random House is the only "approved publisher" and does not provide information on what steps, if any, a publisher can take to become an "approved publisher" to be able to send its publications to imprisoned persons at the Jail. This arbitrary and unjustified distinction in the Jail's policy is overbroad and unconstitutionally restricts non-problematic speech.

In addition, Defendants' ban on speech that is "inappropriate" is unconstitutionally vague and overbroad. While HRDC cannot be certain as to why its correspondence – setting aside HRDC published books or magazines – was denied, given that it was provided no notice by the

18

Jail as to why the correspondence was rejected, HRDC can only assume it was because it was found to be "inappropriate." However, no person would know what is and is not permitted based on such regulation. Such a regulation further gives Jail officials arbitrary and unbound discretion to reject items based on their own personal view of appropriateness, with inevitable results of censorship of speech that pose no harm to the Jail.

**B.**      **Defendants' Constitutional Violations Are Causing HRDC to Suffer Irreparable Harm.**

As the Supreme Court and Seventh Circuit have stated, "[t]he loss of First Amendment freedoms, for even minimal periods of time, *unquestionably constitutes irreparable injury*." *Elrod v. Burns*, 427 U.S. 347, 373 (1974); *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004) (emphasis added). The loss of First Amendment rights is presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Accordingly, courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings. *See, e.g. Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982) (ban on magazines, newspapers, and hardcover books, reasoned to be in place to prevent fires and protect plumbing, violated the First Amendment); *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail policy).

The irreparable harm suffered by HRDC is concrete, severe, and ongoing. Defendants will continue to censor HRDC's mailings to incarcerated persons, without due process, thwarting HRDC's protected speech on critical subjects like government policies, the civil and legal rights of incarcerated persons, jail conditions, and the criminal justice system. HRDC's irreparable

19

harm is exacerbated because *Prison Legal News* and *Criminal Legal News* report on current newsworthy topics on a monthly basis. (Wright Decl. ¶¶ 4-5). The passage of time depletes the publications' news value. (*Id*. at ¶ 6). Accordingly, HRDC will continue to suffer irreparable harm without a preliminary injunction and this factor weighs in favor of granting HRDC's preliminary injunction.

### C.    Traditional Remedies are Not Adequate to Prevent the Harm to HRDC.

Traditional remedies are inadequate to compensate plaintiffs when constitutional rights are violated and damages are difficult to quantify or rectify. *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). Similar to many First Amendment cases, the damages to HRDC are difficult to quantify, and therefore damages are not an adequate remedy in this case. HRDC seeks damages for: (1) the suppression of its speech; (2) the impediment of its ability to disseminate its message; (3) the frustration of its non-profit organizational mission; (4) the loss of potential subscribers and customers; and (5) the inability to recruit new subscribers and supporters. (Complaint, ¶ 27). Damages of this sort cannot be calculated by easy reference to formula or invoice amount; rather, they require intricate analysis and the quantification of the abstract ideas that constitute the rights and liberties afforded by the constitution. Consequently, it is more effective to prevent the damage in the first place, instead of attempting to put a number on them after the fact. This factor weighs in favor of granting a preliminary injunction.

### D.    The Balance of Equities Weighs in HRDC's Favor.

Because HRDC has shown that it is entitled to a preliminary injunction under the first three *Turner* factors, the Court "must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. Here, any potential injuries to Defendants are minimal and speculative. There is no great cost or expenditure of time required to change the current policy to allow HRDC to

deliver its publications to incarcerated persons and afford HRDC its constitutionally mandated due process. As discussed above, thousands of prisons nationwide, including the Federal Bureau of Prisons and prisons in Wisconsin, have policies that both allow HRDC publications and afford HRDC its right to due process with regard to rejected mail. This demonstrates that there would be no substantial harm to Defendants if they were enjoined from enforcing the mail policy currently in effect.

In contrast, as explained above, the irreparable harm suffered by HRDC is concrete, severe, and ongoing. As a result, the balance of equities leans in HRDC's favor given the irreparable harm suffered by HRDC in the absence of a preliminary injunction, and the minimal effort necessary to vindicate its rights under the Fist and Fourteenth Amendments.

**E.      The Bond Requirement Should Be Waived.**

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond, or only a nominal bond. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010); *see also Anderson v. Hansen*, 489 F.Supp.3d 836, 846 (E.D. Wis. 2020). HRDC is a small non-profit organization of twelve employees that would be unable to post anything more than a nominal bond. (Wright Decl. ¶ 34). A bond requirement would effectively deny access to judicial review for HRDC, which is especially harmful here, because HRDC is alleging violations of its fundamental rights under the Constitution. *See Complete Angler, LLC v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."); *see also Koons v. Platkin*, 673 F.Supp.3d 515, 670-671 (D. N.J. 2023) (appeal pending). Further, Defendants would not incur damages if an injunction is issued. Accordingly, waiving the bond requirement is appropriate in this case.

## IV.     CONCLUSION

As set forth above, HRDC is likely to succeed on the merits of its constitutional claims. HRDC is suffering and will continue to suffer irreparable harm to its First and Fourteenth Amendment rights, and HRDC lacks any adequate remedy at law to address the ongoing violations of its constitutional rights. Finally, any harm to the Defendants if an injunction were issued would be negligible, if at all existent. For these reasons, HRDC respectfully requests that this Court grant its motion for preliminary injunctive relief, waive the bond requirement, and enjoin the Defendants from censoring HRDC's mail and publications from the Jail during the pendency of this litigation.

Dated:  August 2, 2024

Respectfully Submitted,

*/s/ Brian C. Spahn*

Brian C. Spahn
State Bar No. 1060080
Theresa M. Correa McMichen
State Bar No. 1122184
GODFREY & KAHN, S.C.
833 E. Michigan St., Suite 1800
Milwaukee, WI 53202
Telephone:  (414) 273-3500
Facsimile: (414) 273-5198
bspahn@gklaw.com
tcorreamcmichen@gklaw.com

Jonathan Picard*
Florida Bar No.: 105477
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Facsimile: (561) 828-8166
jpicard@humanrightsdefensecenter.org

22

*Attorneys for Plaintiff Human Rights Defense Center*

\*\*Pro hac vice* application to be filed

31587205.1

23