# Exhibit A

# Prison Legal News

## PUBLISHED BY THE HUMAN RIGHTS DEFENSE CENTER

**VOL. 35 No 4**
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**April 2024**

# NaphCare: More Proof That Privatized Healthcare Deals Death and Misery to the Incarcerated to Enhance Profits

*by David M. Reutter*

A settlement approved by the federal court for the Eastern District of California on January 16, 2024, recalls an all-too familiar jail story. A wheelchair-bound detainee named Gregory Cantu was denied anti-seizure medication after arriving at Kings County Jail in Hanford on a probation violation. Despite numerous requests from Cantu and his parents, the medication was not provided. Six weeks later, he was found dead from a fatal seizure on April 19, 2019.

The jail's healthcare was being provided under contract from Alabama-based NaphCare, though the neglect that Cantu's survivors alleged he suffered has been attributed to any of numerous other players in the business of providing private, for-profit

| INSIDE | |
| --- | --- |
| From the Editor | 9 |
| 15 Dead, 16 Fired at Louisville Jail | 14 |
| CDCR Locked Down After Riot | 15 |
| $340,000 to Exonerated Md. Prisoner | 20 |
| Parole, Probation Driving Incarceration | 26 |
| Grand Jury Slams Sacramento Jail | 28 |
| 9 Employees Arrested at S.C. Jail | 34 |
| Exceptional Punishments | 36 |
| $11.6m in HRDC Debit Release Card Case | 42 |
| Ga. Sheriff Gropes TV Judge's Breast | 43 |
| Corrupt Former Ala. Sheriff Denied Parole | 47 |
| Historic Ruling at BOP Calif. "Rape Club" | 60 |
| News In Brief | 61 |

healthcare to the incarcerated, and for the same reason: Money.

When a county like King's County cedes jail healthcare to a private firm like NaphCare, it gives up control over that vital function in order to save money. In turn, NaphCare and other firms who take these jail and prison contracts are incentivized to cut costs—and though all parties involved invariably deny it, the easiest way to cut costs is simply not to provide care.

But the same tough-on-crime polices that exploded the U.S. prison population from 197,245 in 1970 to 2,068,800 in October 2021 have left the country with prisoners who are older, sicker and in need of *more* mental health services than those on the outside. Added to that is an opioid drug epidemic that leaves jails with significant populations dealing with serious preexisting medical or mental health conditions while also undergoing withdrawal.

In Cantu's case, there was just a disabled detainee, jailed for a nonviolent probation violation, who then never got the anti-seizure medication he needed to stay alive. Did someone make a decision that it's cheaper to pay the occasional settlement to a family like his if it sues? The final tab was certainly light, considering that the detainee/patient died: for his minor child, identified as "G.C.," $25,000 was paid by NaphCare and another $2,500 by King's County, including costs and fees of $8,407.25 for Cantu family attorney Stacey Cutting with Bish Law in Newhall. *See: Cantu v. Kings Cty.,* 2024 U.S. Dist. LEXIS 7787 (E.D. Cal.).

Whether in local jails or prisons, guards and administrators are ill-equipped to make

medical decisions. For that reason, until the 1970s, carceral health care was minimal, offering little more than first aid, a 1972 American Medical Association survey found. That changed in 1976 as prisoners successfully alleged that "deliberate indifference" to their medical needs violated their constitutional guarantee of protection from "unnecessary and wanton infliction of pain." *See: Estelle v. Gamble,* 429 U.S. 97 (1976).

### Saving Money Is Key

The consequence of that ruling was the emergence of the carceral healthcare industry. But for a medical professional, working in a jail or prison most likely was not on the radar. That left government officials with a recruitment problem that resulted in understaffing. They also faced tight budgets with dramatic rises in the complexity and costs of care as severe sentencing laws put more people away for longer terms, and the incarcerated population continues to age. Enter the medical profiteers, who touted a cure to the problem. Essentially, they said: *Pay us and we will take full responsibility for all aspects of the administration of detainee and prisoner health care.* Plus, they promised to do it cheaper and pass along the savings.

A few companies now dominate carceral health care, including not only NaphCare but also Centurion Health, Wellpath Holdings, PrimeCare Medical and Armor Correctional Health Services, as well as Corizon Health, which has now been split between new prison healthcare contractor YesCare and Tehum Care Services, a firm seeking to discharge much of Corizon Health's debt accrued from prisoner lawsuit verdicts and settlements,

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 2 of 74    Document 4-1



### *The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act*

**John Boston**  ☐ **Prisoners $84.95**  ☐ **Lawyers/Entities $224.95**

ISBN-13: 979-8-9854138-0-9 • Paperback, 576 pages

The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.



### *Prison Education Guide*                                    *$24.95*

**Christopher Zoukis**

ISBN: 978-0-9819385-3-0 • Paperback, 269 pages

Prison Education Guide is the most comprehensive guide to correspondence programs for prisoners available today. This exceptional book provides the reader with step by step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals. This book is an invaluable reentry tool for prisoners who seek to further their education while incarcerated and to help them prepare for life and work following their release.



### *The Habeas Citebook: Ineffective Assistance of Counsel, Second Edition*        *$49.95*

**Brandon Sample & Alissa Hull**

ISBN: 978-0-9819385-4-7 • Paperback, 275 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### *Disciplinary Self-Help Litigation Manual, Second Edition*        *$49.95*

**Dan Manville**

ISBN: 978-0-9819385-2-3 • Paperback, 355 pages

The Disciplinary Self-Help Litigation Manual, Second Edition, by Dan Manville, is the third in a series of books by Prison Legal News Publishing. It is designed to inform prisoners of their rights when faced with the consequences of a disciplinary hearing. This authoritative and comprehensive work educates prisoners about their rights throughout this process and helps guide them at all stages, from administrative hearing through litigation. The Manual is an invaluable how-to guide that offers step-by-step information for both state and federal prisoners, and includes a 50-state analysis of relevant case law and an extensive case law citation index.



### *The Habeas Citebook: Prosecutorial Misconduct*        *$59.95*

**Alissa Hull**

ISBN-13: 978-0-9819385-5-4 • Paperback, 300 pages

The Habeas Citebook: Prosecutorial Misconduct is the second in PLN Publishing's citebook series. It's designed to help pro se prisoner litigants identify and raise viable claims for potential habeas corpus relief based on prosecutorial misconduct in their cases. This invaluable title contains several hundred case citations from all 50 states and on the federal level, saving readers many hours of research in identifying winning arguments to successfully challenge their convictions.

---

☐ The PLRA Handbook
☐ Prison Education Guide
☐ The Habeas Citebook
☐ Disciplinary Self-Help Litigation Manual
☐ The Habeas Citebook: Prosecutorial Misconduct

Order by mail, phone, or online.     Amount enclosed _____

By: ☐ check  ☐ credit card  ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

# Prison Legal News

*a publication of the*
**Human Rights Defense Center**
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Chuck Sharman

**ASSISTANT EDITOR**
Jordan Arizmendi

**COLUMNISTS**
Michael Cohen, Mumia Abu-Jamal

**CONTRIBUTING WRITERS**
Douglas Ankney, Casey Bastian,
Kevin Bliss, Eike Blohm,
Matthew Clarke, Jo Ellen Nott,
David Reutter, Mark Wilson

**ADVERTISING COORDINATOR**
Samuel Rutherford

**HRDC LITIGATION PROJECT**
Jay Hurst—*Litigation Director*
Josh Martin—*Staff Attorney*

***PLN* is a monthly publication.**
A one year subscription is $36 for prisoners and individuals, and $96 for lawyers, institutions and foreign subscribers. Prisoner donations of less than $36 will be pro-rated at $3.00/issue. Do not send less than $20.00 at a time. *PLN* accepts credit card orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 1151**
**Lake Worth Beach, FL 33460**
**561-360-2523**
**info@prisonlegalnews.org**
**www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## NAPHCARE cont'd

as *PLN* has reported. [See: *PLN*, Jan. 2024, p.29.]

NaphCare was founded by James McLane, who in 1989 was a pharmacist at a hospital that provided pharmaceuticals to county jails. The experience spurred McLane to found Correctional Pharmacy Services. In 1993, the company's name was changed to National Prison Care, and it is now known as NaphCare, with estimated annual revenue of $483 million. In 2020, NaphCare provided health care to over 80,000 prisoners in 53 city and county jails and federal prisons throughout the nation.

A 2010 survey by Reuters found nearly half of U.S. jails had turned to privatization. By 2018, privatization overtook 62% of jails. Reuters found that larger jurisdictions often work with the local health department to provide publicly managed care. Small to midsize jurisdictions are more likely to turn to private contractors. Officials there consider privatization the smart move. "It makes sense to have someone whose specialty is to come in and take care of inmates," said Commissioner Helen Stone of Georgia's Chatham County, which includes Savannah. "Saving money" is the key.

Being rid of headaches that detract from police functions they see as their core mission has led many Sheriffs to embrace privatization of medical care. "It is a package deal and everything is done for you," said Capt. Jessica Pete, about medical contractor MEnD Correctional Contract, which has provided services to Minnesota's St. Louis County Jail since 2012. "We are getting fantastic care." That may or may not be true in St. Louis County. The story in many other jurisdictions is one of pain, misery, and even death.

### Eaten Alive by Bugs in Atlanta Jail

On August 3, 2023, the County Commission of Georgia's Fulton County unanimously voted to approve a $4 settlement with the estate of a pre-trial detainee who died in the mental health wing of the county lockup (FCJ), where NaphCare was the contracted care provider.

That's also where LaShawn Thompson, 35, was held for observation after his arrest for misdemeanor simple battery on June 12, 2022, for spitting on an officer who found him sleeping in a park. FCJ records showed detention guards and NaphCare medical staff noticed Thompson's deteriorating health but did nothing to help him before he was found dead in his cell on September 13, 2022, literally "eaten alive" by bed bugs and other vermin, an autopsy revealed.

"He was found on the floor of the jail infested with bedbugs and lice," explained Michael Harper, the Thompson family attorney. "He was neglected. He lost a lot of weight. He was dehydrated. It was just a horrible, awful death due to negligence."

A NaphCare incident report indicated that every person in the mental health unit had lice or scabies or both. More than 90% of the detainees had developed cachexia, a wasting syndrome that is typically seen in patients with advanced-stage cancer. The unit's detainees, among the most vulnerable of some 3,000 held at FCJ, were not receiving necessary medication or engaging in normal activities such as eating, using the toilet, or showering, the report also noted. Yet none of these conditions were noticed or addressed until after Thompson's death.

"The fact that people held in the custody of Fulton County were so malnourished and ill that they are experiencing muscle wasting commonly seen in people with late-stage cancers is horrifying," said Terrica Ganzy, Executive Director of the Southern Center for Human Rights. She called FCJ a public health nightmare.

Fulton County Commissioner Khadijah Abdur-Rahman said she believes that NaphCare reached a similar settlement with Thompson's family, though none was docketed or reported. That's usual in payouts by private contractors, whom courts often don't hold to account under freedom of information laws, despite the fact they take public money to provide a public service.

Thompson's estate was represented by Atlanta attorney Michael Harper. He said the family would not issue a statement on the settlement, which was reached without filing a lawsuit—in itself an indication just how indefensible the jail's position was. Abdur-Rahman kept the most important issue at the forefront: "No amount of money can bring back the life of a loved one," she said. *See: Est. of Thompson v. Fulton Cty.*, Release and Settlement Agreement (2023).

An October 2022 report by the state chapter of the American Civil Liberties Union found FCJ unmanageably overcrowded, burdening the county with "costly lawsuits and complaints alleging prolonged

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 4 of 74    Document 4-1

detention, neglect, and inhumane conditions in its jails."

The federal Department of Justice responded to the death by opening an investigation on July 13, 2023, into the jail and its "access to medical care and mental health care, use of excessive force by staff, and conditions that may give rise to violence between people incarcerated," as *PLN* reported; meanwhile Sheriff Pat Labat used the death to "call [for] building a new Fulton County Jail and Criminal Justice Complex." [See: *PLN*, May 2023, p.16.]

NaphCare has provided healthcare and mental health services at FCJ since 2017 under an initial contract for $20.7 million that has been renewed five times, rising to $27.1 million as of September 21, 2022. An amendment would add another $4.8 million. While Thompson's death hung like dense fog over its meeting, county Commissioners nonetheless extended NaphCare's contract. Both parties spoke of cooperation to improve the quality of care.

"The concerns that have come to light in recent months have not magically gone away or been resolved, but we are making progress," said Sheriff Labat. "My intent remains to provide the best standard of care for inmates while also ensuring there are no gaps in service."

### "Stingy With Care"

Always lurking in the background of conversations about carceral medical care are fiscal realities. "You've got counties being greedy, not wanting to spend money on medical care, and companies saying, 'We can do this, we can do it cheaper for you,'" said Robert Greifinger, former chief medical officer for the New York state Department of Corrections and Community Supervision. "How do companies achieve these economies? Part of it is being stingy with care."

One proven profitable policy is to avoid hospital trips. Such a provision is often embedded into a contract with incentives or fines if a set number of trips is exceeded. Before Corizon Health took over medical care at the Chatham County Jail (CCJ) in Georgia, its predecessor spent more than $1.3 million annually on hospital trips. Corizon reduced the number of trips, and its profit at CCJ soared from 14.6% in 2011 to 21.5% in 2012 and 24.2% in 2013. At the time, Corizon Health was a publicly owned corporation, so such information was available. Because NaphCare is a private company, financial details are not so readily found. Nevertheless, its contracts reveal a business model that seeks to replicate Corizon Health's success in cutting hospital trips.

The NaphCare contract with Boston's Suffolk County House of Correction capped hospital trips to 80 per month for its 1,499 detainees, with a $100 penalty imposed for every additional trip. The family of Roderick Pendleton, 51, pointed to that policy as a contributor to his death in 2015. An autopsy found he died from an untreated bowel obstruction, a serious condition that frequently requires surgery.

"He was way beyond sick," a detainee told investigators looking into Pendleton's death. "I was just thinking—why don't they just send him to the hospital?"

In the past decade, 127 deaths due to medical causes have been recorded in Massachusetts jails, most of which use private medical vendors. In the wake of Pendleton's death, NaphCare admitted that it underbid the contract. The Suffolk sheriff told NaphCare to stick to its original bid. In 2018, NaphCare paid the Sheriff $1,300 for exceeding the contractual cap on outside hospital visits. Additionally, the Sheriff fined NaphCare $2.4 million for understaffing.

In nearby Essex County, NaphCare received $1,000 in monthly bonuses if it ordered no more than 15 emergency ambulance trips. Another $1,000 monthly bonus was paid if there were under 30 referrals to off-site physicians. These types of terms were found in the contracts of all three companies that dominated the Massachusetts carceral medical service industry over the last 10 years.

"It's hard to imagine a more blatant and inappropriate disincentive to provide care than a financial penalty," said David Fathi, director of the ACLU's National Prison Project in Washington D.C.

Incarcerated individuals have no other health care options available to them. Over more than three decades, *PLN* has published thousands of reports that detail instances when medical staff or guards had knowledge that a prisoner or detainee was in pain, yet the judgment of an underqualified or deliberately indifferent licensed "medical professional" caused guards not to intercede because the prisoner was determined to be malingering. This regularly resulted in serious injury or death.

"The biggest problem, not only with NaphCare, but with these other contractors is they try to do as least as possible under the contract," said attorney Cal Potter, who represents a Las Vegas woman whose complaints of severe abdominal pain were ignored by NaphCare staff until her condition degraded to require emergency surgery. The woman went into septic shock from an abscess in her digestive track and almost died. "You see a lot of these situations where they use physician assistants instead of a



TM

BBB A+ rating

*Conpals!*

# INMATE CONNECTIONS

## www.ConvictPenPals.com



Personal, Legal & Art/Business profiles, personal email, blogs & more! 50,000+ Hits Daily! Checks, money orders, credit cards, & Cash App accepted!

WRITE & DISCOVER ALL WE OFFER!
(Send SASE or stamp for fast reply)
465 NE 181st Ave. #308 Dept. PLN
Portland, OR 97230

EMAIL INQUIRIES, CORRLINKS, JPAY
CS@Conpals.com & Info@Conpals.com

ONLINE SIGNUP
Signup.Convictpenpals.com

¡Hablamos Español!
Since 2002

" *Huge compliments to all of you @ Conpals. When I first rec'd my CARES Act $, I treated myself to four PenPal Sites – yours is the only one I've rec'd letters from, and all from very nice individuals. – FEDERAL INMATE*



doctor or (licensed practical nurses) instead of a registered nurse," Potter said.

## Staffing Not Easily Addressed by Contract

Staffing is an issue at Nevada's Washoe County Jail (WCJ). That problem and an increase in deaths came after Sheriff Chuck Allen took office in January 1, 2015, and he sacked the previous medical contractor in favor of NaphCare. Of 13 deaths at WCJ between then and 2017, 10 were detainees who died after NaphCare was awarded a $5.9 million annual contract to provide for their care. The 13 deaths are more than the total deaths at WCJ in the eight years prior to NaphCare coming on board. It had a death rate that is five times higher than the national rate in local jails.

Allen expressed frustration with NaphCare's staffing tactics. When the old contractor left WCJ, some staff remained, but many left due to a lower salary. "We lost a lot of our institutional knowledgeable in the staff working here," Allen said. "We had it addressed immediately with NaphCare and they started increasing wages."

Like most all carceral care contracts, WCJ's contract specifies minimum hours for doctors, nurses, physician assistants and mental health providers to be present. Neither Allen nor NaphCare General Counsel Brad Cain disputes that NaphCare meets or exceeds the total number of contracted hours. But not everyone agrees due to deficiencies in specific areas.

"I struggle with that [statement]. If you give me more hours with a (registered nurse), a (licensed practical nurse), or an (emergency medical technician), but you don't give me enough mental health providers, that's a problem," said WCJ Captain Heidi Howe. "Right now we have a full time psychiatrist, we do. But we are supposed to have mental health care seven days a week and that's not happening."

The lack of properly trained staff impacts the delivery of procedures NaphCare sells as part of their solution. "Any inmate identified as being at risk of withdrawal of a specific class of substances is enrolled in NaphCare's detoxification program, and the assessment and treatment protocols used by NaphCare personnel are nationally recognized and accepted as the appropriate standard of care for these issues," Cain said.

Patients facing detox are in a fragile health condition, with a high risk of heart attack. When a detainee is forced to go "cold turkey" without weaning off the drugs slowly, it only worsens the situation. "The problem with cold turkey is the side effects make you more susceptible to morbidity and mortality," said Dr. John Dimuro, Nevada's former Chief Medical Officer.

Keely Darmody fit the criteria to be enrolled in the intoxication program, but it is evident that she was left to suffer the painful effects of withdrawal. Darmody, 25, had developed a drug habit as a means to cope with her bipolar disorder, and she was arrested in August 2016 for possessing drug paraphernalia. She was released but soon returned to WCJ for failing a drug test. NaphCare became responsible for treating her evident withdrawal symptoms.

Five days later, Darmody was found unresponsive on her "cell floor with a garbage can full of vomit at her side," reported the *Reno Gazette Journal.* "She spent the last three days of her life vomiting until she was so dehydrated she died." An autopsy found that Darmody had a high level of methamphetamine in her system, suggesting she consumed drugs while in jail. Jail command staff had no explanation for that possibility.

Richie West was arrested for operating a pain pill ring out of his father's car dealership. While at WCJ, he was enrolled in NaphCare's detoxification program. But West overdosed on the methadone that NaphCare's Dr. Mark Hahn had prescribed him. Court records state that West received two doses of Narcan to revive him. NaphCare terminated Hahn after the incident. Dr. Dimuro noted that West was a challenging case because of his addiction to pain pills and the fact he had a gastric bypass, which prevented him from digesting normal doses of pain medication. "On a general scale, it worries me that non-pain physicians are doing the weaning," Dr. Dimuro said.

"These companies are inherently motivated to make money. That's why they're in the business," said Andrew Harris, Professor of Criminology and Justice Studies at the University of Massachusetts in Lowell. "There are going to be situations where care is going to be withheld, very often with negative consequences for the patients."

## Reality Belies a Shiny Marketing Image

*PLN*'s archives are filled with reports of profiteers in the carceral medical care industry who incorporate into their bidding equation the costs of litigation and contractual fines. So while penalties cut into NaphCare's bottom line, the question is whether those penalties act to compel compliance with contractual obligations. There is no quick, easy answer to that question, for it is difficult to determine if the fines are just considered a cost of doing business.

However, at least one profiteer has publicly acknowledged that litigation is considered just another expenditure. "This is a litigious environment," said Kip Hallman, President of carceral medical care provider Wellpath Holdings. Government officials "see us as being a solution to that problem."

There are "extreme challenges" in providing medical care to the incarcerated because of "high rates of chronic complex illnesses, drug and alcohol abuse, and mental illness," said Cain. "Unfortunately, even with top-notch health care personnel, appropriate policies and procedures and advancements in technology, and vigilant prevention efforts, not every inmate death is preventable."

Marketing image and perception are essential to success in business, so NaphCare has a strong public relations staff that does a great job of portraying the company as the solution to the "extreme challenges" that carceral medical care presents.

"NaphCare remains committed to our mission to improve and save lives," said Communications Director Stephanie Coleman. That statement is consistent with the compassionate care NaphCare promises on its website.

"Our commitment to excellence has no compromise. We deliver unmatched care, raise the bar of customer service and hold our products—and ourselves—to the highest standards because our partners, patients and [employees] deserve nothing less," the website declares. "Care isn't just in our name. It's at our core. We are caring professionals who respect the dignity and rights of all members of society. United by this belief, we work as a team to improve each and every life we touch."

However, NaphCare sent Eileen Taylor, a physician assistant at Massachusetts's Essex County Jail in 2016 and 2017, a different message about her incarcerated patients. "Don't send them out [to see outside physicians] unless you absolutely, positively have to," she was reportedly informed by superiors. "NaphCare's driving force was money. It superseded everything else." That, sadly, often included basic human compassion.

Taylor, who has a worker's compensation claim against NaphCare and is part of a group suing the company over pay, said costs were often cited by the firm as a reason for denying requests for diagnostic needs such as urgent blood tests. Other orders, she said, would be changed by NaphCare's off-sight centralized medical staff.

Kevin Chamberlain, a detainee who arrived at the jail in 2017, was a 66-year-old Vietnam War veteran. Jailed 43 days for a probation violation for driving under the influence with a suspended license, he spent nearly the whole time in the infirmary.

"He was screaming about being in pain," recalled Taylor. "Maybe they'll con you 90% of the time, but you better watch out for the 10% of the time that they're not."

Indeed, Chamberlain had a history of heart trouble and blood clots. "He'd call me at night, and he would cry," said his wife, Susan. He told her, "I'm not going to make it." Susan's visits were denied because guards said, "He's not medically cleared."

Taylor recalled Chamberlain as cantankerous, but she said he wasn't a person given to exaggerating his symptoms. He was left to languish until he was found unresponsive in his cell on March 28, 2017. Efforts to revive him failed. An autopsy said he died of heart disease and untreated blood clots.

A growing number of lawsuits against NaphCare casts doubt whether its stated mission to "blaze the trail" and "go above and beyond" to "treat everyone how we want to be treated" drives the company. Or is it, as Taylor said, that the "driving force [is] money?"

### "Massive" $24 Million Punitive Damages in Washington Case

A federal jury sitting in the District Court for the Eastern District of Washington State sent NaphCare its own message about the care provided to Cindy Lou Hill, 55, at Spokane County Jail (SCJ); it awarded her estate nearly $27 million in July 2022, as *PLN* reported, including $24 million in punitive damages against NaphCare. [See: *PLN*, Oct. 2023, p.27.]

In August 2018, Hill was found in a fetal position on her cell floor, screaming from intense abdominal pain. Her cellmate dragged her across the room to the door because she couldn't reach it on her own. NaphCare Nurse Hannah Gubitz determined Hill was suffering heroin withdrawal and had her moved to a medical cell. But her condition was not brought to the attention of a doctor nor was she taken to a hospital. Guards checked on her, but she had no more medical evaluations, refusing the last one offered to her just two-and-a-half hours before she was found dead. An autopsy revealed a ruptured duodenum that became infected and killed her.

According to the federal Bureau of Justice statistics, Hill was the eighth person to die in SCJ within 14 months. But one of the "benefits" to a government of privatizing healthcare is to reduce liability risk. In Hill's case it didn't work; federal District Judge Mary Dimke ruled in May 2022 that Spokane County couldn't dodge responsibility for Hill's death, after finding that six hours of critical surveillance video had been deleted "with an intent to avoid



"...an essential resource..."
—Peter Schmidt, Publisher, *Punch & Jurists*

The **HABEAS CITEBOOK:** Ineffective Assistance of Counsel

2nd EDITION

By **BRANDON SAMPLE & ALISSA HULL**

Edited by **SUSAN SCHWARTZKOPF**
Foreword by **ELIZABETH ALEXANDER**

"...handy and easy-to-use... "—Kent Russell

## The Habeas Citebook *(2nd edition)*
### by Brandon Sample and Alissa Hull

The second edition of *The Habeas Citebook* is now available! Published by Prison Legal News, it is designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief.

This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel. It will save litigants thousands of hours of research and it focuses on the winning cases criminal defendants need to successfully challenge their convictions.

Well organized into 52 concise chapters, this easy-to-use book puts the law at the reader's fingertips.

**Price: $49.95**
*(shipping included)*
**275 pages**

*Order by mail, phone, or online.*

Amount enclosed for *Habeas Citebook* _____ By: ☐ check ☐ credit card ☐ money order

Name: _____ DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____



**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 7 of 74    Document 4-1

its litigation obligations." SCJ saved footage showing Hill's transfer and from the hour before her death, too. But the video in the middle wasn't saved, and the county couldn't explain the gap to Dimke's satisfaction.

"Spokane County offers the Court no explanation—credible or otherwise—about why someone at Spokane County Detention Services made the intentional choice to preserve video from 8:43 a.m. to 9:15 a.m. and 4 p.m. to 6:30 p.m. yet chose to allow the portion from 9:15 a.m. to 4 p.m. to be permanently destroyed," she wrote in the ruling.

"It's massive," said Ed Budge, the attorney for Hill's Estate, about the verdict. "It was absolutely the right decision. The jury recognized that a message needed to be sent."

Spokane County was pushed into its initial six-month $2.6 million contract with NaphCare in 2016 because it could not find enough nurses for its own medical staff. While the contract solved those staffing issues, multiple nurses said publicly that NaphCare's takeover and cost-cutting measures were leading to lower-quality care. For example, detainee Bryan Monnin went 40 days with an untreated elbow injury; detainee Patricia Swiger went weeks without getting her medication; and detainee Kurt Warren had MRSA for weeks before he was treated. NaphCare nurses ignored Warren's infection, which spread and eventually required surgery.

The county currently pays NaphCare $7 million annually to provide medical care at SCJ. Despite the big settlement after Hill's death and other published failures in providing care, county commissioners have voiced no concerns about NaphCare's performance.

## NaphCare Avoids Getting Sucked into Ohio Jail Injury Case

In most instances of neglect or deliberate indifference, government officials usually support their contractors. The Sheriff's Office in Ohio's Montgomery County took a different tact when facing liability for injuries to former detainee Joseph Guglielmo. The homeless veteran sustained injuries that left him in a wheelchair when he was allegedly beaten brutally by guards in January 2015 as other guards blocked the view of a camera. Guglielmo sued Sheriff Phil Plummer and the county. The Sheriff then filed a third-party complaint accusing

NaphCare of deliberate indifference to the detainee's serious medical need.

The Sheriff's legal complaint made other attempts to distance jailers from Guglielmo's injuries, saying he entered the jail with head injuries from fighting with Dayton police and incurred additional injuries from banging his head against a wall. As for the scuffle with guards, the Sheriff insisted they used "reasonable" force and it was a NaphCare nurse who provided deficient care when she gave Guglielmo an ice pack and had him placed in an observation cell after the altercation. He was later found unresponsive in his cell before he was taken to a hospital where he underwent surgery and spent two months in a coma, from which he emerged wheelchair-bound and with cognitive impairments.

Fortunately for NaphCare, the federal court for the Southern District of Ohio didn't buy the county's arguments and granted its motion to dismiss the county's third-party complaint in December 2017; represented by attorneys with the Brannon Law Firm in Dayton, Guglielmo went on to settle with the county for $5.6 million in June 2019. *See: Gulglielmo v. Montgomery Cty*, 2017 U.S. Dist. LEXIS 198853 (S.D. Ohio); and 2019 U.S. Dist. LEXIS 93854 (S.D. Ohio). Perhaps fortunately for the county, NaphCare apparently holds no grudge; it still provides healthcare to detainees in the county jail.

*PLN* has published numerous reports about NaphCare and allegations of deficient medical care, compiling a library of 96 complaints, briefs, and articles. One report covered avoidable deaths of dozens of prisoners in its home state of Alabama due to NaphCare cost-cutting measures, while another detailed 42 more state prisoner deaths to complications from untreated HIV; the state DOC canceled its contract with the firm in 2003, after just two years. [See: *PLN,* Oct. 2003, p.1; and Aug. 2005, p.28.]

For every big prison healthcare failure, there are hundreds, if not thousands, of

smaller instances of unnecessary pain, suffering and death. The only thing that changes are the names and locations. Meanwhile, NaphCare continues to represent it is going "above and beyond" to provide compassionate care. However, the federal government caught NaphCare cheating and imposed a six-figure fine.

"Specifically, the United States alleged that, when certain physicians did not indicate the type of service performed on onsite visit sheets, NaphCare charged the government at higher-level services than were provided," the U.S. Department of Justice (DOJ) said, announcing a 2021 settlement that required NaphCare to pay $694,593 to settle a False Claims Act complaint for services between January 2014 and June 2020 at the federal Bureau of Prisons (BOP) lockup in Terre Haute, Indiana. "The settlement also resolves allegations that, for two other physicians at BOP's facility in Victorville, California, NaphCare similarly submitted claims that included higher-level services than those that were actually performed."

A report issued by DOJ's Office of the Inspector General (OIG) in 2022 questioned the cost effectiveness in pricing BOP's medical contracts. "Because the BOP's award pricing structure consists of premiums on Medicare rates, as well as a percentage markup on out-of-network costs, we found that the awards provided little incentive for NaphCare to reduce healthcare costs or ensure accurate invoices, as higher medical bills resulted in larger contractor payments," the OIG report stated.

OIG also found that BOP's "insufficient oversight" contributed to "unallowable and unsupported" expenditures, as well as

**9th Ed. of Winning Habeas Corpus & Post Conviction Relief. Case reviews to include Supreme Court thru *Shoop v Hill*, 139 S. Ct. 504 (2019).** Atty. Kent Russel writes: "Now that I've been turned on to Winning Habeas Corpus, I always make sure it's close at hand." **Power packed 635 pages** - NOT WHITE SPACE. **Write your brief directly from the book, actual quotes of judge**

- Ineffective Assistance of Counsel
- Habeas Corpus law
- Plea Agreement
- Actual innocence
- Post-Trial Motions
- Equitable tolling

**Price to Prisoners $60.50**
**Send Order to:** Fast Law Publishing
PO Box 2315
Port Orchard, WA 98366
www.fastlaw.org

**WINNING HABEAS CORPUS AND POST CONVICTION RELIEF**
2021
**9th Edition**

*Written and Edited by fredErick Stephens*

"wasteful pharmaceutical costs and interest payments." NaphCare struggled with "challenges in fully accomplishing award deliverables"—i.e., complying with terms of its contract—but BOP struggled with "untimely approval for healthcare visits." The prison agency "also did not properly complete required contractor performance assessments," the OIG report stated.

### A New Chance in Arizona

Despite this dismal performance track record, the Arizona DOC awarded Naph-Care a five-year $1.4 billion contract on May 27, 2022, representing a 74% increase in the amount of money the state pays to provide health care for each prisoner every day. DOC was compelled to make changes after the failure of Centurion Health to satisfy the federal court for the District of Arizona that it was providing a constitutionally minimal level of care; in fact, the Court found the provision of healthcare was frankly awful, as *PLN* reported. [See: *PLN,* December 2022, p.1.]

Arizona officials have bet that Naph-Care has learned from its mistakes, like the big one in Alabama two decades ago, and is now ready to manage the state's 40,951 prisoners—even though when Alabama cancelled NaphCare's contract in 2003, the firm was responsible only for 27,727 prisoners.

A closer look at procuring officials reveals a cozy relationship with NaphCare. DOC Director David Shinn was a former Warden at BOP's Federal Correctional Institution in Victorville, California, where NaphCare was hit with a False Claims Act violation. Larry Gann, DOC's Assistant Director of Medical Services Monitoring Bureau who participated in the procurement process, testified about his background in federal court in November 2021, revealing that he worked for Naph-Care as Director of Nursing at a Nevada prison in 2006. For the next nine years, he worked in various capacities for NaphCare, becoming a vice-president in 2015. Gann said he turned the company's situation around at the Nevada prison while gaining profitability. Shinn seems sold that Gann and NaphCare can pull Arizona out from under federal court oversight, too.

"In considering our selection of a new healthcare partner, providing maximum savings to the Arizona taxpayer and providing the highest-quality care for the inmates in our custody were top priorities," Shinn said. "We believe NaphCare was the best-possible choice in these areas."

Statistically speaking, DOC faces long odds to win that $1.4 billion bet. A *Reuters News* "review of deaths in more than 500 jails found that, from 2016 to 2018, those relying on one of the five leading jail health-care contractors had higher death rates than facilities where medical services are run by government agencies." That analysis covered deaths not only from illnesses and medical conditions but also from suicide, drugs and alcohol. It found that jails and "publicly managed medical services" in prisons averaged 12.8 deaths per 10,000 incarcerated people, while lockups where healthcare was provided by NaphCare or another of the five largest players in the carceral healthcare field had an *extra* 2.3 to 7.4 deaths per 10,000. Those rates were "18% to 58% higher, depending upon the company."

Finally, the *Reuters News* report found that jails where NaphCare and Armor operated "had the highest death rates"—20.2 and 18.8 deaths per 10,000 people incarcerated, respectively. Rates for the other top-five profiteers were 16 per 10,000 for Corizon, 15.9 for Wellpath and 15.1 for PrimeCare.

The losers in this equation, of course, are the prisoners and detainees who fall victim to carceral medical care profiteers. They are regularly left to languish in an isolation cell and suffer excruciatingly painful deaths or life-changing medical catastrophes—typically after prevention and intervention would have reduced the seriousness of an injury or prevented death. The evidence often shows the prisoner pleaded for medical care and was ignored, accused of malingering or given ineffective remedies. Sadly, very few cases result in a verdict or settlement to compel one of these profiteers to compensate for injuries caused. Instead, when one contractor fails and public heat is applied, jurisdictions believe the solution is just to find another provider.

In the small constellation of carceral healthcare giants, NaphCare is the brightest current star thanks to its big contract with the Arizona DOC. That shine is greatly diminished, though, by the company's dubious distinction as the deadliest private prison healthcare provider.

The question now is this: Will Naph-Care become the trail blazer it claims to be, with its doctors and nurses treating prisoners as they themselves wish to be treated? Or will it remain at the altar of carceral health industry profits, offering up sacrifices of human misery and death? *PLN* will update developments as they are available. ◼

Additional sources: *Arizona Republic, Atlanta Journal-Constitution, Center Square, Dayton Daily News, Reuters News, Seattle Times, Spokane Spokesman-Review, WABE, WAGA, WBUR*



# PenPals.Buzz

### A SNAPTURA COMPANY

## Ready to join America's fastest-growing prison pen pal site?

- ✓ **Best Customer Service!**
- ✓ **Pay Via Check or Online**
- ✓ **Seen on TikTok & Google**
- ✓ **Messages Sent Daily**

All orders processed within 48 hours.

Institutional email?
**help@penpals.buzz**

## Send SASE for our FREE Brochure
PenPals.Buzz, 859 Washington Street #215
Red Bluff, CA  96080

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 9 of 74    Document 4-1

# From the Editor

*by Paul Wright*

Karl Marx wrote that history repeats itself, first as tragedy then as farce. Sadly, the history of prison privatization in America is anything but farcical. Through much of the 19th century many prisons and jails in the US were privately operated or run with the prisoners being kept by private businesses in exchange for their labor. By the early 20th century wide swaths of the American gulag were being run by the convict leasing system and much of the early American road system was built by such prison slave labor.

At the beginning of the 20th century, American public opinion was turning against private prisons as their corruption and brutality became better known. By the time of the Depression in 1929 local, state and the federal government were the sole managers of the American gulag, with often dismal results. That status quo remained until the early 1980s when we saw a return of private prisons, first with Corrections Corporation of America and then private, for profit health companies like Prison Health Services.

Forty years later, it is readily apparent why the private prison industry has previously been shut down and run out of business. This issue's cover story on Naphcare is pretty much the same as every story we have run on private, for profit prison health care companies. Their entire business model is premised on the notion that they get the government to pay as much as possible for health care and then they deliver as little as possible. The HMO from hell business model. The tragedy of course is that it necessarily kills, cripples and maims untold hundreds or thousands of sick prisoners who actually need medical care each year.

The harm these companies inflict is seen as a necessary by product of their greed and desire for profit. Of course, government run prison and jail health care is rarely any better in terms of medical outcomes. One of the big lies of privatized health care is that somehow this will save the government money. Four decades into the prison privatization experience and no one has shown that governments save any money. While the private corporations may do the job for less money, that price differential simply becomes their corporate profit.

The miserable and deadly failings of private health care companies are well known and well documented. For decades the story and pattern remain the same yet with the possible exception of Virginia, no prison or jail that has privatized their health care system has reverted it back to government control. Scandals, exposes, body counts and corruption simply leads to a new contractor coming in who does as bad or worse a job than their predecessor did. To date, no one in a position of power in the US seems concerned about it and if anything, the privatization of prison health care is accelerating not slowing down. We will continue reporting on developments as they occur.

Enjoy this issue of *PLN* and encourage others to subscribe. 🖋

# Woman Denied Cardiac Care in Federal Prison in Texas—Despite Personal Assurance of BOP Medical Director

In September 2023, an elderly prisoner went into cardiac arrest at the Federal Medical Center (FMC) in Carswell, Texas, after the Bureau of Prisons (BOP) Medical Director had assured her sentencing judge that he would personally see to her care yet failed to do so.

"That was my mistake," Dr. Mark Holbrook told Judge Robin Rosenberg in federal court for the Southern District of Florida.

His admission came during a lengthy status hearing held over September 19 and 21, 2023, in the case of Suzanne Ellen Kaye, 61. Under the online identity of "Angry Patriot Hippie," she threatened to shoot FBI agents "in the fucking ass" after the insurrection at the U.S. Capitol on January 6, 2021. For that she was tried

in June 2022 for making threats using interstate communications. When a jury convicted her, she went into cardiac arrest on the courtroom floor. Nevertheless, she was sentenced in April 2023 to 18 months in prison—based upon Holbrook's now-broken promise. *See: United States v. Kaye*, USDC (S.D. Fla.), Case No. 9:21-cr-80039.

The Court's status hearing followed another cardiac event Kaye suffered in September 2023 on the cell floor of fellow prisoner Katherine Moore, who wrote to the judge: "Granny's eyes were wide open, but you could see that the light was no longer there."

Medics were able to revive Kaye, who remains at the prison, where she described medical care as "nothing short of torture."

Regarding Holbrook and his promise, Assistant Federal Public Defender Kristy Militello said, "I'm not saying he lied—maybe he meant to and he forgot—but it is inexcusable in my opinion."

She also pointed to notes made by doctors in Kaye's medical file indicating that she might be faking her symptoms. Prison Clinical Director Maitee Serrano-Mercado pushed back against that, calling what Kaye suffered a "pseudo seizure" that induced real symptoms.

The only federal medical prison for women, FMC-Carswell lost its accreditation during the COVID-19 pandemic and has yet to regain it. 🖋

Additional source: *Palm Beach Post*

# Drunken "Karen" Jail Guard in Michigan Invades Former Home, Demands to Speak to Prosecutor When Cops Arrive

After a 20-year veteran guard at Michigan's Bay County Jail was caught drunk in the wrong home in July 2023, he tried to exert his privilege by demanding to speak to the county prosecutor when police arrived. They ignored him, though, so Sgt. Lester A. Cousineau, Jr., 48, appeared in court on October 2, 2023, for sentencing on one count of entry without permission.

The incident unfolded on July 14, 2023, when Cousineau apparently stocked up on Burger King and booze before he drove home and passed out in the living room recliner.

Except, it wasn't his home anymore.

Jimmy Duncan, who has owned the home for eight years, was out. A teenage house-sitter who found burger wrappers on the floor saw the stranger snoozing in the recliner. He then ran to the basement for a hammer and called Duncan, who called 911.

Police responded and briefly detained the hammer-holding teen before Duncan's son arrived. He identified Cousineau as the home's former owner and said he has a drinking problem. Cops ordered the guard outside, but he retreated deeper into the home. Eventually he returned to the recliner, where he was found passed out yet again.

Once handcuffed and placed in a police patrol vehicle, Cousineau began banging on the car and shouting, "I want to speak with Curt the prosecutor now"— apparently a reference to Arenac County Prosecutor Curtis G. Broughton. Like those self-important internet "Karens" reviled for demanding to speak to a manager, Cousineau was justly ignored. Instead cops noted that he asked, "Where am I? Why are you here? How did I get here?"

At the Arenac County Jail, his blood alcohol content was measured at 0.118%, far exceeding the 0.08% legal limit for driving. The next day, he posted a $3,000 cash bond and was released. He was arraigned in Arenac County District Court on July 25, 2023, pleading no contest to the charge the following month. In October 2023, sentencing was delayed for one year, leaving Cousineau effectively on probation. Bay County Sheriff Troy R. Cunningham said the guard also remains on personal leave from his job at the county jail.

Source: *Michigan Advance Newspapers, Saginaw News, WJRT*

# With Push to Empty North Carolina's Death Row Comes Another to End Life Without Parole

Leaving office at the end of 2024, North Carolina Gov. Roy Cooper (D) faces pressure from a coalition of 22 nonprofits to commute the sentences of all 136 prisoners on the state's death row now. Pressing that plea, more than 200 advocates from the N.C. Coalition for Alternatives to the Death Penalty marched on the Governor's mansion in Raleigh on December 2, 2023.

The state has not conducted an execution since 2006, but it would be unusual for a governor to single-handedly empty a state's death row. As *PLN* reported, former Oregon Gov. Kate Brown (D) succeeded before leaving office at the end of 2022, while former Louisiana Gov. Jon Bel Edwards (D) tried and failed before his term ended a year later. [See: *PLN*, Sep. 2023, p.60; and Dec. 2023, p.48.]

Even if North Carolina's condemned prisoners were granted clemency, they would almost certainly face life without the possibility of parole (LWOP)—unless state lawmakers pass HB 697. Known as the Prison Resources Repurposing Act (PRRA), it was created by two state prisoners sentenced to LWOP, Phillip Vance Smith II and Timothy W. Johnson.

PRRA is not a "get out of jail" card; it includes educational, occupational and behavioral goals that those with long-term sentences must work toward over a 20-year period. Even then, release must be approved by the state Post-Release Supervision and Parole Commission. But the bill does not require additional funding, repurposing existing rehabilitation resources instead.

"To do nothing will only exacerbate high recidivism rates, which lead to violent crime," added the two.

Duke University researchers found that race is the primary driver of LWOP sentences in the state, not the severity of the crime. The Sentencing Project also found that LWOP sentences unfairly affect people of color, especially those convicted before 25, a group that the nonprofit says will "age out" of criminal activity by their late 30s—when their LWOP sentences will keep them locked up, without hope of becoming productive citizens.

While acknowledging public opposition to releasing violent offenders, who make up 70% of state prison population, Smith and Johnson note that North Carolina already releases violent prisoners every day, as their sentences expire. With PRRA, though, fewer will leave decades of confinement without a trade or an education needed to establish economic security, in turn avoiding recidivism.

Sources: *Bolts Magazine, NC Newsline*



## There is Always Hope for Freedom

**BIZ BLIZZARD & ZIMMERMAN**
ATTORNEYS AND COUNSELORS AT LAW

Jacob Blizzard, Attorney
Texas Board of Legal Specialization Certified
Criminal Law | Criminal Appeals

### Texas and Federal

*Post-Conviction Appeals - Texas 11.07 Habeas Corpus*
*Sentence Reduction - Sentence Modification*
*2254-2255 Federal Habeas Corpus  -  821 Sentencing Relief*

BlizzardLawFirm.com        Phone: 325-326-5962        contact@blizzardlawfirm.com

Private Law Firm - Not a Pro Bono firm - Collect calls not accepted
1174 North 3rd Street, Abilene TX 79601

# Months-Long Wisconsin Prison Lockdown Prompts Lawsuits

A federal lawsuit filed on October 26, 2023, seeks class-action status for a group of Wisconsin prisoners challenging poor healthcare and conditions of confinement in the state Department of Corrections (DOC), resulting from "a prolonged, unnecessary and unexplained lockdown" that has so far lasted seven months at Waupun Correctional Institution (CI).

Faced with overcrowded and understaffed conditions at Waupun CI and Green Bay CI, DOC has kept both prisons under "modified movement" since late March 2023, with no visitors and limited time out of cell for prisoners. DOC spokesman Kevin Hoffman said a third prison in Stanley is under restrictions, too, but some access to recreation and visitors remains. The prisoners are represented in their suit by attorney Lonnie D. Story of Daytona Beach, Florida. *See: Anderson v. Wisc. Dep't of Corr.*, USDC (E.D. Wisc.), Case No. 2:23-cv-01430.

Meanwhile, the state is isolating more prisoners in "restrictive housing" (RH) as DOC's staff vacancy rate soared to 32% in October 2023. At 54%, Waupun CI had the highest rate, while also reporting two deaths during the long lockdown. The October 2023 death of Tyshun L. Lemons, 30, remains under investigation, though the complaint notes it may be a suicide.

Another lawsuit has been filed by the family of Dean Hoffman, 60, whose said his June 2023 suicide was both predictable and preventable, given that there is "no record" that the mentally ill prisoner "receiv[ed] any psychological services while in solitary confinement." Story, who is also representing the family, likened the RH cell where Hoffman was held to a "concrete coffin." *See: Hoffman v. Wisc.*, USDC (E.D. Wisc.), Case No. 1:23-cv-00553.

DOC says that 44% of staff positions are vacant at Green Bay CI; the number was 47% at Columbia CI and 48% at Dodge CI. The prisons are overcrowded by some 400 prisoners at Dodge CI and more than 200 at Green Bay CI. The maximum-security lockup for women, Taycheedah CI, was 200 prisoners over capacity and operating with just two-thirds of its needed staff. Amid these conditions, prisoner Cindy Schulz-Juedes, 68, was found unresponsive in her cell and declared dead on July 19, 2023.

Fellow prisoner Taylor Sanchez, 27, was charged with her murder on September 1, 2023.

The lockdowns have resulted in mandatory overtime for guards, many working several 16-hour days weekly. Medical and mental health care delivery has slowed for prisoners, many of whom resort to self-harm to see a doctor more quickly. DOC has put more prisoners in "disciplinary" RH and, when that fails, in "administrative" RH. Both mean isolation and loss of privileges in conditions similar to solitary confinement. There were 957 prisoners held in the two types of RH in August 2023, the most since May 2019.

Of that number, about 12%—122 prisoners—had been diagnosed with a serious mental illness (SMI). At state prisons in Columbia, Green Bay and Waupun, the number of prisoners with SMI is the highest since record-keeping began in 2019. Underscoring how dangerous this situation is, a 2016 report by the National Institute of Justice (NIJ) found a significant correlation between restrictive housing and prisoner suicides. *See: Restrictive Housing in the U.S.—Issues, Challenges, and Future Directions*, NIJ (Nov. 2016).

Unsurprisingly, DOC ended its fiscal year on June 30, 2023, with 378 reported assaults or attempted assaults on staff, the highest level in 10 years. State lawmakers are throwing more money at the problem, hiking hourly pay for guards from $22 to $33. But for now the state is apparently using lockdowns to deal with overcrowding and understaffing.

As if conditions weren't bad enough, Green Bay CI also suffered a rodent infestation earlier in 2023. Prisoners at the maximum-security lockup reported using rolled-up towels to keep mice from running under cell doors. Hoffman said the problem was now under control. ◾

Additional sources: *Fon du Lac Reporter, Green Bay Press-Gazette, New York Times, WEAU*

# Alaska Prisons Report Three Deaths in Three Days

The Alaska Department of Corrections (DOC) reported its first three deaths of 2024 in just five days in early January—one prisoner and two pretrial detainees.

Goose Creek Correctional Center medical personnel said the death of prisoner John Malcolm Groff, 82, on January 12, 2024, was "expected." He was serving 45 years after admitting to sexually molesting three young relatives at his cabin in 2008.

The same day, Anchorage Correctional Complex detainee Joshua Keith Zimmerman, 33, died. DOC said no foul play was suspected but did not specify a cause of death. He had been awaiting trial exactly a month since his arrest on assault and robbery charges.

On January 15, 2024, Spring Creek Correctional Center detainee Daniel Eugene Rosendahl, 37, died under the same circumstances, DOC said. He had been jailed five days on a DUI charge.

The deaths represent a grim start of the year for DOC, which counted 13 deaths in 2023 and an all-time high of 18 in 2022, according to the state chapter of the American Civil Liberties Union (ACLU). When the ACLU launched the Alaska Prison Project (APP) in September 2022 to reduce the state's high incarceration rate, DOC held 4,700 people in custody—nearly as many as the 4,980 held in Illinois' Cook County Jail in October 2023, though that county's population of 5.1 million is nearly *seven times* higher than Alaska's population of 733,276, according to July 2022 estimates by the U.S. Census Bureau.

DOC spokeswoman Betsy Holley cited a "medically fragile population" for the spate of deaths, which she called "very unfortunate." But APP Director Megan Edge pushed back, saying of the death toll: "It's a lot of very young people, people who are not in custody for very long, people who are still pretrial, and DOC gives almost zero answers as to why people are dying."

Additional sources: *Alaska Beacon, Alaska Public Media, Mat-Su Valley Frontiersman, WBEZ*

Case 2:24-cv-00981-NJ     Filed 08/02/24     Page 12 of 74     Document 4-1

# Florida County Makes Free Jail Phone Calls Available

On October 1, 2023, phone calls became free for some 860 jail detainees at the jail in Florida's Alachua County, whose Board of Commissioners voted for the change six months earlier. That brought the cost from 21 cents per minute to zero, though for no more than three daily calls.

The Board voted to provide unlimited free calling, but the plan implemented by the Alachua County Sheriff's Office (ACSO) allowed two free calls per day, each lasting up to 10 minutes and separated by at least 15 minutes.

"Start with two, see how that works," explained Deputy County Manager Carl Smart.

When commissioners heard about the two-call limit, they reportedly prevailed upon Sheriff Emery Gainey, newly appointed by Gov. Ron DeSantis (R) on October 2, 2023, to up the daily number to three. Calls must be monitored, and no calls are allowed between 10:00 p.m. and 8:00 a.m. Left unaddressed was the biggest constraint—the jail's oversized population. With 293.5 jail admissions for every 100,000 residents over 18, the county's incarceration rate is double Florida's overall rate of 143.4.

At the same April 2023 meeting where they voted to provide free calls, commissioners agreed to eliminate a kickback from private telecom giant Securus Technologies, which holds the contract to provide phone service at the jail.

"What we're giving up amounts to almost a half-million dollars," Smart estimated. "But we'll be negotiating a new contract, so hopefully that number will come down a lot."

If he is contemplating a competitive bid from another vendor, though, it's going to cost him: Under the current contract with Securus, which owns the jail's phones, the County will have to spend $800 to $1,000 per line to switch vendors.

Nevertheless, the change was celebrated by Gainesville native Graham Bernstein, 20, a University of Florida undergrad who worked with Florida Prisoner Solidarity to push the proposal through the Alachua County Labor Coalition and the Florida Student Policy Forum (FSPF) before they presented it to commissioners. He predicted it would lower recidivism rates by keeping detainees in contact with loved ones, who in turn will not be forced to sacrifice essential purchases to pay for calls. FSPF also won approval for a $1 million pilot program in the state Department of Corrections that began October 1, 2023, rewarding state prisoners for good behavior with free phone calls.

At commissioners' December 2023 meeting, Gainey said ACSO was too understaffed to fully implement the plan, resulting in more detainee fights and gang activity over phone access, plus a spike in stolen detainee phone PINs from 15 to 93 per day. He can't add phones, he said, without a dedicated "phone room," which would require even more staff he doesn't have to escort and monitor detainees using it.

But commissioners voted for Gainey to try unlimited free calling anyway, instructing him to set a per-call time limit after which a detainee has to hang up and go to the back of the line to await another turn. ◣

Source: *Gainesville Sun, Independent Florida Alligator, Main Street Daily News*

# HALE & MONICO
## AMERICA'S JUSTICE ATTORNEYS

## *Trial Attorneys Seeking Justice*

## WRONGFUL CONVICTIONS | MEDICAL MALPRACTICE
## SEXUAL ASSAULT | POLICE/PRISON ABUSE

### CALL 312.626.7698 FOR A FREE CONSULTATION

### FOR MORE INFORMATION EMAIL INFO@HALEMONICO.COM

**HALE & MONICO – 53 W. JACKSON, SUITE 334, CHICAGO, IL 60604**

# Colorado Prisoners Disciplined for Not Working Despite Ban on Prison Slavery

Although Colorado voters amended the state constitution in 2018 to ban slave labor inside state prisons, the state Department of Corrections (DOC) has continued to discipline prisoners for refusing to work—14,000 times just since 2019, according to a November *NPR News* report.

That bolsters the claims of two state prisoners suing over DOC's policy; as *PLN* reported, Richard Lilgerose and Harold Mortis filed suit in February 2022, seeking an injunction to prevent DOC from charging prisoners who refuse to work with a Class 2 disciplinary violation, which can result in a loss of earned "good time" sentence credits or even placement in solitary confinement. [See: *PLN*, Mar. 22, 2022, online.] In August 2023, a state judge hearing the case agreed that isolation, like physical punishment, may violate the constitution; however, revoking privileges like "good time" credits may not.

University of Denver assistant professor of sociology and criminology Michael Gibson-Light noted that "slavery was not abolished" by the 13th Amendment to the U.S. Constitution, "it just changed," he said, so that "now the justifications were different. They had to do with law-breaking. They had to do with vagrancy. They had to do, eventually, with drug use."

"I was actually 30 years a slave," Abron Arrington said of his long incarceration by DOC, much of it spent in isolation for refusing to work for just 13 cents an hour—time he preferred to spend studying for a physics degree. Community organizer Kym Ray of Together Colorado said that's the point of efforts to end the DOC policy—not to keep prisoners from benefitting from work programs but just "to give people the choice."

"There's a reason it's called the Emancipation Proclamation, not the compensation proclamation," Gibson-Light agreed. "It's not a question about wages. The question is about freedom."

Arrington, who was granted clemency and released in 2019, said that "[a] lot of people are making a lot of money off the system," including some 100 Colorado companies using prisoner labor for wages often far below market, plus the state and local governments using underpaid prisoners to perform maintenance and housekeeping tasks, as well as more dangerous jobs like firefighting.

Nationwide, prisoners produce an estimated $2 billion in goods and services annually, according to research by the American Civil Liberties Union and the University of Chicago Law School's Global Human Rights Clinic, plus another $9 billion worth of services they provide to the prisons where they are held—usually for little or no money.

"It's a massive labor force that is completely hidden from view," Gibson-Light said. "And that's by design."

In Colorado, DOC still pays prisoners as little as 13 cents hourly, though the rate for some jobs rises to $2. That's better than nine states where prisoners earn nothing—Maine, Nevada, Texas, Arkansas, Mississippi, Alabama, Georgia, South Carolina and Florida. Most prison systems justify work requirements by pointing to the benefits provided post-release. But Gibson-Light calls that a lie.

"On the surface, it sounds like 'Oh, there's so many opportunities.' [But] they do not align with the realities of the labor market," he said. "You can be a barber and make good money, but you get out and you can't get a barber license if you have a record."

If the job DOC forces on a prisoner doesn't pay much and also fails to deliver benefits promised after release, there's little incentive to do it absent the threat of punishment. That's why Towards Justice attorney Valerie Collins, who is representing Lilgerose and Mortise, said that arguing about wages "muddies the water."

"We did not bring wage claims," she said, "to keep the focus on the forced nature of the work itself, in the coercion that is used to extract that labor."

Ray wants more protections and training for prisoner workers, many of whom "have lost fingers because they're working on faulty equipment or equipment that they haven't even been properly trained on."

Meanwhile, six other states—Utah, Nebraska, Vermont, Oregon, Alabama and Tennessee—have followed Colorado and passed constitutional amendments to close the loophole excepting prisoners from slavery bans. "This is a fast-moving train," said Abolish Slavery National Network co-founder Kamau Allen.

Source: *Bolts Magazine*

# From Prison Cook to Praised Pizza Chef

A former Pennsylvania prisoner is now a chef at a Philadelphia pizzeria, which was named one of the 50 best in the U.S. by the *Washington Post* on August 31, 2023.

Those held in the same cell block with Mike Carter may have already tried his pizza, though with more improvised ingredients. For Carter, no mozzarella, oregano, tomatoes or dough meant no problem; Cheez-It crackers, barbeque sauce and ramen noodles could all be purchased at the commissary, and they made up his pizza behind bars.

Carter honed a natural curiosity about cooking over 12 years of incarceration, beginning when he was just 16. Before his last release in 2017, he served three sentences, joining the 44% of released American prisoners who return to jail or prison. Staying out was difficult, until he wrapped up his last sentence—for a probation violation—and found a job at Down North Pizza. One of Philadelphia's most popular restaurants, it hires only former prisoners.

The restaurant is a project of Down North Foundation, an anti-recidivism nonprofit. Founder Muhammad Abdul-Hadi said that for released prisoners, "There's a big stigma. They've been dehumanized for so long. We focus on humanizing individuals, and allowing people to see that they should not be defined by a mistake they made."

In addition to steady work, Down North Pizza also offers employees housing and pro bono legal services. Now its Executive Chef, Carter has also launched a catering service on the side, and he's writing a cookbook to be published in 2025.

"We are not our worst mistakes," he said. "There is redemption for everybody."

Source: *Washington Post*

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 14 of 74    Document 4-1    April 2024

# Louisville Jail Records 15 Detainee Deaths, 16 Employees Fired

On September 26, 2023, Louisville Metro Corrections Department (LMCD) suspended guard Terry Henderson after he crashed his car into a vehicle driven by fellow guard Andrew Young. Responding Louisville Metro Police Department (LMPD) officers reportedly suspected Henderson was drunk, but no charges were filed. Young was treated at a hospital and released. But that wasn't the only guard misconduct to embarrass the jail.

The day before, on September 25, 2023, former guard Yasmany Leyva was charged with felony shoplifting, after he was identified by a fellow guard in surveillance photos of a suspect at a Lowe's Home Improvement store. Ironically, before Leyva was fired from LMCD in 2022, he worked off-duty as a security guard at a Kroger grocery store and made at least 20 shoplifting arrests between 2018 and 2020. He was one of 16 jail employees fired for misconduct between November 2021 and July 2023—a period when the jail also recorded 15 detainee deaths.

"A lot of folks that didn't need to be here were being … let go," said LMCD Director Jerry Collins.

Leyva's firing followed kidnapping charges filed against him in nearby Indiana, where he set up a vigilante sting to recover a Mercedes Benz stolen by a potential buyer who took it for a test drive and never returned. Luring the man to Indiana, Leyva took him hostage and held him at gunpoint for the drive back to Kentucky. There he summoned LMPD officers, misleading them about the trip across the state line. Charges against him were dropped, however, when the victim stopped cooperating.

Most of the employee separations were for less dramatic crimes. As *PLN* reported, guard Cynthia Kosman, 29, was arrested for allegedly smuggling drugs into the lockup in April 2023, while Marissa Brown, a contract food services employee also known as Carlotta Phillips, was arrested on similar charges in May 2022. [See: *PLN*, June 2023, p.63; and July 2022, p.63.]

In February 2023, Collins fired guard Ramon Skaggs, after fellow guards and a jail nurse complained that he indulged an admitted fetish by running his fingers through their hair. The unnamed nurse told investigators, "I thought I was going to have a panic attack and die right there, because I didn't know what his intentions were."

Guard Daniel Wells resigned in June 2023, after the FBI "returned" a case to LMCD involving accusations that he struck an unnamed detainee in 2021 and "made little effort to temper the amount of force."

Henderson, the most recently suspended guard, was hired by LMCD in 2021 despite two prior DUI convictions. The first, for a single-car smash-up in March 2019, cost him his previous job as a LMPD cop. The second, just months later in June 2019, resulted in a six-month suspension of his driver's license and a 30-day jail term, with 15 days credit for time served after his arrest. Henderson was also the subject of an incident report filed in August 2022 after he punched a woman detainee five times, a use of force LMCD investigators wrote "was completely unnecessary and avoidable." Additionally, LMCD is investigating a complaint filed by Young after the crash. 🔥

Sources: *Louisville Courier-Journal, WDRB*

# Parole Hearing Preparation & Representation

- Experienced Parole & Writ Attorney

- Thorough board preparation by a Certified OMCP Counselor, formerly incarcerated for 29 years, successfully released through CDCR-BPH parole board process & successful immigration hearing

- Re-entry & reintegration expertise

- Packets--letters of support, programming plans, housing & job offers, & letters of remorse

- C-file reviews & evaluations



POST-CONVICTION ADVOCATES

Freeing the unjustly incarcerated. Amplifying stolen voices. Rebuilding lives.

(213) 332-2850

Legal Mail:

5318 E 2nd St. #999,

Long Beach, CA 90803

www.PCAlaw.org

*SE HABLA ESPAÑOL*

# 428 Georgia Prison Employees Criminally Charged in Five Years

On February 28, 2024, prisoner advocates held a press conference outside the Georgia State Capitol in Atlanta, demanding that state lawmakers address twin afflictions in the state's beleaguered Department of Corrections (DOC), whose 51,000 prisoners now represent its highest population in 15 years, even as the number of prison guards has plunged to its lowest point in 24 years.

Fueling the outcry was a report by the *Atlanta Journal–Constitution* in September 2023 that 428 DOC employees had been arrested for alleged criminal behavior just since 2018—an average over seven each month. Of those arrests, 80% involved contraband smuggling, and 80% of those arrested were women under 30. Half had experienced financial difficulties with prior evictions or civil debt judgements.

The numbers reflect DOC's struggles to recruit employees, often hiring young women with no law enforcement experience. On top of that, DOC prison guards are paid less than those in many other states. Neighboring Alabama, where low salaries and deplorable conditions have persisted for decades, now pays its guards significantly more.

The consequence of all this smuggling is a flow of contraband that fuels violence even as it enables some prisoners to continue illegal activity behind bars. Some low-level offenders also pick up training in higher-level criminal enterprise.

DOC won't blame its own for the problem, pointing to the occasional smuggling bust of non-employees. But evidence betrays a system where prisoners rule, not guards, and corruption dates back for years: In 2016, following a two-year investigation of "unprecedented" scope, the *Washington Post* reported that 46 DOC guards had been found involved in smuggling.

Whether lured by financial desperation or recruited by gangs or even swept up in a romantic relationship with a prisoner, guards are fueling the flow of illegal goods: drugs, alcohol, cigarettes, cellphones and weapons. Some of the more unusual delivery methods have included multi colored highlighter pens; reassembled Hot Pockets microwave snacks; packages of grits from Huddle House; noodle soup containers; electrical tape strapped to the groin or crotch; and even a menstrual pad. Guards have been caught looking the other way while prisoners smuggled contraband on a bus transporting them to work detail; in a van headed to medical appointments; in employee and state-owned vehicles; and in clandestine drone drops or packages tossed over a fence onto prison property.

A scandal rocked Smith State Prison in 2023, when former Warden Brian Adams was charged with bribery, making false statements, and violating his oath as a public officer, as well as violating the state's Racketeer Influenced and Corrupt Organizations (RICO) Act. As *PLN* reported, investigators uncovered a sprawling contraband smuggling scheme carried out by the "Yves Saint Laurent Squad," led by prisoner Nathan Weekes, which paid prison employees bribes via Cash App, Western Union and cryptocurrency for contraband including marijuana and meth, as well as weapons and luxury items. [See: *PLN*, July 2023, p.11.]

Other high-ranking employees convicted in contraband schemes include Hays State Prison guard Lt. Lakeshia Thomas and Baldwin State Prison guard Lt. Tracey Wise. For smuggling drugs and synthetic marijuana, Thomas is now serving a 15-year sentence. Wise is on five years of probation as a first-time offender.

The rampant corruption poses a serious challenge to DOC's mission, prompting criticism even from prosecutors, who have joined a call for urgently need reforms, including more thorough background checks of employee applicants' financial and credit history to identify risky candidates; increased wages and benefits to attract more qualified individuals and reduce financial desperation; improved training and support to reduce vulnerability; and a zero-tolerance policy with swift prosecution to deter corruption.

Sources: *Atlanta Journal–Constitution, Fox News, Washington Post*

# California Prisons Locked Down After Massive Riot Hospitalizes Prisoner, Eight Guards

A riot broke out at Ironwood State Prison on January 31, 2024, triggering a "threat assessment" that locked down every facility run by the California Department of Corrections and Rehabilitation (CDCR). Eight staffers and one prisoner were hospitalized after the brawl. All were released the following day.

A huge group of 200 prisoners rushed at guards during a contraband investigation on the prison yard, which began after a prisoner head-butted a guard escorting him. Neither the prisoner nor the guard he assaulted was named. Fists and rocks flew during the melee before guards subdued the crowd with "chemical agents" and "non-lethal impact rounds," CDCR said. Afterward, prison officials instituted a 24-hour "modified programming" protocol, restricting activities at yards and dayrooms in all state prison facilities.

Investigators said the following day that they had so far identified 30 prisoners who participated in the uprising. Movement in Facility D at the prison also remained restricted while the investigation continued.

Located near the Arizona border, Ironwood is a Level III state prison in CDCR's four-level security designation system, adjacent to the Level II Chuckawalla Valley State Prison, which is slated to close in March 2025. Both lockups are significantly over capacity, holding 2,464 and 2,176 prisoners in facilities designed for 2,200 and 1,738, respectively.

Source: *CBS News*

**GO HOME TO YOUR LOVED ONES!**

The Law Offices of Julia Bella
Parole - Post-conviction - Appeals

Call or Write or Email:
(832) 757-9799
503 FM 359, Ste. 130 Box 228
Richmond, Texas 77406
julia@jbellalaw.com

Working zealously for you
and your family!



# One Detainee Dying Every Week in L.A. County Jails

As of December 31, 2023, Los Angeles County jails had recorded 34 detainee deaths in seven months—over one every week, far more than New York City's notorious Rikers Island complex, which recorded seven deaths during the same period.

Overcrowding is blamed for the spate of dying. The jail system averaged 103% of capacity in 2023, some weeks spiking to 116%. Processing backups left detainees sleeping on the floor of the main jail's intake area for days at a time. Those exhibiting symptoms of mental illness couldn't even lie down but remained shackled to a chair during the wait to be processed—which could take days.

Once assigned housing, mentally ill detainees have it especially bad. In their dorm on the fifth floor of Men's Central Jail, 90 detainees live in a space designed for 64, "shrouded in sheets or towels for a modicum of privacy," according to a report by the county's Sybil Brand Commission (SBC), which provides jail oversight and inspection.

That's where a formerly homeless detainee, 50-year-old Masoud Rahmati, was brushing his teeth on June 13, 2023, when he was attacked by fellow detainees for reasons that the county Sheriff's Department (LASD) called unclear. The attack was captured on video, according to family attorney Jeremy Lessem, who said "no one was paying enough attention at the time to notice." Rahmati lay injured for nearly four hours before paramedics arrived, just in time to pronounce him dead. Fellow detainees Jaime Garcia Alfaro, Carlos Morataya and George Adrian Hernandez have been charged with his murder.

A "shocked" SBC inspector who visited the jail that month, Mary Veral, compared it to a "Third World country," noting three large fires burning inside cells. Lack of supervision leaves detainees free to light fires for cooking, and a lack of smoke alarms leaves it up to the depleted guard force to notice and pull an alarm.

Unsurprisingly, many deaths are suicides, since jail conditions are a "recipe for hopelessness," as SBC Chair Mark-Anthony Clayton-Johnson noted. But LASD doesn't release names of detainees who die, and their cause of death is frequently misattributed; as *PLN* has reported, a June 2022 UCLA study found that half of "natural" deaths at the jail showed signs of physical harm. [See: *PLN*, Jan. 2023, p.52.]

Worse still, LASD may not be counting all jail deaths in the county. Dr. D. Pulane Lucas said in September 2023 that the death at the jail of her son, Stanley Wilson, Jr., was not included in the online database maintained by the county, nor in a separate database maintained by the state's Correctional Health Care Services.

Asst. Sheriff Sergio Aloma shrugged off the deaths, noting that the county's jail system is the country's largest, admitting some 60,000 detainees every year. Guards, like all LASD deputies, also got a pass from a Los Angeles County Superior Court judge, who said they didn't have to submit to interviews and photographs of tattoos marking membership in at least 18 "deputy gangs," as *PLN* reported. [See: *PLN*, Oct. 10, 2023, online.]

## "Watershed Moment"

On June 22, 2023, the federal court for the Central District of California approved a joint stipulation (JS) addressing conditions at the jail system's Inmate Reception Center (IRC), part of its on-going oversight in a case that has been pending since 1975.

For years, LASD flaunted the Court's orders, and the crisis came to a head on February 27, 2023, when attorneys representing jail detainees and prisoners from the American Civil Liberties Union (ACLU) filed for an order to show cause why defendant Sheriff Robert Luna should not be held in contempt for violating a preliminary injunction issued by the court on September 27, 2022. The Court scheduled a hearing, pressuring Luna to agree to the JS.

Under its terms, detainees may no longer be held over 24 hours in IRC—which has no beds—nor more than eight hours caged in its Clinic, or more than four hours restrained in the Clinic's "Front Bench." Detainees may not be kept over 12 hours in holding cells—which also lack beds—and never in a cell that is over capacity or unsanitary. Detainees must also have access to healthcare and mental health care, including pill call.

ACLU attorneys called the agreement "a watershed moment" in the suit's 48-year history. Their efforts were further rewarded on October 23, 2023, when the Court ordered Defendants to pay $365,274.88 in legal fees and costs to ACLU attorneys and others representing the class from Bingham McCutcheon in Los Angeles. *See: Rutherford V. Luna*, USDC (C.D. Cal.), Case No. 2:75-cv-04111.

The most lauded JS provision diverts mentally ill arrestees into 3,141 non-carceral beds for mental health treatment, with plans to add another 1,691 beds. However, LASD estimates that 40% of its 13,000 to 14,600 detainees have mental



**WERE YOU EXTRADITED TO THE UNITED STATES SUBJECT TO GUARANTEES? WERE THOSE GUARANTEES OR CONDITIONS HONORED BY THE US AUTHORITIES?**

E.C.E.U.S. is a European NGO dedicated to assisting those subject to U.S. extradition requests. If you were extradited to the U.S. subject to conditions or guarantees and those guarantees allowing for your extradition were not honored by the U.S. authorities once extradited, please contact us directly for **assistance.**

E.C.E.U.S.
David Mendoza Herrarte
117 E. Louisa St.
Seattle, WA 98102

Phone: +34 688 825 147 (Spain)
Email: ECEUS.NGO@proton.me

health needs. Though not all have been clinically diagnosed with serious mental illness (SMI), that means the additional beds—a total of 1,975 on top of the county's existing stock—are insufficient.

Days after settling the suit, on June 27, 2023, the county Board of Supervisors voted to expand a jail program that recruits and trains incarcerated peer caregivers to those suffering with SMI. The program began in 2018 and has grown to include nine volunteer mental health assistants (MHAs), who together help about 100 fellow detainees with SMI held in the jail's Forensic In-Patient (FIP) step-down units—which provide more time out of cell—reminding them to take medication and show up for programming.

The Board's vote authorizes LASD to grow the number of FIP units from 10 to 30 by 2025, noting that "the Sheriff will need to purchase or otherwise rapidly allocate key therapeutic elements to create a therapeutic physical space, which may include colorful paint, murals, aquariums, soft furniture, plants, and activity tables."

Supervisor Holly Mitchell (D-2nd Dist.), who voted for the measure, also wondered what the county was giving MHAs for their work. "It is their role that is making this successful, and I think that should be acknowledged in a significant, relevant way," she said, hoping at least for special assistance in finding jobs after release for the unpaid volunteers.

Each MHA receives at least six months of "intensive hands-on training on how to care for people with severe mental health needs," according to Supervisor Hilda Solis (D-1st Dist.). With the program expansion, over 600 detainees with SMI will get their help.

Founding program member Craigen Armstrong said MHAs do "everything from teaching financial literacy groups to cutting their toenails." Since leaving death row at San Quentin State Prison after his murder conviction was tossed in 2016, Armstrong has been held at the jail while his attorney and prosecutors argue over retrying him or accepting a plea deal with a life sentence. ◾

Additional sources: *The Appeal, Chicago Reader, Houston Public Media, LAist, Los Angeles Times*, *New York Times,* Vera Institute of Justice

# Sentencing Project Finds "Important Inroads" Against Mass Incarceration, Racial Inequality Behind Bars

On October 11, 2023, the Sentencing Project reported that the share of Black men who will experience incarceration at some point in life has declined from one in three for those born in 1981 to one in five for those born in 2001 and just now entering full adulthood. But while calling this trend an "important inroad," the "persistence of racial injustice in the criminal legal system" remains the top takeaway from *One in Five: Ending Racial Inequity in Incarceration*.

After decades of mass incarceration, the report notes recent reforms that offer hope. The U.S. prison population in 2021 had shrunk by 25% from its 2009 peak, thanks to reduced penalties for drug and property crimes. Progress is uneven, though, since Black Americans are still imprisoned at five times the rate of whites. However, decarceration efforts have reduced the Black prison population by 39% percent since its peak, including a 70% plunge since 2000 in the number of Black women in prison.

Despite these declines, the road to true equity is long. Black men were still imprisoned at 5.5 times the rate of white men in 2021, and a Black male born in 2001 is four times more likely to face imprisonment in his lifetime than a white male. Black women fared better, with an imprisonment rate 1.6 times the rate of white women in 2021.

Jail populations have also shrunk, falling 19% since 2008, with the biggest drops again notched by non-white groups. But like the inequalities in prison incarceration numbers, Black and American Indian jail imprisonment rates remain stubbornly high. Community supervision traps millions more with expensive requirements that disproportionately affect people of color.

Youth incarceration has shown progress, with a 77% drop since 2000 while racial disparities also narrowed. Black youth in 2019 were 4.4 times as likely to be incarcerated in the juvenile justice system as their white peers. American Indian youth were at their peak level of disparity in 2019, being 3.3 times as likely to be incarcerated as white youth. The report cites a need for further youth decarceration given evidence that incarceration is often neither necessary or effective for youth, and well-designed alternative-to-incarceration programs produce better public safety outcomes than locking kids up.

Although there has been a long-term crime drop in the U.S., the report warns that progress in decarceration faces an uncertain future. Any uptick in crime rates is likely to spark political backlash and threaten further progress. Already, critics are pushing to roll back reforms in places like New York City and Washington, D.C. Even after Florida voters re-enfranchised felons, GOP state lawmakers moved the goalposts to require they first pay off all fees and costs, though the state often can't say just how much that is.

Nationwide, the opioid crisis threatens to trigger a return to harsh mandatory-minimum sentences, further jeopardizing decarceration and racial justice gains. The report cautions policymakers to resist the temptation to return to failed past strategies and double-down on evidence-based solutions that prioritize public safety, equity and community well-being. ◾

Source: *The Sentencing Project*



**The Colossal Book of Criminal Citations (7th Edition) By: Richard Davis**

SALE

900+ pages
$84.95
s/h included

- **6600+ Supreme, Circuit, District,** and State Court Citations
- **200+ Topics Covering Pretrial through Post-**Conviction Events
- 500+ Legal Definitions, W/Sample Motions, Juror Questions, **Trial Strategies, and MORE!**
- 8.5 x 11 Soft Cover

**FREE!!** PCR, IAC, and Habeas Checklists only on our website.

**The Colossal Book of Civil Citations (2nd Edition) By: Richard Davis**

500+ pages
$69.95
s/h included

- **2100+ Supreme, Circuit, District,** and State Court Citations
- **60+ Topics**
- 500+ Legal Definitions
- 25+Sample Motions
- **Select Federal Statutes**
- 8.5 x 11 Soft Cover

Send Check or M.O. to Barkan Research
PO Box 352, Rapid River, MI 49878
(906) 420-1380
Credit Cards accepted
Website: www.barkanresearch.com

# HRDC Awarded Over $130,000 in Legal Costs and Fees for Defendant's "Bad Faith" in Maine Records Lawsuit

*by David M. Reutter*

On January 16, 2024, Maine's Superior Court for Kennebec County ordered state officials to pay $130,600.02 in attorney fees and legal costs to *PLN*'s publisher, the Human Rights Defense Center (HRDC), after making a rare finding that the officials exercised bad faith in repeatedly denying the nonprofit's request for public records.

Under the state Freedom of Access Act (FOAA), HRDC sent a request to the Self-Funded Risk Management Pool (SFRMP) of the Maine County Commissioners Association (MCCA) on June 18, 2021, seeking payment documentation made in settlement of a lawsuit brought by a former Kennebec County jail detainee, who accused guards of using excessive force. *See: Afanafor v. Kennebec Cty.*, USDC (D. Me.), Case No. 1:20-cf-00235.

But the only document the county provided reflected a settlement of $1—even though MCCA, which insures the county, said the settlement amount was $30,000. HRDC then filed an appeal to the county's denial. SFRMP representative Malcom Ulmer sent a copy of a *Portland Press-Herald* article in which he was quoted stating the case settled for $30,000—the same article that alerted first HRDC to the settlement. But Ulmer provided no other documents to show SFRMP actually paid $30,000 to settle the case.

On July 2, 2021, Zachary Heiden, an attorney with the Maine chapter of the American Civil Liberties Union (ACLU), sent a letter to Ulmer and Peter Marchesi, an attorney for Kennebec County, notifying them that ACLU was representing HRDC and reiterated its FOAA request. They replied that there were no more responsive documents.

HRDC then filed its FOAA complaint on July 27, 2021, arguing that no public entity settles a lawsuit for $30,000 without generating paperwork to document it. The Court denied SFRMP's motion to dismiss for untimeliness on April 28, 2022. At a hearing on September 29, 2022, Ulmer admitted he was in possession of a claim file and financial records that documented the $30,000 payment. Attempting a dodge, he claimed that HRDC had not "specifically" requested them— that is, the nonprofit hadn't guessed the right question—so he didn't release the documents. Ulmer also claimed for the first time that some documents were privileged.

On December 1, 2022, the Court rejected both arguments. Heiden's letter specifically used the phrase 'accounting records' in describing potentially responsive documents, the Court noted; so it was wrong to say that HRDC never requested the specific records that Ulmer tried to keep from disclosing. The Court also did not find it credible when Ulmer testified that "he believed that he did not have to disclose those records or assert a privilege to them because he thought HRDC was seeking only a settlement agreement."

Finding that response to the FOAA request inadequate, the Court ordered disclosure of all records that HRDC requested. SFRMP was also ordered to pay HRDC $127,127.33 in attorney fees and $3,472.69 in costs after the Court concluded it did not act in good faith but instead "adopted absurd, blatantly untrue, and inconsistent legal positions in this litigation to avoid a ruling on the merits." *See: Human Rights Def. Ctr. v. Maine Cty. Comm'rs Assoc. Self-Funded Risk Mgmt. Pool*, Maine Super. (Kennebec Cty.), Case No. CV-21-131.

# Condemned Texas Prisoner Ruled Too Mentally Ill to Execute

*by Matt Clarke.*

Condemned Texas prisoner Scott Louis Panetti, 65, was taken off the state's death row on September 27, 2023, when the federal court for the Western District of Texas found him too insane to kill—or as the Court said, because he "lacks a rational understanding of the connection between his offense and his sentence of death," so his execution "would therefore violate the Eighth Amendment's prohibition on cruel and unusual punishment."

In September 1992, Panetti's wife left him, moving in with her parents, Joe Alvarado, 55, and Amanda Alvarado, 56, at their Fredericksburg home. Panetti followed and fatally shot his in-laws, taking his wife and child hostage before surrendering hours later to police. Prior to that, Panetti had a long and well-documented history of mental illness. While serving in the Navy in 1976, he was diagnosed with depression and insomnia. After an honorable discharge in 1977, he was diagnosed with sociopathic personality disorder with the possibility of early schizophrenia. During 14 commitments to psychiatric hospitals between 1981 and 1992, possibility turned into certainty. He was diagnosed with severe schizophrenia, schizoaffective disorder and sociopathic personality disorder, aggravated by drug and alcohol abuse.

Astonishingly, Panetti was found competent to stand trial for killing his in-laws. He insisted on representing himself, wearing a burgundy cowboy costume as he rambled incoherently throughout his trial. The list of witnesses he tried to subpoena included Jesus Christ, Pope John Paul II, former Pres. John F. Kennedy (D)—who was then dead—and actress Anne Bancroft.

Standby counsel said Panetti's mental illness made it clear he was incompetent, turning the trial into "a judicial farce, and a mockery of self-representation." Nevertheless, jurors convicted Panetti of capital murder and sentenced him to death. His appeals and first round of state and federal habeas actions passed in vain.

The issue of his competency for execution was raised for the first time after a death date was set in a second round of habeas actions. Since then, "Panetti's mental health has been evaluated by a multitude of experts and courts" and "the literature on this topic has been voluminous," the district court noted, culminating in a groundbreaking decision by the Supreme Court of the U.S. that barred executing him—or any prisoner—found mentally incompetent. *See: Panetti v. Quarterman*, 551 U.S. 930 (2007).

 Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 19 of 74    Document 4-1

Texas quickly determined he was competent to remain on death row, but a challenge to that at the U.S. Court of Appeals for the Fifth Circuit delayed Panetti's execution to allow him to contest the competency determination. *See: Panetti v. Davis*, 863 F.3d 366 (5th Cir. 2017). The district court then held a three-day hearing, during which Panetti was represented by Federal Defender Amy Marie Fly and Federal Public Defenders Tivon Schardi and Donna F. Coltharp; Gregory W. Wiercioch of the University of Wisconsin Law School; and attorneys Keith S. Hampton of Austin and Michael Clark Gross of Gross and Esperanza in San Antonio.

At the hearing, the state argued that because Panetti knew he had been convicted of the murders and knew he was to be executed, he was therefore sane enough to be killed. However, defense experts testified that Panetti could not connect those dots, believing instead that his execution was a scheme to prevent him from preaching and revealing a pedophilia, corruption and drug smuggling scheme in Fredericksburg. As the Court summarized, "the Eighth Amendment demands more than a single thread of arguably rational thought in a sea of otherwise unorganized thoughts and delusions to establish that a person rationally understands the reason for his execution." It therefore prohibited Panetti's execution. See: *Panetti v. Lumpkin*, 2023 U.S. Dist. LEXIS 173754 (W.D. Tex.). ◣

# Oregon Prisoner's Parole Deferral Based on "Dangerous Offender" Statute Reversed

On August 9, 2023, the Oregon Court of Appeals reversed a decision by the state Board of Parole and Post-Prison Supervision (BPPS) deferring parole consideration for Gerald O. Person.

Sentenced as a "dangerous offender" for crimes committed in the late 1980s, Person was up for parole in 2020 when BPPS delayed his application.

The Board said that the condition which the trial court originally determined made Person dangerous—that he suffered from "a severe personality disorder indicating a propensity toward dangerous criminal activity," per ORS 161.725 (1987)—was still present and not in remission; so relying on ORS 144.228 (1987), it deferred Person's parole consideration for 24 months.

He appealed, challenging the BPPS finding that he had a "mental or emotional disturbance, deficiency, condition, or disorder" predisposing him to certain crimes, which "therefore" meant he was still a dangerous offender. The appellate court agreed that that the former finding did not adequately support the latter conclusion—in other words, that though Person may still be predisposed to criminal behavior, that didn't necessarily mean predisposition to *dangerous* crimes.

The Court first provided a detailed summary of the statutory framework for the dangerous offender statute and related caselaw, going back to a 1986 holding by the state Supreme Court that the dangerous offender law required a finding by the trial court that the defendant was "mentally abnormal" and had a propensity for "dangerous criminal activity." *See: State v. Huntley*, 302 Ore. 418 (1986).

In *Bell v. Board of Parole*, 238 Ore.App. 711 (2017), *review denied*, the Court of Appeals extended that analysis to BPPS decisions when considering dangerous offenders for parole and determining whether they still had a propensity for dangerous criminal activity. Such decisions must be based on substantial evidence, though the offender's mental or emotional condition does not have to be the same as "the specific symptoms or traits present at the time of sentencing."

With respect to Person, BPPS found that he had a condition that predisposed him "to the commission of any crime to the degree rendering [him] a danger to the health or safety of others," and that this was not in remission. That decision, the Court held, lacked substantial reasoning. While BPPS determined Person's condition predisposed him to certain unspecified crimes, that did not explain how it concluded that he still had a propensity for *dangerous* criminal activity. In short, BPPS's finding did not support its legal conclusion as required by ORS 144.228 (1987).

The case was remanded with instructions for BPPS "to craft an order that demonstrates substantial reason under the applicable standard"—meaning BPPS will likely change the wording of its order deferring Person's parole without changing its decision. Judge Josephine H. Mooney dissented, arguing that BPPS had relied on sufficient reasons and evidence to defer Person's parole for two years; despite its decision "not [being] artfully written," she opined it was "basically adequate." Person was represented by attorneys with the Office of Public Defense Services. See: *Person v. Bd. of Parole & Post-Prison Supervision*, 327 Or. App. 332 (2023). ◣

# Mourning Our Losses

**MOURNING OUR LOSSES (MOL) IS SEEKING MEMORIALS, WRITING, AND ART**

MOL was launched by a group of educators, artists, and organizers committed to the release of incarcerated people. In 2020, we began publishing memorials to honor the lives of our siblings dying from COVID-19 in jails, prisons, and detention centers. We continue to grow this platform for grief, healing, and reflection for all those affected by the death of a loved one due to poor conditions, negligence, violence, and mental health crises inside - the byproducts of mass incarceration.

We are driven by our prison experiences. Our crowd-sourced memorial site depends on our ties to you, our siblings inside. Our goal is to inform conversations about the dangers of mass incarceration by sharing stories of those we've lost. We teach the public that we're people – not numbers or "inmates." We don't use dehumanizing language in memorials, nor do we talk about the crime for which a person was convicted.

You can help by submitting a memorial for a loved one who died while incarcerated or related writing/photos/artwork (which we may not be able to return safely). When you submit, please include the name the person went by and your name (or if you want to be anonymous). Let us know if it's ok to edit errors, and if we can contact you to follow up. Write us at:

Mourning Our Losses
P.O. Box 162690
Atlanta, GA 30321

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 20 of 74    Document 4-1

# Maryland Compensates Exonerated Prisoner Over $340,000

On September 20, 2023, the Maryland Board of Public Works approved over $340,000 in compensation to Demetrius Smith, who spent years unjustly incarcerated—more than a year of that time after his innocence had been established. Gov. Wes Moore (D), who chairs the three-member Board, personally apologized to Smith, who was also present at the hearing.

"We're here today more than 10 years after he was released from incarceration, providing Mr. Smith with long overdue justice that he was deprived of, an apology from the state of Maryland that until today he's never received," Moore stated.

Smith's wrongful conviction dates to 2008 when, at the age of 25, he was charged with killing Robert Long, who was cooperating with police in prosecuting Jose Morales for drug crimes. As Moore noted, the presiding judge during Smith's bail hearing called his case "probably the thinnest" he had ever encountered. Nevertheless, "the prosecution was determined to press forward," Moore recalled, "relying on testimony from a witness who was later found to have not even been at the scene of the crime."

Less than two months after his initial arrest, while still out on bail, Smith was arrested once more and taken into custody for first-degree assault. In this case, too, the prosecution relied on witnesses who would later recant their testimony, according to the governor.

In 2010, Smith was convicted of Long's murder and handed a life sentence, along with an additional 18 years. In 2011, he entered an Alford plea for the assault charge. An Alford plea does not constitute an admission of guilt but acknowledges the probability of a conviction if the case were to proceed to trial. As Moore explained, Smith opted for the plea after losing faith in the criminal justice system.

It wasn't until 2011 that the Maryland U.S. attorney's office charged Long's actual murderer, Troy Allen "Madron" Lucas. Nonetheless, Smith languished in prison for another year and a half before the state eventually dropped his murder conviction in 2012.

In May 2013, Smith petitioned a state court to revisit his Alford plea for the assault charge. That led to a modification of his sentence to time served, with an additional three years of probation that was later reduced. Meanwhile Morales was sentenced in December 2013 for arranging the hit on Long, and Lucas was convicted in September 2017 of pulling the trigger.

Gov. Moore told Smith: "I am deeply sorry for the fact that our justice system failed you not once, but our justice system failed you twice, and while no amount of money can make up for what was taken from you, the action this board is taking today represents a formal acknowledgment from the state for the injustice that was caused."

The agreement that the Board approved provided for a total payment of $340,802.50, including $25,000 to attorneys representing Smith from Naftalis & Frankel LLP in Washington, D.C. It brought Smith a measure of relief that was then unavailable from the state's wrongful conviction compensation fund. An amend-



**FUISTE EXTRADITADO POR LAS AUTORIDADES DE LOS EEUU CON GARANTIAS O CONDICIONES? SE CUMPLIERON LAS AUTORIDADES AMERICANAS CON SUS GUARANTIAS O CONDICIONES DE EXTRADICION?**

**E.C.E.U.S. es un ONG europeo dedicado para asistir a personas que fueron extraditados con condiciones y/o garantías. Si fuiste extraditado a los EEUU sujetado a condiciones y/o garantías, y dichas garantías no fueron cumplidas por las autoridades americanas, por favor contáctanos para asistencia legal gratis.**

E.C.E.U.S.
David Mendoza Herrarte
117 E. Louisa St.
Seattle, WA 98102

Phone: +34 688 825 147 (Spain)
Email: ECEUS.NGO@proton.me



**Everyone has a story
Now's the time to write yours!**

**IFW offers Breaking Into Print - a time-tested, customized, professional writing course with:**
- One-on-one instruction with an author or editor
- Customized coursework to fit your writing goals
- Flexibility to work at your own pace and on your schedule
- Feedback detailing your writing strengths and suggestions to improve
- Instruction on how to market your submission-ready manuscripts

***START by taking our Writing Assessment!***

**STEP 1: Complete the Writing Assessment**
Our assessment includes 3 prompts to get your creative juices flowing. It's a fun and free exercise!

**STEP 2: Receive Your Results**
Our professional evaluators will review your submission and your results will be returned in the mail. Be assured that your assessment will be treated with respect and in confidence.

**STEP 3: Meet Your Instructor**
If you qualify, you'll be paired with an author or editor as your personal mentor. Your mentor's expert edits help you develop polished and professional writing skills.
**By the time you finish the program, you will complete at least two manuscripts suitable for submission to an editor.**

To get your FREE copy, complete and mail the coupon below today. We'll evaluate it at no cost to you. If you qualify, you'll be eligible to enroll. There's no obligation.

*Yes!* Please send me your FREE Writing Assessment describing your combined fiction/nonfiction program. I understand that if I pass, I may enroll—but I am under no obligation.

Name _____

DOC # _____

Street _____

City _____ State _____ Zip _____

Complete and mail to: Institute for Writers PO Box 3773 Allentown PA 18106          ©Institute for Writers 2024

ment to that law, SB 14, passed in 2021 that expanded its application to those like him whose convictions were tossed without a court-issued Writ of Actual Innocence (WOAI), which Smith lacked.

Another Naftalis & Frankel client, Anthony Hall, 60, got a WOAI in May 2023, clearing him in the fatal 1991 shooting of Gerard Dorsey. Based on the testimony of Gerald Patterson, an eyewitness who later recanted, Hall spent 27 years in prison before he was paroled. After discovery of exculpatory police interviews never turned over to his defense team, Baltimore City Circuit Court Judge Charles J. Peters reversed Hall's convictions and issued a WOAI.

"While the court's recognition of Anthony's innocence comes three decades too late, it is gratifying that the world now knows that he was innocent all along," said attorney Barry Pollack of Harris St. Laurent & Wechsler LLP, which also worked on Hall's case, along with the Mid-Atlantic Innocence Project.

Additional sources: *Maryland Daily Record,* National Registry of Exonerations, *NPR News*

# Seventh Circuit Again Rejects Challenge to Three-Book Limit at Cook County Jail by Now-Dead Detainee

*by David M. Reutter*

On April 6, 2023, the U.S. Court of Appeals for the Seventh Circuit affirmed dismissal of a suit filed by a pretrial detainee challenging the contraband policy at the Cook County Jail (CCJ) in Chicago, after guards took and destroyed approximately 30 of his books.

The lawsuit was filed by Gregory Koger, who has since died. He was serving a 300-day sentence at CCJ on October 5, 2013, when guards searched his cell and found 42 books and magazines received through the mail, far exceeding the jail's three-book limit. Koger had been warned of the search and that any property in excess of the policy would be confiscated. He also knew that searches were conducted in other cell blocks for this purpose. Yet he took no action to dispose of his excess books in advance.

After the search concluded and the excess books were confiscated, guards destroyed them. Koger sued, arguing that confiscation and destruction of his books violated his due process rights. As *PLN* reported, the case was dismissed, but the Seventh Circuit reversed and remanded that ruling in August 2018. The U.S. District Court for the Northern District of Illinois then dismissed his challenge to the book policy, finding it constitutional. [See: *PLN*, Jan. 2019, p.23; and Mar. 2020, p.43.] On appeal again, the Seventh Circuit didn't take issue with that finding, but it said application of the policy violated Koger's due process rights, in a ruling handed down in February 2020. *See: Koger v. Dart*, 950 F.3d 971 (7th Cir. 2020)

Koger, who by then was no longer incarcerated, died at home alone the next month, in March 2020. But he was already in settlement talks with defendant CCJ officials, so his Chicago attorneys, Mark G. Weinber and Adele D. Nicholas, persuaded the district court to substitute as Plaintiff the administrator of his estate, Brian Orozco. That same court then dismissed the case in November 2021, finding no due-process violation because "Koger was on notice of the three-book rule in the Handbook, was given multiple in-person warnings, and had opportunities to divest himself of his excess books through various means." Plaintiff appealed once more.

The Seventh Circuit agreed that "Koger had a continuing property interest in the books, even if the three-book policy deemed them contraband." But the higher court said the analysis turned on whether Koger was provided sufficient due process. Noting that Koger was aware of the three-book policy and that he could send the books out, give them to another prisoner or donate them, the Court said "[i]nstead, Koger chose to retain his excess books after the Jail staff warned him of the impending search and confiscation."

Koger also failed to file a grievance on the matter, the Court continued. And it was apparent that he violated CCJ policy—whose constitutionality was upheld because requiring CCJ to store excessive property "would unavoidably entail additional administrative oversight and expense" that the Court found unnecessary. Since "Koger had an adequate chance to protect his property interest," the district court's decision was affirmed. See: *Orozco v. Dart,* 64 F.4th 806 (7th Cir. 2023).



## MARILEE MARSHALL,  ATTORNEY AT LAW

California State Bar Board of Specialization
**Certified Criminal Law *and* Appellate Law Specialist**

***If you have a California case you need a California lawyer!***

(626) 564-1136

**State and Federal Appeals and Writs, Lifer Parole Writs**
**30+ years of success**
20 North Raymond Ave
Suite 240
Pasadena, CA 91103
marileemarshallandassociates.com

# $33 Million Awarded to Family of Oklahoma Jail Detainee Mocked By Nurse and Guards As He Died Begging for Help

*by Douglas Ankney*

On August 23, 2023, a jury in U.S. District Court for the Northern District of Oklahoma made a massive award of $33 million to the family of Terral B. Ellis, Jr., an Ottawa County Jail (OCJ) detainee who allegedly died begging for medical attention while a nurse and guards mocked him. Upholding that amount on review in February 2024, the Court added almost $1 million more in fees and costs for Plaintiffs' attorneys from Smolen Smolen and Roytman PLLC in Tulsa,

Megan Capel, the mother of Ellis's minor child, along with his parents, Terral B. Ellis, Sr. and Shelly Bliss, sued the Board of County Commissioners and several county Sheriff's Office employees, including former Sheriff Terry Durborow, OCJ nurse Theresa Horn LPN and guards Jeffrey Harding and Charles Shoemaker, plus a third identified as "Bray." Proceeding under 42 U.S.C. § 1983, Plaintiffs alleged that Ellis was a healthy 26-year-old when he turned himself in at OCJ on a pending charge on October 10, 2015, determined to turn his life around for his toddler son. Video of the booking showed Ellis was polite and cooperative.

He was assigned to D-Pod, an open dormitory where fellow detainee Michael Harrington confirmed that Ellis was in "good health and good spirits" before a six-day stint in segregation. When he returned, though, Ellis was "sick in bed" and "something was extremely wrong with him," Harrington said.

Ellis complained of severe back pain and was not eating. Nurse Horn—OCJ's only medical staffer—was absent, so on October 17, 2015, Shoemaker phoned her at home to relay Ellis' complaints. Horn waited another two days before seeing Ellis, and even then she did not take his vital signs. Instead she misdiagnosed Ellis with a broken rib; however, as an LPN, she was not qualified to make any diagnosis.

As he complained that his condition was getting worse, Ellis' requests for further medical attention went ignored. By October 19, 2015, he was sweating profusely, no longer able to eat or drink on his own, so weak that Harrington "literally had to hand feed and water [him]," according to the complaint later filed on his behalf. Unable to make it to the toilet, Ellis urinated in cups Harrington brought and then emptied.

Though Bray accused him of faking his symptoms, Ellis suffered an apparent seizure on October 21, 2015. Harrington and the other D-Pod detainees began loudly calling for medical attention. Bray and another jailer responded to the ruckus by ordering everyone but Ellis to the rec yard. Horn, again absent from the jail, was phoned and advised calling emergency responders. Meanwhile, Bray and another guard were heard sarcastically mocking Ellis: "It's awesome how a guy with no history of seizures suddenly has seizures. Yeah, I think I feel one coming on."



## Blackstone Career Institute™
SINCE 1890

# Change your life
### *Learn The Law!*

Earn your paralegal certificate! Blackstone's Independent Study Paralegal Program offers you the opportunity to be productive while serving time.

— As low as —
# $30 Per Month

- Affordable Tuition, Easy Payment Plan
- Includes Civil Litigation & Criminal Law
- 125 Years of Legal Training Experience
- Potential earned time for education training

☐ **Yes!** I'd like to learn more. Please rush me **FREE** course information.

Name _____ Doc# _____

Address _____

_____

City_____ State _____ Zip _____

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate. **PLN**

P.O. Box 3717 | Allentown, PA 18106



NAUGHTY NEIGHBOR PIXX
SPECIAL!! 100 for $35
Send a S.A.S.E. with 2 stamps for 2 free catalogs!! We have the BEST pixx in the game and the fastest response time! Look for our gift catalog coming SOON!
Send SASE to:
NAUGHTY NEIGHBOR PIXX
P.O. Box 3074
Spring, Texas 77383-3074

They also told paramedics who arrived that Ellis was faking his symptoms and not to take him to a hospital because OCJ "would not foot the bill" for transport. Paramedics failed to properly examine Ellis, taking no vital signs before deciding that Ellis "did not appear to be in respiratory distress." They then left him at the jail.

Ellis was moved to segregation cell H-1, which had no sink or toilet. However, it had a "D-ring"—a "metal ring on the floor of the cell that was used to restrain inmates," the complaint explained. Horn later stated in her deposition that Ellis' condition didn't concern her. "It wasn't the first time somebody had urinated in a cup," she said, shrugging off how the detainee was supposed to dispose of it in a cell with no toilet: "I don't know. I guess … there was a drain in there—a sewer drain. I guess it's used for pissing in the floor."

Even as Ellis' legs went numb, guards kept up their sarcastic commentary, saying "He can't feel his legs!" and calling Ellis "the zombie." The next morning, as Ellis begged to go to a hospital, Shoemaker and another guard repeated mockingly: "Help me! Help! Help!" When Horn arrived, Ellis pleaded with her to look at his legs, which by then had turned black. She refused, telling him to "shut up" and threatening to chain him to the D-Ring if he didn't.

At 1:38 p.m. that day, October 22, 2015, Shoemaker found Ellis unresponsive, his hands and feet discolored, and he was cold to the touch. The guard informed Horn, who after much delay called for paramedics. But before they arrived, she had detainee "trustees" remove and clean Ellis's urine-soaked sleeping mat. Never regaining consciousness, Ellis was transported to a hospital and there pronounced dead. The medical examiner determined the cause of death was "sepsis/septic shock" due to "acute bronchopneumonia." Plaintiffs' expert, Todd Wilcox, M.D., opined that had Ellis's pneumonia been timely diagnosed and treated, sepsis would never have occurred, calling the death "entirely preventable." *See: Ellis v. Grimes*, USDC (N.D. Okla.), Case No. 4:17-cv-00325 (2023).

After the verdict, Plaintiffs' attorney Daniel Smolen said that because "[t]he facts are so horrific" and Ellis "died in such a barbaric way," it was "highly frustrating" that no jail staffer was criminally charged.

Meanwhile Defendants moved the Court to reduce or cancel the verdict, or to order a new trial. That motion was denied on February 29, 2024, the same day the Court awarded Plaintiff $970,402 in attorney fees and $19,480.54 in costs. *See: Ellis v. Ottawa Cty. Sheriff*, 2024 U.S. Dist. LEXIS 35043 (N.D. Okla.). ◀

Additional source: *KFOR*

# $9,000 Settlement in Wisconsin Prisoner's Heat-Related Illness Suit

*by Matt Clarke*

On October 3, 2023, the Wisconsin Department of Justice sent a check for $9,000 to a state prisoner in settlement of his claims that he suffered a heat-related illness, fell and injured himself after state Department of Corrections (DOC) guards ignored his pleas for help. In addition to the settlement, the state agreed to waiver of $545.80 in costs for the prisoner, Paul D. Ammerman.

Beginning on June 4, 2021, there was a weather warning of high temperatures around Columbia Correctional Institution, where Ammerman was confined in administrative segregation (ad seg) at the time. He complained that the ventilation system was not functioning, but the complaint was rejected as moot because the system had allegedly been repaired. Ammerman had previously complained of being locked in ad-seg with no fan and windows that did not open.

The warned-of heat wave was still simmering four days later on June 8, 2021, when Ammerman began to complain of diarrhea, headaches, and muscle cramps—symptoms of heat-related illness. His complaints were ignored, however; he also submitted a Health Services Request form to no avail.

Ammerman continued to complain of heat-related illness the next day, adding that he had lost consciousness for 20 minutes. He complained to several staff members, including a guard, Sgt. Terstriep, another guard named Jackson and Nurse Johnson. Again, he was ignored.

That same day, about five hours later, a guard asked Ammerman if he wanted his bedtime medication; the prisoner again passed out, fell and struck his head on the edge of a desk. As he regained consciousness in a treatment room, "the nurse was trying to clean the blood off [his] face and head," his complaint recalled. Rushed to a hospital, he had "fluids pumped into him" and "five (5) stitches put into his head," plus a concussion review was performed.

Ammerman filed suit *pro se* pursuant to 42 U.S.C. § 1983 in federal court for the Western District of Wisconsin, accusing Terstriep, Jackson, Johnson and other defendants of deliberate indifference to his serious medical needs. During discovery, Ammerman was able to obtain video of guards' body camera recordings showing him requesting medical assistance and complaining of heat-related illness. The video also showed him passing out and his head striking the desk, bloodying his face. Oddly, DOC did not restrict him from sharing his settlement with *PLN*, but a copy of the video that he said was sent with it was not in the envelope.

In his accompanying letter, Ammerman said that as an inexperienced litigator, he settled "mostly because I do not know what I was doing," adding that when it comes to monetary payouts, "some is better than none." That is understandable considering how difficult it is for a *pro se* prisoner litigant to prevail in trial. *See: Ammerman v. Jackson*, USDC (W.D. Wisc.), Case No. 3:23-cv-00156. ◀

John F. Mizner, Esq.
311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889
jfm@miznerfirm.com



MIZNER
LAW FIRM

Representing Pennsylvania Inmates
Medical mistakes
Inadequate care
Delay in treatment

# Lights, Camera, Action! "Dead Man Walking" Comes to Sing Sing

When a new production of "Dead Man Walking," the opera based on the 1993 memoir of Louisiana death penalty abolitionist Sister Helen Prejean, opened at New York City's Metropolitan Opera in September 2023, there was a rare offsite performance—at the state's Sing Sing Correctional Facility in Ossining, with lead singers from the Met's production backed by a chorus of prisoners.

Their costumes were just prison-issued green pants. There were no props. The 150 prisoners in the audience had to be screened and counted before filing into the auditorium to arrange themselves according to cell block and building number.

Onstage, the 14-member chorus represented about half of the 30 prisoners in the Met's "Musical Connection" program, which has been teaching performance, composition and music theory to prisoners for 15 years. The others in the program declined to participate, wary of the opera's dramatic portrayal of a condemned prisoner's execution by lethal injection.

But for chorus member Michael Shane Hale, 51, who is serving 50 years to life for murder, the experience was positive. "We feel so powerless; we feel so invisible," he said, adding that the performance "reminds you not to get lost in prison." ◾

Sources: *New York Times, Vogue*

# Sixth Circuit Refuses Michigan Prisoner's Excessive Force Claim Despite Guard's Conviction for Battery

*by David M. Reutter*

On August 16, 2023, the U.S. Court of Appeals for the Sixth Circuit affirmed dismissal of a Michigan prisoner's lawsuit with an outrageous-sounding opinion that a guard "may have violated a prison use-of-force policy or committed a state-law tort," yet that "does not necessarily" mean there was also a violation of the Eighth Amendment's ban on "cruel and unusual punishment."

Joseph Johnson was sentenced to serve a few weeks in Michigan's Kalamazoo County Jail for violating probation on a domestic violence conviction. Immediately after sentencing, he was taken to the jail for booking. The next morning, guard Chantel Einhardt heard Johnson "yelling and banging" on his holding cell door because he "wanted to be moved to general population," the Court recalled. Einhardt said he would be moved and also restrained if he kept hitting the door.

At around 3:30 p.m., Johnson was left unhandcuffed in the intake area to await transfer to general population. He apparently then violated jail policy by wrapping a towel around his head—nothing in the record explained how this was a violation—and refused an order to remove it by guard Alan Miller, at whom Johnson reportedly argued and threw his sack lunch.

Einhardt observed this situation and decided to de-escalate it by escorting Johnson to general population. En route, she twice called for Johnson to slow down so she could maintain control of him, but he appeared to ignore her. Guard Clair Sootsman got involved; surveillance video showed him pointing Johnson to a wall. Words were exchanged; Sootsman called Johnson a "pussy," and the detainee replied, "I am," before taking another step to pass the guard and continue on his way.

Other guards later said they didn't see this or didn't find it threatening. But Sootsman did. Video showed he shoved Johnson against the wall and took him down in a chokehold. Johnson didn't resist, and the entire incident lasted about seven seconds. An internal investigation found Sootsman violated jail use of force policy; he pleaded guilty to misdemeanor battery and was fined $546.

With the aid of attorney David A. Dworetsky of Fieger, Fieger, Kenney & Harrington, P.C. in Southfield, Johnson filed suit in federal court for the Western District of Michigan, making civil rights claims under 42 U.S.C. § 1983 as well as state tort law. The district court granted Sootsman's motion for summary judgment and dismissed without prejudice the state law claims. Johnson appealed.

On appeal, Sootsman pressed his claim to qualified immunity (QI). The Sixth Circuit agreed, finding Johnson failed to prove the subjective element of QI—that Sootsman used the force "maliciously and sadistically," as held in *Hudson v. McMillian,* 503 U.S. 1 (1992). The Court found Sootsman had a "plausible basis" to believe Johnson posed a threat and required restraint; it also found the force applied was proportional to the threat, lasting only seven seconds. Moreover, Johnson did not suffer any serious injury. Thus, the Court concluded that "no reasonable jury could find that Sootsman's actions arose from a sadistic intent to inflict pain on Johnson rather than a (perhaps mistaken) belief of the need to restrain him." *See: Johnson v. Sootsman*, 79 F.4th 608 (6th Cir. 2023).

The case illustrates the high bar prisoners must hurdle to prove an Eighth Amendment violation, especially with use-of-force claims. As the Sixth Circuit noted, state tort law provides a remedy. In Johnson's case, the guard's battery conviction is evidence that supports a tort claim for battery, which would also provide leverage for a settlement. ◾



**The Best 500+ Non-Profit Organizations for Prisoners & Their Families (7th edition)**

Only $19.99

Order from: **Prison Legal News, POB 1151 Lake Worth Beach, FL 33460**

561-360-2523

*Add $6 shipping for all book orders under $50.*

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 25 of 74    Document 4-1

**RECLAIM** *Your* **FUTURE**
azexpunge.org

# EVER BUSTED FOR MARIJUANA IN ARIZONA?
## YOUR CONVICTION COULD BE KEEPING YOU IN PRISON
# LONGER THAN YOU HAVE TO BE.

Now that recreational use of marijuana is legal in Arizona, the qualified attorneys from the Reclaim Your Future campaign can help you expunge certain past marijuana convictions* for **FREE.**

### *WHAT DOES EXPUNGEMENT MEAN?*
It means that qualifying marijuana-related records are sealed and no longer available to the public. Expungement also eliminates some of the consequences of a marijuana offense. For example, the offense can **no longer be used as a prior offense to enhance a sentence** or to prove someone is a **repeat offender.**

| What offenses qualify?* | ¿Qué delitos cumplen los requitos? |
|---|---|
| ***Possessing, consuming or transporting:*** <br> - 2.5 ounces (70 grams) or less of marijuana | ***Poseer, consumir o transportar:*** <br> - 2.5 onzas (70 gramos) o menos de marihuana |
| ***Possessing, transporting or cultivating:*** <br> - 6 marijuana plants or less at the individual's primary residence for personal use | ***Poseer, transportar o cultivar:*** <br> - 6 plantas o menos en la residencia principal del individuo con fines de uso personal |
| ***Possessing, using or transporting:*** <br> Paraphernalia related to the consumption of marijuana | ***Poseer, usar o transportar:*** <br> - Parafernalia relacionada con el de marihuana consumo |

*Federal and tribal offenses are not eligible for expungement. *Los delitos federales y tribales no son elegibles para eliminación.*

*Write Us or Call!*

**RECLAIM YOUR FUTURE / RECLAMA TU FUTURO**
**4001 N. 3RD ST., SUITE 401**
**PHOENIX, AZ 85012**
**info@azexpunge.org | (800) 722-4026**

**Legal services provided by the Arizona Justice Project, DNA People's Legal Services, and their partners.**
**Reclaim Your Future is funded by the Arizona Department of Health Services.**

**SE HABLA ESPAÑOL. SERVICIOS LEGALES GRATUITOS.**

# Parole and Probation Accused of Driving Prison Growth

*by David M. Reutter*

One alternative to incarceration that criminal justice reformers clamor for is probation or parole. A May 2023 report by Prison Policy Initiative (PPI) counted nearly 3.7 million people in the U.S. under some form of community supervision, nearly twice the number held in prisons and jails. The report also showed that parole and probation often operate as *drivers* of prison growth.

In Texas, with over 437,000 people on parole or probation, the state Board of Pardon and Paroles (BOPP) imposes stipulations that include mandatory substance abuse classes, alcohol abstinence and prohibitions on whom a parolee may associate with. To the extent these restrictions limit employment or housing opportunities, they make re-entry into society upon release more difficult.

Since 2021, Marci Simmons has been on parole in Texas. Her conditions were written in a dense legalese that made it hard to understand all the ways she could violate them. "I have [attended] some college, and I had a hard time understanding that," she said. Simmons' stipulations prohibit her from having a checking or savings account, or a credit or debit card. Yet she is required to work. Unlike many other parolees, Simmons has family she can entrust to handle her financial affairs. Yet the restrictions create a quandary in caring for her grandmother with Alzheimer's. "I'm scared to use her debit card to pay her bills," Simmons admitted.

Others on parole must submit to electronic monitoring, usually with a GPS ankle monitor. Upon her release from prison in December 2018, Jennifer Toon was fitted with one and then subjected to hyper-intensive supervision for the next year, mandated to submit written schedules for work, classes, church, recreation—even to go outside in her own yard. Her supervising parole officer approved only work and treatment classes, leaving her "devastated." In a common refrain from those subjected to GPS monitoring, Toon also said the equipment often failed. Then there was the financial burden of footing the bill for her own GPS monitoring. As a result, Toon tells women still incarcerated: "I know you want to get out of prison, but if you've only got a year left on your sentence or two years left on your sentence, I'm going to tell you to ride it out."

Another issue Toon confronted was reporting to the parole office. Due to a shortage of parole officers—the Texas Department of Criminal Justice (TDCJ) has just under 1,200 in some 70 offices to supervise 103,000 parolees—those in rural areas like Toon must report to an office in another county. "[W]hen you don't have any money and you don't have a vehicle and your officer says be in Tyler and you live all the way in Henderson.… Well, how do I get there?" she wondered. "They're going to violate me if I'm not there."

The situation is not much better on the other side of the desk, where parole officers earn $42,000 to $67,000 annually to handle caseloads often double what they should be, leaving less time to assist each parolee.

"When I took this job, it was supposed to be about community supervision, reintegrating and helping people back into society," one officer said. "That's not what it's about. It's all about writing them up, violating them and revocation hearings.… Do I think we're helping to make the community a better place? Absolutely not."

Longtime Texas parole lawyer Gary Cohen said that while BOPP typically does not revoke parole for missing office visits or falling behind on fees, a "lockup period is kind of a slap in the wrist," one that tells parolees, "Hey, we need to get your attention.… And if you mess up again the consequences may be harsher."

With so many reincarcerations, University of Wisconsin Law School Associate Professor Cecelia Klingele said that probation and parole "have become important drivers of prison growth." Clearly, an incarceration alternative is effective only if resources are devoted to assure it doesn't merely open a revolving door back into prison. *See: Punishment Beyond Prisons 2023: Incarceration and Supervision by State*, PPI (May 2023).

Additional source: *Texas Observer*

# WRONGFULLY CONVICTED?
# UNFAIR SENTENCE?
# BAD LAWYER?
# NEED A DO-OVER?

# WE CAN HELP.

We are the best source for direct appeals, petitions for review, timely petitions for post-conviction relief, successive petitions for post-conviction relief, and habeas corpus petitions in Arizona.

**NO PRO BONO CASES • ARIZONA CASES ONLY**

**GRAND CANYON** LAW GROUP

1930 E BROWN RD, STE 102 MESA, AZ 85203

621 N 5TH AVE PHOENIX, AZ 85003

**T 480.999.9764** grandcanyon.law

## CALL FOR SUBMISSIONS

**Zo Media Productions is currently accepting submissions from incarcerated writers. We accept: Manuscripts, Short stories, Poems, Essays, Screenplays, Theatrical works, and Articles**

**Submissions will be considered for publication, or film shorts. Royalties and payment for work is negotiable.**

**Submit to:**
**Zo Media Productions**
**P.O. Box 862**
**Bristow, OK 74010**
**Submissions@ZoMediaProductions.com**



MEDIA PRODUCTIONS

# Louisiana Supreme Court Springs Prisoner From Death Row

Condemned Louisiana prisoner Darrell Robinson got off death row on January 26, 2024, when the state supreme court found his 2001 trial was tainted and granted a new one. Robinson, 55, was the only one of 57 state prisoners awaiting execution who didn't file a clemency request in 2023, when former Gov. John Bel Edwards (D) announced his opposition to the death penalty—a mass effort that ultimately failed, as *PLN* reported. [See: *PLN*, Dec. 2023, p.48.]

A unanimous jury convicted Robinson of quadruple murder in the 1996 execution-like killings of Billy Lambert, 50, his sister, Carol Hooper, 54, her daughter, Maureen Kelley, 37, and Kelley's infant son, Nicholas. At the time, Robinson was a tenant on the farm owned by Lambert, an acquaintance made while getting VA treatment for alcoholism. When Robinson arrived home and found the bodies, he fled in fear, he claimed.

But prosecutors presented a second-hand confession from jailhouse snitch Leroy Goodspeed, who told the jury nothing was promised him in return. That was a blatant lie. In fact Goodspeed's robbery charges were dismissed with a note that he "was an essential witness in a murder trial." Ninth Judicial District Judge Patricia Koch also allowed the state to suppress DNA analysis of blood found on a jacket Lambert was wearing, which didn't match Robinson's blood.

After 23 years in prison, Robinson's appeal finally reached the state's high court, where a majority of justices agreed that "the defendant did not receive a fair trial, or a verdict worthy of confidence." His sentence was vacated, over the dissent of two justices. One, Will Crain, argued that the trial court had not made a finding that perjury was committed by those testifying that Good-speed received no quid pro quo—so that element of Robinson's conviction should not be reviewable. *See: State ex rel. Robinson v. Vannoy,* 2021-00812 (La.)

Robinson's attorney with the Mwalimu Center for Justice, Matilda Caria, marveled at "the breadth of the Brady violations" in the case, referring to the state's duty to share all evidence against a defendant laid out in *Brady v. Maryland*, 373 U.S. 83 (1963). Freelance prosecutor Hugo Holland—who once kept a portrait of Confederate KKK leader Nathan Bedford Forrest in his office—vowed to retry Robinson, calling the appeal "quite a useless exercise when this guy should have been executed years ago." 🖋

Additional sources: *Fortune, New Orleans Times-Picayune*

# $1.75 Million Settlement Reached in Washington Jail Suicide

*by David M. Reutter*

The Washington city of Lynnwood agreed on September 20, 2023, to pay $1.75 million to settle a lawsuit alleging guards at the Lynnwood Municipal Jail were negligent in the suicide death of Tirhas Tesfatsion two years before. An investigation after her death found "significant" lapses between wellness checks.

Tesfatsion, 47, was arrested just after midnight on July 12, 2021, for her second DUI in less than a year. A judge set her bond at $7,500. The investigation report after her death found five times that guards let more than the maximum 60 minutes pass between safety checks of her cell. Another five incidents involving Tesfatsion were never recorded in the guard activity log.

Jail surveillance video captured three guards who investigators said were "focused primarily on their work stations and/or cellphones" for nearly three hours after lunch was served before Tesfatsion's body was discovered. Two of the guards were viewing "video content" that "[did] not appear to be work-related," the investigative report added.

Tesfatsion and three men in other cells were the only detainees at the jail, so there were more guards on duty than there were detainees to supervise. One of the guards left the jail for a two-hour period on personal business while Tesfatsion proceeded to hang herself.

Guards last checked on Tesfatsion to serve lunch at 12:06 p.m. on July 13, 2021. She was recorded on video between 1:51 and 1:59 p.m. fashioning a ligature out of her jail jumpsuit, but no one apparently noticed at the time, nor when she then made two failed attempts to hang herself from her cell's bunk beds before she was seen entering the bathroom area at 2:00 p.m. There she succeeded in hanging herself, but she was not discovered by guards until 3:01 p.m. Efforts to revive her failed.

Tesfatsion's Estate, represented by Bellevue attorneys James Bible and Jesse Valdez, filed suit in federal court for the Western District of Washington on July 12, 2023. The Court then approved the $1,750,001 settlement, which included costs and fees for the estate's attorneys. See: *Tesfatsion v. City of Lynnwood,* USDC (W.D. Wash.), Case No. 2:23-cv-01048.

No charges were filed against any of the guards involved, two of whom still work for the police department but were given unpaid suspensions. A third resigned after Tesfatsion's death. A Community Recovery Center was carved out of a new jail the city was building; when it opens later in 2024 it will offer mental health resources in a "crisis stabilization center." 🖋

Additional source: *KING*



## Ink From The Pen

Artist behind the walls?
Inspired by prison art?
Roll with the big dogs!
Check out *Ink from the Pen*!

1440 Beaumont Ave. · Ste. A2-266 · Beaumont, CA 92223

760.616.0557 | www.InkFromThePen.com | 🅕 🅘

*Magazines are allowed in most State and Federal Prisons*

Case 2:24-cv-00981-NJ     Filed 08/02/24     Page 28 of 74     Document 4-1

# Grand Jury Slams Sacramento County for Delaying Jail Improvements Mandated in Consent Decree

*by Douglas Ankney*

Delays in improvements mandated in a 2020 consent decree resulted in at least six preventable detainee deaths at Sacramento County jails, according to a grand jury investigative report on June 2, 2023.

As *PLN* reported, the County's two lockups were the subject of *Mays v. Cty. of Sacramento*, a lawsuit that alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126 § 12101, et seq., as well as the Health Insurance Portability and Accountability Act (HIPAA), including understaffing, overuse of solitary confinement, failure to provide adequate medical and mental care, and discrimination against prisoners with disabilities. A settlement resulted in the consent decree to reduce jail population and make physical improvements, as well as limiting the use of solitary confinement. [See: *PLN*, Mar. 2020, p.57.]

The grand jury's Report said the County was stonewalling on the promised changes, pointing to a letter to the County's Board of Supervisors dated September 1, 2022, stating that "conditions in the Jails remain deplorable." Supervisors in December 2022 then approved a new "Intake and Health Services Facility" to remedy finally the ADA and HIPPA violations. But they said it would take five years or longer to complete. According to the Report, that left no "immediate plans to address the many outstanding violations," even though "[v]igorous interim plan execution is vital to avoid the threat of federal receivership, increased liability for non-compliance, preventable illness for the jail staff and inmate population, and higher costs" due rising interest rates.

The Report highlighted deficiencies that include: (1) lack of privacy during health examinations, due to inadequate space; (2) inadequate number of booking stations, resulting in bookings taking hours to complete; (3) detainees crowded in holding cells during bookings, without a minimum of six feet of separation; (4) insufficient staffing for medical and mental health care; (5) prisoners at risk of suicide being detained in cells with blind spots and/or held in isolation cells; (6) unsanitary conditions, with soiled floors in the housing areas, holding areas, and medical exam areas along with clogged drains and flies swarm-ing; and (7) frequent rotation of leadership that caused delays in the implementation of the consent decree.

To address these deficiencies, the Report made a number of recommendations, including (1) increasing the number of intake stations by at least three; (2) installing temporary trailers in the parking garage of the Main Jail to alleviate HIPPA and ADA violations; (3) getting supervisors' rapid approval for funding and construction of an additional 18 mental health treatment rooms by December 31, 2023; (4) creating a non-rotating executive leadership position to cover compliance with the consent decree; (5) developing and implementing a sanitation and disinfection program; and (6) hiring additional medical staff. *See: 2022 - 2023 Grand Jurors' Report: What's Taking So Long? County Delays Mandated Jail Improvements*.

On August 9, 2023, the County and its Sheriff's Department (SCSD) rejected many of the recommendations, declining to install temporary trailers in the parking garage "due to space and operational constraints." Supervisors also refused to construct more mental health treatment rooms, instead directing County staff to "test a modular product" for jail "privacy and operational needs." However, that could not be done within the recommended time frame, they added. Supervisors agreed to the sanitation and disinfection program, but it was not expected to be implemented before March 31, 2024.

SCSD blamed rotation of staff leadership on the County's failure to approve a "10% pay incentive" in order to "retain the current Captains, Assistant Commanders and Compliance Lieutenants." The department said it was "researching the feasibility of creating a non-sworn position in the compliance role." It also disputed unsanitary conditions cited in the Report, but it promised to consider adding intake stations—after further investigation.

Also in August 2023, an investigation into a spike in jail overdoses led to the arrests of six people—including Zareonna Harris, an employee of contracted jail medical provider Avid Healthcare Services. Harris, along with James Whitfield, Donald Zackery, Tomani Zackeri, Roderick Turk and Dimauri Allendandridge, allegedly smuggled fentanyl, methamphetamine, cocaine and escape tools into the jail. Sheriff Jim Cooper blamed the smuggling operation on "jail medical staff," which he called "inept." Cooper also called for Supervisors to return management of the main jail's medical unit back to SCSD.

In a scathing *Sacramento Bee* editorial, Dr. Phillip Summers defended his medical staff and put the blame for problems squarely back on Sheriff Cooper and SCSD. Summers explained that the medical unit was removed "from under the Sheriff's Department in 2018 because the sheriff's policies and practices have been consistently identified as a central problem in the county's chronic noncompliance" with the consent decree.

Summers cited examples of SCSD staff interference, such as: canceling or delaying medical visits; preventing pregnant women from attending scheduled obstetrical appointments; postponing specialty care; overriding doctor's orders; skimping on required medical screenings; completely disregarding requests for medical evaluations; neglecting patients in need of psychiatric treatment; and skipping distribution of medications for days at a time.

These deficiencies, Summers said, were documented by court-appointed investigators. "Instead of undermining the jail's medical providers," he said, "the sheriff needs to devote his energy to ensuring that his staff are doing everything in their power to facilitate healthcare delivery and maintain the health and safety of the incarcerated people that are his responsibility."

As *PLN* also reported, former Sheriff Scott Jones underreported jail deaths by excluding those occurring outside of the lockups that were nevertheless attributable to causes within them. For example, 61-year-old Clifton Harris was savagely beaten by his cellmate and remained hospitalized on life support for eight months until his family removed him. But his death was not included in the tally of jail deaths because he was not in custody at the time. [See: *PLN*, Mar. 2021, p.53.] ◾

Additional source: *Sacramento Bee*

Case 2:24-cv-00981-NJ    Filed 08/28/24    Page 29 of 74    Document 4-1

# Kansas DOC Claims Discrimination Against Wiccans Was "Inadvertent"

*by Douglas Ankney*

On September 27, 2023, the Kansas Department of Corrections (DOC) appeared to back down from a fight over providing state prisoners materials from a Wiccan shop—though it maintained a ban on correspondence from the shop owner and an associated coven.

For at least 20 years, MoonShadow Coven has provided a free course in Basic Wicca to any incarcerated person requesting it. The coven is a small Wiccan religious group operating from The Enchanted Willow shop in Topeka, which is owned by Dr. Robert E. Miller. For those two decades, he has sent coven materials to prisons and jails in Arizona, Florida, Illinois, Missouri, Washington and Kansas.

But in August 2023, DOC began photocopying incoming prisoner mail, allegedly to reduce the inflow of contraband. The photocopies are then printed and distributed to prisoners or made available in digitized versions on electronic media tablets. Because coven materials are copyrighted, Dr. Miller notified DOC that he objected to copying, pointing out that DOC did not photocopy Bibles, so Wiccan materials should be treated equally.

DOC Public Service Executive Vickie Brungardt responded by letter: "We do not believe that you have a registered and enforceable copyright. Nor do we believe that there has been any violation of copyright laws with regard to your pamphlets. However, we are willing to attempt to honor your request that photocopying not occur. The best way of honoring your request is to discontinue allowing this mail into the facility for distribution to residents at this time."

Not only did DOC ban coven course materials, it also banned a newsletter to some 47 students. DOC also banned Dr. Miller's private correspondence with prisoners—apparently in retaliation for protesting copying of coven materials. A 'Notice of Mail Censorship' provided no reason for DOC's rejection but noted: "Mail from this individual has been deemed censored by [DOC] central office."

Dr. Miller complained to DOC Secretary Jeff Zmuda and Gov. Laura Kelly (R). In reply he heard only crickets. Then the *Kansas Reflector* picked up the story and contacted DOC. The next day, DOC told Miller's shop that the ban was "inadvertent" and had been "rescinded."

"We apologize for the oversight by our staff," DOC said.

However, the ban on Miller's letters and coven materials was not lifted; DOC told him they were a "threat to institutional safety, order or security." American Civil Liberties Union of Kansas Communications Director Esmie Tseng said the move appeared to be part of a larger effort by DOC to discourage materials from non-Christian religions and spiritual groups. ▨

Source: *Kansas Reflector*

# California Adds Statewide Detention Monitors Overseeing Local Jails

Quietly, on October 4, 2023, California Gov. Gavin Newsom (D) signed into law a measure to boost transparency in the state's local jails, also adding a layer of oversight vested in a new statewide "detention monitor"—who will act much like an Inspector General to identify problems and make recommendations to county sheriffs regarding in-custody jail deaths.

S.B. 519 was sponsored by state Sen. Toni Atkins (D-San Diego), who said it will force sheriffs to disclose more information about mounting jail deaths. In her home county of San Diego, with one of six large jail systems in the state to notch a record number of deaths in 2022, payments to settle related lawsuits have totaled some $50 million, as *PLN* reported. [See: *PLN*, Nov. 2022, p.1.]

The new law's other main provision adding state oversight was designed to encourage sheriffs to take corrective action after in-custody deaths. At a July 2023 hearing, Atkins noted that each county's Board of Commissioners is responsible for "settling lawsuits involving in-custody jail deaths," but she said those same politicians "have limited authority in requiring the Sheriff's Department to enact policies to reduce in-custody deaths."

S.B. 519 augments the Board of State and Community Corrections with a new Director of In-Custody Death Review, who will be appointed by the governor to a six-year term by July 1, 2024. Aided with a new staff of medical and mental health professionals which the bill also provides for, the Director will review in-custody deaths in county jails and make policy recommendations to sheriffs. Importantly, the recommendations are public records, as are responses from sheriffs, which are due within 90 days.

Atkins originally wanted to strip local jail authority from sheriffs and establish a Department of Corrections in each county. But she got so much pushback that she amended the proposal as a "sign of good faith."

Sheriffs were not impressed. California State Sheriffs' Association President and Tulare County Sheriff Mike Boudreaux called the measure an unnecessary "duplicate of things that really are already in place when we have a death in our jail."

Sacramento defense attorney Mark Merin agreed that the bill's in-camera review provision—allowing a sheriff to challenge records requests in private before a judge—will likely slow the disclosure process so much that "I don't see this streamlining things and producing a flood of, you know, useful information." ▨

Additional source: *Cal Matters*

The Law Group of THP
Attorney Terry Henderson Peden
Licensed in TX & AL

- **Parole**: includes interview, social worker, packet, and <u>3 reps if necessary</u> - flat fee! (Mention Promo Code: "Elaine" for discount - Exp 8/1/24)
- **Civil Rights**: Major Injury and Wrongful Death
- **Non-Prison Cases**: Serious Injury, Criminal, Employment, & Land Acquisition/Sales

<u>Lawyers that actually give a damn!</u>
Call or Write Us
334-544-9471
P.O. Box 1410, Houston, TX 77251
www.theLawGroupofTHP.com

# PFAU COCHRAN VERTETIS AMALA
## ATTORNEYS AT LAW

# BOYS' HOMES FROM HELL

**Boys Village in Seattle**
**Toutle River Boys Ranch**
**Secret Harbor Group Home**

Were you abused at **Boys Village** in Seattle, **Toutle River Boys Ranch** or **Secret Harbor Group Home**? Did you think that the monsters who did this to you would never pay? You are not alone. The system that was supposed to protect you failed you, just as it failed many other boys who were sexually abused at countless other group homes.

PCVA attorney Darrell Cochran has helped many men confront the institutions that allowed rampant abuse to take place at their facilities, even when the abuse occurred decades ago. To date, he has recovered tens of millions of dollars to compensate those who suffered so greatly.

Contact Darrell Cochran to learn how he and the other attorneys at PCVA can assemble a team that will fight for you.

## Catastrophic Injury • Medical Malpractice • Sexual Abuse



**PCVA Law, Attn: Dept. DCPLN**
**909 A Street, Suite 700, Tacoma, WA 98402**
**Email: pln@pcvalaw.com • Phone: (888) 303-9045**
www.pcva.law

# Massachusetts High Court Calls Denial of Prisoner's Medical Parole without Risk Assessment Arbitrary and Capricious

*by Douglas Ankney*

On April 3, 2023, the Supreme Judicial Court of Massachusetts called a medical parole denial by the state Commissioner of Correction arbitrary and capricious because it was made without a standardized risk assessment for prisoner applicant Martin McCauley, as required by Title 501 Code Mass. Regs. §17.02.

McCauley, then 66, filed a petition via counsel in April 2020 for release on medical parole pursuant to G. L. c. 127, § 119A. The petition included two opinions that McCauley was permanently incapacitated, one from Dr. Steven Descoteaux, Medical Director for the state Department of Correction, who works for its private medical provider, Wellpath, and another from Dr. Michael Moore, Medical Director of Massachusetts Correctional Institution (MCI) at Norfolk, where McCauley was incarcerated. With his petition, McCauley included a parole plan demonstrating he had family support with a plan to reside with his sister at her condominium.

Also in April 2020, Steven Silva, then Superintendent of MCI-Norfolk, recommended against releasing McCauley on medical parole. Silva cited factors such as McCauley's ability to walk with his "rollator" walker "at times quickly" and that McCauley did not need assistance with "dressing, showering, or toileting." Silva also cited McCauley's criminal history; the facts underlying his current conviction for first degree murder (McCauley was convicted of shooting a robbery victim between the eyes with a pistol held six inches away); McCauley's institutional violence, which included an assault on a guard; and his extensive disciplinary record, "especially those involving drug transactions and the attempted introduction of heroin into the facility." As for "the required assessment of the risk for violence that the inmate poses to society pursuant to G. L. c. 127, section 119A(c)," Silva enclosed a copy of McCauley's most recent classification report and personalized program plan, noting that the prisoner "does not receive a Risk or Needs Assessment" owing to his sentence of life without parole.

In June 2020, the Commissioner denied the petition. After two petitions for rehearing were also denied, McCauley "commenced an action in the nature of certiorari in the county court pursuant to G. L. c. 249, section 4." The case was transferred to the Superior Court where it was ultimately denied. McCauley appealed from the Superior Court to the Appeals Court where it was transferred to the state's high court on its own motion.

The Court observed that G. L. c. 127, § 119A allows medical parole for a prisoner "where several requirements are met," including whether the DOC Commissioner "determines that a prisoner is terminally ill or permanently incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society"; in that case, the law says, "the prisoner shall be released on medical parole.'

"The statute commands," the Court continued, that the superintendent of the applicant's prison "shall transmit to the commissioner, along with a recommendation, three different items: a medical parole plan, a written diagnosis by a physician licensed to practice medicine under G. L. c. 112, section 2, and 'an assessment of the risk for violence that prisoner poses to society.'"

Authority "to promulgate rules and regulations necessary for the statute's enforcement" is vested in the Secretary of the Executive Office of Public Safety and Security. One such rule found in 501 Code Mass. Regs. § 17.04(2)(d), (e) (2022) "requires a multidisciplinary review team to provide information to the superintendent regarding the risk assessment 'which must be based upon the results of a standardized assessment tool that measures clinical prognosis, such as the LS/CMI assessment tool and/or COMPAS' in addition to a recent classification report."

But McCauley's classification report included no such risk assessment, apparently because assessments are not made for those with a life sentence, like him. The Court allowed "that a standardized risk assessment is but one relevant factor that the commissioner could have considered in making her decision," but it said such an assessment "is a consideration required by regulation, and we cannot acquiesce to its absence." Accordingly, the petition was remanded to the Commissioner for reconsideration after a standardized assessment is conducted. *See: McCauley v. Superintendent, Mass. Corr. Inst., Norfolk*, 491 Mass. 571 (2023). 



Vol. 4

# FREEBIRD PUBLISHERS

All New Catalog Vol. 4. Our full color catalog has product listings of our prisoner publications: books, photo services, high quality gifts and holiday selections too! Catalog includes complete detailed ordering information, forms and more. All pages featured in detailed full color photographs on 5.5" x 8.5", 92 pages with full descriptions & prices. **$5.00**

**Freebird Publishers**
**221 Pearl St. Ste. 541 N. Dighton MA 02764**

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 32 of 74    Document 4-1

# Third Circuit Revives Disabled New Jersey Prisoner's Claim for Deprivation of Walking Cane

*by Douglas Ankney*

On September 19, 2023, the U.S. Court of Appeals for the Third Circuit reversed dismissal of prisoner Tremayne Durham's suit blaming employees of the New Jersey Department of Corrections (DOC) for injuries he suffered in a shower slip-and-fall, after they denied him access to his cane and a shower chair.

Durham was incarcerated at New Jersey State Prison (NJSP) in Trenton in January 2018, when a doctor diagnosed him with lumbar stenosis, a "narrowing of the spinal canal in the lower back." The doctor prescribed epidural injections for pain management and a walking cane. In May 2020, Defendants sent Durham to a quarantine unit but refused to let him take his cane. For 10 days, Durham repeatedly requested his cane, informing guards he was in severe pain. He also requested to see the doctor and use a chair in the shower. Guards denied his requests, calling him "an asshole who gets nothing" because he "complains a lot." The shower had no handrails, so without his cane or a chair, Durham fell and had to be transported in a wheelchair to the prison clinic, where he remained for several days.

Durham subsequently filed a *pro se* complaint in federal court for the District of New Jersey under 42 U.S.C. § 1983, accusing Defendants in their individual and official capacities of deliberate indifference to his medical needs in violation of the Eighth Amendment. He further alleged claims under the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126 § 12101 et seq., and the Rehabilitation Act (RA), 29 U.S.C. § 701 et seq.

The district court dismissed the suit *sua sponte*, reasoning that Durham was not a "qualified individual" within the meaning of the ADA or RA and that Defendants were entitled to Eleventh Amendment immunity as to claims in their official capacities seeking monetary damages. Durham appealed.

The Third Circuit observed that to state an ADA claim, Plaintiffs must demonstrate that: (1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability, as laid out in *Haberle v. Troxell*, 885 F.3d 171 (3d Cir. 2018). "Where compensatory damages are sought, a plaintiff must also show intentional discrimination under a deliberate indifference standard," the Court added, citing *Furgess v. Penn. Dep't of Corr.*, 933 F.3d 285 (3d Cir. 2019).

Unlike the deliberate indifference standard to demonstrate an Eighth Amendment violation, ADA's deliberate indifference standard requires only a showing that: (1) defendants had knowledge that a federal right was substantially likely to be violated and (2) defendants failed to act despite that knowledge. A claim under RA requires the same showing with the additional element of proving that the program in question received federal dollars, as held in *Gibbs v. City of Pittsburgh*, 989 F. 3d 226 (3d Cir. 2021).

A "disability" includes "walking and standing," the Court noted, and providing showers in prison also qualifies as a



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

"service, program, or activity" under ADA. So discrimination may be shown by refusal to make reasonable accommodations that results in denial of use or access, as held in *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 672 (7th Cir. 2012). Based on this, the Third Circuit concluded that Durham had stated a cognizable claim.

The Court further observed that the Eleventh Amendment bar against suing state officials in their official capacities may be abrogated by Congress, as held in *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299 (1990). ADA itself specifically provides that "[a] State shall not be immune under the eleventh amendment" for violating the act. Congress also has authority to abrogate Eleventh Amendment immunity whenever the conduct giving rise to an ADA violation also violates a constitutional amendment, as shown by *United States v. Georgia*, 546 U.S. 151 (2006). And Durham had alleged a violation of his Eighth Amendment rights stemming from the same conduct that gave rise to his ADA claims.

To prevail on his Eighth Amendment claim, Durham had to show that "(1) he had a serious medical need; (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to [Durham]," a test laid out in *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). The district court had found that Durham's allegations lacked "the requisite mental state for the 'deliberate indifference' element: that prison officials knew of and disregarded 'an excessive risk to inmate health or safety,' meaning a 'substantial risk of serious harm.'" The Third Circuit disagreed, citing Durham's numerous complaints about his pain, his repeated requests for his cane and for a chair to use while showering—all of which showed that Defendants were aware of the risk of serious harm, meaning their refusal to grant the requests showed their indifference. Consequently, Durham had alleged a plausible claim of an Eighth Amendment violation which, in turn, was the basis of Congress' authority to abrogate Eleventh Amendment immunity.

Thus the district court's dismissal was vacated and the case remanded. Before the Court, Durham's case was argued by attorneys Oren N. Nimni and Samuel Weiss of Rights Behind Bars in Washington, D.C. See: *Durham v. Kelley*, 82 F.4th 217 (3d Cir. 2023). ◼



# Quantum|Navigation for Criminal Defendants

We are not a law firm, so much more than a law firm. Q|Nav is your source for legal counsel, experts, investigators, researchers, deep digger detectives, and paralegals, owned and managed by us, for you – for all state and fed cases. Our services are unique as we assist people by providing information and experience-based guidance to them and their families related to the criminal justice process and their unique circumstances. Our founder was incarcerated 17 years, earning clemency and commutation. He knows where you've been – where you are. We all do. We wish we could work for little or no fees, but we can't. To assure our/your independence, we do not accept donations or grants.

**There are various stages throughout the complex criminal accusation, conviction, and sentencing process that require guidance**. This includes indictments and charging complaints; Pre-plea or trial options; Mitigation; Positioning motions; Defense counsel selection; Global settlements; Negotiations; Jury analysis; Expert witnesses; and testimonial strategic planning. Because we understand the highly punitive nature of the sentencing laws, we can assist with providing resources related to civil remedies, mitigation for sentencing, lesser-offenses, non-consecutive sentencing (where possible), and proportionality reviews [statistical and statutory].

**We believe in sentencing fairness, proportionality**, ***relief.*** Equity begins with the ***initial charges*** but continues throughout every stage of the criminal accusation process. Remedies include executive (clemency/pardon), and quasi-executive and parole relief, Conviction Review Units, meritorious parole, special needs early release, local advocate(s) partnerships, innocence projects, public defender agency clemency portals, proportionality petitions, new evidence discovery, prosecution direct negotiations through "*joint motion postconviction plea deals*", blends, and combinations of plans as your individual circumstances command. We believe in genuine victim and community **Restorative Justice** and guide our clients and loved ones trying to secure early release with **a *real*** life plan. Facts and evidence, particularly **discovery of new evidence** rules all avenues for success.

**We know how the criminal process impacts you, your family, loved ones, victims, alleged victims, and hometown society**. Please ask your loved ones, lawyer, advocates about us - check us out. Ask around about Q|Nav's success stories for defendants like you. ***If*** we think that we might be useful, we'll **deliver to you** an abbreviated 10-page website brochure, incorporating our client input form, client qualification process, and fee arrangements. Please summarize your case – your goals in 300 words or less. Do not send original papers. **We give special attention to defendant families and loved ones who passionately advocate for their imprisoned loved one.**

**PHONE**:(720) 530-7581 **WEB:** www.QNAV-LLC.com **EMAIL:** contact@qnav-llc.com

### SEND ALL MAIL TO OUR AURORA COLORADO ADDRESS

**WASHINGTON OFFICE *FOR FAST RESPONSE* DENVER OFFICE**

| | | |
|---|---|---|
| The Pitch at The Wharf | 4255 South Buckley Rod | The Point at Inverness |
| 800 South Main Street | PMB 419 | 8310 South Valley Hwy |
| Suite 200 | Aurora, CO 80013 | Suite 300 |
| Washington DC 20024 | | Centennial, CO 80112 |

# Nine Employees Arrested at Troubled South Carolina Jail

In just a month in early 2024, nine employees were arrested at the Alvin S. Glenn Detention Center, the lockup run by South Carolina's Richland County. The state Department of Corrections (DOC) opened an investigation at the jail in Columbia in July 2023, prompted by a series of stabbings, escapes and contraband smuggling attempts, as *PLN* reported. [See: *PLN*, Nov. 2023, p.39.]

The first arrest occurred on January 12, 2024, when guard Amara Brown, 27, was booked into the lockup where she worked for allegedly placing an August 2023 DoorDash food order that was later found during a cell shakedown of an unnamed detainee—the same one to whom Brown also admitted smuggling a cellphone. She was released on a $10,000 bond.

On January 17, 2023, fellow guard Antiona Walker, 25, was allegedly caught trying to enter the jail with packs of Newport cigarettes hidden inside potato chip bags and a fountain drink that reeked of alcohol. No bond amount was announced for her.

The following day, on January 18, 2023, guard Donisha Grady, 36, was arrested after tipped-off investigators discovered she had spoken with an unnamed detainee over his contraband cellphone 65 times in six months. A week after that, on January 25, 2024, guard A'Zasia English, 23, was also jailed for allegedly communicating outside of work with an unnamed detainee on his contraband cellphone. Grady's bond was set at $10,000 and English's at $20,000.

The next day, January 26, 2024, a K-9 dog alerted guards to a car driven by Zaria Watson, 23, a guard working under contract from Allied Barton Security. They searched the vehicle and found marijuana, after which Watson was arrested and jailed on a $20,000 bond.

Just one more day passed before the next arrest on January 27, 2024, when jail employee Consuela Porch, 27, was arrested on multiple counts of exchanging contraband and having sex with detainees. Tipped-off investigators intercepted her entering the jail with a plastic cup stuffed with cigarettes and vapes. They also found more contraband in a search of her car. She admitted having an "on and off" relationship with an unnamed detainee, the Sheriff's office said, using her smartwatch to coordinate contraband drops. She was jailed on a $20,000 bond.

Two days after that, on January 29, 2024, contract jail nurse Jakiera Day was allegedly caught trying to enter the jail with marijuana, which she attempted to hide in a box of crackers. A search of her car then turned up medications apparently pilfered from the jail dispensary and notes to unnamed detainees. She was booked on a $10,000 bond.

By that point, guard Wendell Scholar, 32, had already been on leave 11 days after he allegedly assaulted a detainee on January 18, 2024. Other guards said they had to restrain him after he dragged an unnamed and handcuffed detainee up a flight of stairs, slammed him into a wall and began punching him. While that incident was under investigation, another came to light from October 17, 2023, when fellow guards also had to intervene to pull Scholar off another unnamed detainee he had pushed onto a cell bed and begun punching. For good measure, he shoved yet another unnamed detainee as he was being led away. Scholar was arrested and charged on February 9,

# Great Self-Help Books



Encyclopedia of
Everyday Law
**$34.99**



Criminal Law
A Desk Reference
**$44.99**



Represent Yourself
in Court
**$39.99**



Win Your Personal
Injury Claim
**$34.99**

**Order from Prison Legal News**

Add $6 shipping for orders under $50

**Prison Legal News**
PO Box 1151
Lake Worth Beach, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org



Criminal Law Handbook
**$49.99**



Legal Research
**$49.99**



Deposition Handbook
**$34.99**

⚖ **NOLO** YOUR LEGAL COMPANION

2024, with assault and battery "of a high and aggravated nature," third-degree assault and three counts of misconduct in office.

The ninth arrest, on February 11, 2024, was the eighth involving contraband charges. On her way into work at the jail, Shatata Jameca Smith, 26, was stopped carrying a Hello Kitty tumbler and a dinner bag of pasta inside which guards found what turned out to be 99 oxycodone pills and 6.4 grams of crack cocaine.

In a December 2023 letter to county administrator Leonardo Brown, DOC promised to shut down the lockup if deficiencies in staffing and security were not addressed within 90 days. But with nowhere to put some 900 detainees, that threat seemed empty. The federal Department of Justice (DOJ) announced its own investigation on November 2, 2023, based on "credible allegations" that the jail "is structurally unsafe and that there have been sexual assaults, homicides and prevalent violence resulting in serious injuries." At the same time, DOJ said it was opening an investigation into similar allegations at Charleston's Sheriff Al Cannon Detention Center. *See: Justice Department Announces Civil Rights Investigations into Conditions in South Carolina Jails*, DOJ (November 2, 2023). ◤

Additional sources: *The State, WIS, WLXT*

# Two Kansas Prison Guards Fired, Six Disciplined for Mocking Injured Prisoner and Refusing Her Help

On October 17, 2023, a month after a Topeka Correctional Facility prisoner fell and had to crawl back to her cell because guards refused to help her, the Kansas Department of Corrections (DOC) fired two high-ranking guards at the prison and disciplined six others for neglecting her medical needs. No one disciplined was named.

The incident unfolded on September 7, 2023, when Elizabeth Wince fell on the sidewalk before 9 p.m. headcount, according to a fellow prisoner, who mentioned three guards by their last names—White, Crone, and Williams—and said they mocked Wince, calling her fat and lazy. Watching Wince crawl back to her cell, a journey which took a painful two hours, one guard allegedly patted her own knee and called out, "Come on, you can do it."

Between her fall and that crawl, Wince had been denied treatment in the medical clinic. The following day, on September 8, 2023, she was hospitalized after her foot turned black. She then spent several weeks recovering from multiple broken bones in her foot. Meanwhile the guards reportedly attempted to justify their behavior by saying they thought Wince was faking her symptoms. After DOC fired or disciplined those involved, it characterized the guards' behavior as an isolated lapse in judgement. The agency also denied any systemic issues with the prison or its medical care provider, Centurion Health.

DOC tapped Centurion Health to replace Corizon Health, saying it hoped to improve a poor quality of care that prisoners have long complained about. However, current and former Kansas prisoners say "their medical care threatens their health," as *PLN* reported. [See: *PLN*, Dec. 2023, p.1.]

Wince's fellow prisoners said they were not allowed to help her and would have been disciplined if they had tried, though that didn't stop guards from reprimanding them anyway. Many prisoner complaints allege that guards call prisoners "bitches" and say their mistreatment does not matter because they will "die in here"—prompting at least one prisoner to worry aloud, "Was that intended as a threat?" ◤

Sources: *CBS News, KCUR*

# Missouri Moms Jailed After Kids Miss Too Much School

"Truancy" sounds old-fashioned. But after two mothers were convicted of letting their kids miss too much school, the Missouri Supreme Court upheld their incarceration sentences for the misdemeanor on September 15, 2023.

The Court's ruling came in the consolidated appeals of Caitlyn Williams and Tamarae LaRue, who were convicted of violating the state's compulsory attendance law in 2022—Williams for letting her daughter miss 15 days of first grade, LaRue after her son skipped 14 days of kindergarten. Each parent was sentenced to 15 days in the Laclede County Jail, though LaRue's term was suspended, and she was placed on probation for two years.

Chronic absenteeism, defined as missing 10% or more of a school term, has risen alarmingly, with over 14.7 million U.S. students chronically absent in 2021-22, a number 80% higher than before the COVID-19 pandemic. Approaches to truancy vary widely. Some states criminalize it, leading to fines, court involvement and even jail time for parents like Williams and LaRue. Other states emphasize prevention and intervention, offering support to families facing underlying problems with transportation or childcare needs related to poverty.

Many absences for the two women's kids resulted from sickness in the family. LaRue's five-year-old missed one day with a fever, another for a doctor's appointment. At other times she had car trouble, or one of her other three kids had COVID-19. Her primary crime appeared to be that she was a single parent with several kids and limited resources.

The cases reveal the human cost of punitive truancy enforcement. Ellen Flottman, the Columbia attorney representing both women, argued that the legal definition of truancy was too vague and that enforcement of the law violates constitutional due process protections. But the Court disagreed and affirmed both convictions. *See: State v. Williams*, 673 S.W.3d 467 (Mo. 2023).

As *PLN* reported, a Pennsylvania mother of seven died in jail in 2014 after accumulating $2,000 in unpaid fines and court costs connected to her children's truancy. Eileen DiNino's death prompted a 2015 revision to state law that minimized truancy prosecutions. [See: *PLN*, July 2016, p.60.] ◤

Additional source: *Washington Post*

 Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 36 of 74    Document 4-1

# Exceptional Punishments

*by Kate Weisburd*

No one should be made to give up their rights in exchange for being spared from prison.

The same scene unfolds in criminal courtrooms across the country every day. After someone has been found guilty by a jury or pled guilty, a judge imposes a sentence. The judge sometimes sentences them to prison, but often the judge sends them to a halfway house, treatment program, or other form of court supervision outside of prison.

As punishments, these non-prison sentences involve a litany of rules and restrictions that strip people of basic constitutional rights. Over the years, I have collected and analyzed hundreds of public records containing the rules governing people on various forms of court supervision. People under criminal court supervision are frequently required to provide DNA samples to law enforcement, use devices that measure drug and alcohol use, or wear GPS and microphone-equipped ankle monitors that record and track their precise location 24/7, sometimes for months or years at a time. Restrictions on where people can live, with whom they can live, whom they may marry, and how they may parent are also common, as are limitations on travel, work, and religious life. As part of non-prison punishments, courts commonly order people to participate in religious drug treatment programs such as Alcoholics Anonymous (AA), and successful completion of these programs might require individuals to sign self-incriminating "acceptance of responsibility" statements.

My experience defending young people in California's juvenile delinquency courts allowed me to see firsthand how non-prison punishments were not really alternatives to incarceration, but alternative forms of incarceration, or prison by another name.

Yet can the deprivation of basic constitutional rights—such as the rights to marry, parent, worship, and protest—really be imposed as direct punishment for a crime in lieu of prison? Is there a punishment "exception" to the Constitution? As I claim in a forthcoming article in the California Law Review, the answer must be no: there is no legal justification for rights-violating punishments to escape traditional constitutional scrutiny.

Because non-prison punishments are often justified as decarceral in spirit, the illegality of how they strip away basic rights has often been overlooked. This oversight is hardly surprising. Prison, after all, involves significant limitations on privacy, movement, and basic autonomy. If a judge can sentence someone to life in prison, how can a judge not also have the power to strip someone of the right to marry, or speak, as direct punishment? Courts have too often ignored this question, but its answer is not as obvious as it might seem.

To be sure, the deprivation of rights has always been a mainstay of criminal punishment, yet advances in surveillance technology, along with the influence of private "community corrections" entrepreneurs, has created an ever-more expansive and invasive web of rights-restricting non-prison punishments. While reform-minded pundits on both the left and the right often justify these punishments as a route toward ending mass incarceration, these punishments instead risk reinforcing what scholars Amanda Alexander and Reuben Jonathan Miller call "carceral citizenship," a status that legitimates the legal exclusion of historically subordinated groups and reinforces social–legal hierarchies based on race, class, disability, and gender.

There is no legally sound justification for exempting rights-restricting punishments from traditional forms of constitutional scrutiny—both within prison and outside. A criminal conviction does not give the state carte blanche to deprive people of rights so long as those deprivations do not run afoul of the Eighth Amendment's prohibition on cruel and unusual punishment. As the Supreme Court declared in 1973, there is "no iron curtain drawn between the Constitution and the prisons of this country." There is also no such curtain between the Constitution and other forms of punishment. Despite this strong categorical language and robust—albeit often inadequate—body of law governing prison conditions, non-prison punishment continues to extinguish rights and escape constitutional scrutiny. Why?

Either implicitly or explicitly, judges, prosecutors, and reformers defend non-prison punishments along similar lines: These non-prison punishments may be another form of incarceration, but they are still better than prison. Yet, as I argue, better-than-prison is a low threshold and



# DIRECTORY OF FEDERAL PRISONS

## The Unofficial Guide to Bureau of Prisons Institutions

### BY CHRISTOPHER ZOUKIS

The Directory of Federal Prisons is the most comprehensive guidebook to Federal Bureau of Prisons facilities on the market. Not simply a directory of information about each facility, this book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. What sets the Directory of Federal Prisons apart from other prison guidebooks is the first-hand validation of information.

**Price: $99.95** *(shipping included)*

Name _____ DOC/BOP # _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Prison Legal News • PO Box 1151, Lake Worth Beach, FL 33460**
**Tel. 561-360-2523 • www.prisonlegalnews.org**

is neither legally nor logically sound. Just because a criminal sanction is better than prison does not make it constitutional.

There are two obvious objections to my position that non-prison punishments illegally strip people of rights. The first is that prison is worse but perfectly legal. Courts, scholars, and policymakers often evaluate rights-stripping punishments through the lens of prison: If rights are restricted in prison, anything less restrictive outside of prison must be legal. Yet it does not follow that anything less restrictive than prison is per se constitutional. As the Ohio Supreme Court explained, simply because the state "might have incarcerated a defendant does not, in itself, justify" the imposition of any restriction that would have also applied in prison. And, indeed, given the lack of specific laws permitting a loss of rights—laws that do exist with respect to prison—erasing rights as part of non-prison punishments appears to be illegal.

The second objection to my argument pertains to decarceration: But for non-prison punishments, people would remain in prison. It is tempting to assume that, were it not for non-prison punishments, even more people would be incarcerated. Yet in a world without non-prison punishments, there is no convincing evidence that the same people would otherwise be incarcerated. Some may, but many would not. Conversely, some non-carceral punishments, such as parole and federal supervised release, are never substitutes for incarceration but are imposed in addition to, not in lieu of, incarceration. It is rarely a one-to-one exchange between one day in prison and one day subjected to non-carceral punishment.

More fundamentally, the fact that some non-prison punishments are experienced as less harsh than prison does not justify punishments that violate constitutional rights. As Michelle Alexander explains in the context of electronic ankle monitoring, "digital prisons are to mass incarceration what Jim Crow was to slavery." She elaborates that if an enslaved person had been presented with a choice between continued slavery or living under Jim Crow, they would have certainly picked Jim Crow—but that choice does not justify Jim Crow. By the same token, simply because non-prison punishment is less harsh than prison does not justify punishments that otherwise violate the Constitution.

The growing bipartisan interest in alternatives to incarceration—and the perceived benevolence of non-prison punishments—makes it imperative that we reckon with the unconstitutionality of rights-stripping punishments.

All punishment, including imprisonment, is state action and this means that rights-stripping punishments should be subject to traditional constitutional scrutiny. Restrictions on speech should be subject to traditional First Amendment scrutiny, restrictions on movement should be subject to Fourth Amendment review and Due Process protections, and so forth. Prison sentences are also not exempt. A prison sentence, after all, is also Fourth Amendment seizure (people in prison are clearly "seized") and should trigger Fourth Amendment scrutiny. It may be that a seizure that occurs in prison is "reasonable" under Fourth Amendment law, but not because the Fourth Amendment does not apply to people in prison. In fact, it does.

Of course, there is reason to doubt that this constitutional argument will convince all judges—and that, even if it convinced some, it would be upheld by the Supreme Court, given the Court's present composition. Yet there is still value in challenging the premise that some people are protected by the Constitution while others—in particular, people convicted of crimes—are excluded.

Challenging rights-violating punishments also forces a much-needed recalibration of the appropriate baseline for evaluating punishment that occurs outside of prison. The better-than-prison justification assumes that prison is always the alternative, but this is a false binary and an incorrect baseline. When contemplating alternatives to incarceration, the baseline should be freedom from all forms of carceral control and surveillance. The ideal presumption should be that if someone is not in prison, they should be free.

To be sure, as others have cautioned, carceral logic and punitiveness are embedded in many public institutions that operate adjacent to, but technically outside of, the criminal system (such as subsidized housing, schools, family law, welfare responses, and hospitals). But the reality that carceral logic extends well beyond prison walls is all the more reason to treat all state action the same for purposes of constitutional rights. All state action, such as punishment, civil sanctions, welfare policies, and regulations, should be subject to the same level of constitutional scrutiny. As we reckon with the future of the carceral state, including the potential for true decarceration, the illegality and illegitimacy of rights-violating punishments cannot be ignored. ◾

*This essay was adapted by the author from a forthcoming article in California Law Review. It originally appeared in Inquest on September 21, 2023, and it is used with permission. The original, along with illustrations, can be found at inquest.org.*

# N.J. Prison Guard Sacked Over Mock George Floyd Killing

On September 20, 2023, the New Jersey Civil Service Commission upheld a decision by an Administrative Law Judge (ALJ) allowing the state Department of Corrections (DOC) to fire a state prison guard involved in a mock killing of George Floyd during a Black Lives Matter protest. Joseph DeMarco, an 18-year DOC veteran, was terminated from his position at Bayside State Prison after joining counter-protestors who staged the stunt in June 2020.

At the time DOC said the guard's "reckless and inflammatory" actions "show[ed] a profound disregard for consideration of public order and safety." DOC attorneys later told Susan Olgiati, the ALJ who reviewed the firing, that the agency was "bombarded" with complaints after video of the mock funeral circulated on the internet.

Olgiati affirmed DOC's firing decision in June 2023, noting that DeMarco failed "to stop or de-escalate the offensive, inflammatory, derogatory and racially insensitive actions and comments" of his fellow counter-protestors, while many of the protestors were local residents who could have recognized him as a DOC employee. Olgiati also said DeMarco's claims that the counter-protest left him in "shock" and "embarrassment" were not credible. ◾

Source: *South Jersey Courier Post*

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 38 of 74    Document 4-1

# Third Circuit Unhappy With Federal Detainee's Denied Marriage Request at Pennsylvania GEO Group Lockup

On September 19, 2023, the U.S. Court of Appeals for the Third Circuit revived a claim by Brian Davis, a Jamaican national held for four years at Pennsylvania's Moshannon Valley Correctional Center (MVCC). The prison is privately operated by the Florida-based GEO Group, Inc., primarily housing low security noncitizens for the U.S. Bureau of Prisons (BOP).

While there, Davis requested to wed his fiancée, Fredricka Beckford. But his requests were denied, although he had complied with MVCC's marriage policy—one he contended was more restrictive than BOP's; in fact, no prisoners had been allowed to marry there since GEO Group assumed operational control.

In 2016, after Davis was released and deported, he and Beckford filed suit against GEO Group, former MVCC Warden George C. Wigen, former BOP administrator Donna Mellendick and U.S. Department of Homeland Security Assistant Field Director David O'Neill, blaming them for preventing the marriage. Proceeding under 42 U.S.C. § 1983, the couple raised claims under the Equal Protection Clause, as well as a federal tort claim for intentional infliction of emotional distress, asking for a damage award against the federal government under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, (1971). They later added a § 1985(3) conspiracy claim based on race and alienage, noncitizen status.

The federal court for the Western District of Pennsylvania dismissed the case, finding the GEO Group and Wigen were not federal actors for *Bivens* purposes. The district court also said that the § 1983 claims failed because Defendants were not state actors and that the § 1985(3) conspiracy claim did not apply to the right to marry.

On appeal, the Third Circuit reversed in part, holding that private actors engaged in "the federal equivalent of 'state action'" may be subject to *Bivens* claims, but declining to extend *Bivens* protection to infringements on the right to marry. The § 1985(3) claim was allowed to proceed, as the alleged conspiracy involved both private and federal defendants. *See: Davis v. Samuels,* 962 F.3d 105 (3d Cir. 2020).

On remand, Davis and Beckford filed an amended complaint adding a claim under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1. RFRA applies only to federal prisoners; for state prisoners, similar protections are provided by the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc. The district court again dismissed the case, finding no proof that the inability to marry substantially burdened Plaintiff's religious beliefs.

Taking up the case once more, the Third Circuit issued a superseding ruling that again partially reversed the district court's order. To state a RFRA claim, the appellate court explained, a plaintiff must allege that government officials substantially burdened his sincere religious conduct; to counter that, the government defendants must then present evidence that their policy is the "least restrictive means of achieving a compelling governmental interest."

As a matter of first impression, the Court addressed the issue of whether denial of religious conduct that is *not* mandatory creates a substantial burden. Answering that question in the affirmative, the Court said "[a] substantial burden under RFRA extends to non-mandatory religious conduct and expression, i.e. conduct or expression not 'compelled by, or central to, a system of religious belief,'" and Davis' request to marry "[fell] within that category."

GEO Group and Wigen argued that even if Davis and Beckford had stated an RFRA claim, it should not apply to them because they were not government actors. That argument was soundly rejected: "By operating a prison containing federal inmates, GEO Group and [former warden] Wigen acted as 'instrumentalities' of the federal government," the Court said.

The federal defendants, Mellendick and O'Neill, argued they were entitled to qualified immunity (QI) on the RFRA claim, as the law was not clearly established at the time with respect to non-mandatory religious conduct. With this the Third Circuit agreed, noting that it had not distinguished its prior ruling in *Washington v. Klem,* 497 F.3d 272 (3d Cir. 2007).

As to the § 1985(3) claim based on alienage, Beckford did not have standing because she was a U.S. citizen, while Davis failed to show the denial of his marriage request was due to or motivated by the noncitizen status of prisoners at MVCC, or that such denials served to prevent using marriage to circumvent deportation proceedings.

Lastly, dismissal of Beckford's intentional infliction of emotional distress claim was affirmed as she did not allege any physical harm or show that Defendants' conduct was sufficiently egregious. The case was remanded for further proceedings on the RFRA claim against GEO Group and Wigen. Davis and Beckford were represented by attorney Stephen A. Fogdall with Schnader Harrison Segal & Lewis, a longtime Philadelphia firm that shuttered in August 2023. *See: Davis v. Wigen,* 82 F.4th 204 (3d Cir. 2023). ◼

## Are Phone Companies Taking Money from You and Your Loved ones?

HRDC and PLN are gathering information about the business practices of telephone companies that connect prisoners with their friends and family members on the outside.

Does the phone company at a jail or prison at which you have been incarcerated overcharge by disconnecting calls? Do they charge excessive fees to fund accounts? Do they take money left over in the account if it is not used within a certain period of time?

We want details on the ways in which prison and jail phone companies take money from customers. Please contact us, or have the person whose money was taken contact us, by email or postal mail:

**HRDCLEGAL@HUMANRIGHTSDEFENSECENTER.ORG**



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth Beach, Florida 33460

# Russian Opposition Leader Dies in Prison

Aleksei Navalny, 47, a Russian attorney who led opposition to Pres. Vladmir Putin, died on February 16, 2024, in a penal colony inside the Arctic Circle. The country's Federal Prison Service said he collapsed after a walk, just a day after appearing healthy, though gaunt, in a video court hearing.

Navalny led counter demonstrations after Putin's March 2012 election, earning a brief jail term. His candidacy for Moscow mayor that spring was interrupted by a conviction for embezzling funds from state-owned timber company Kirovies. He was sentenced to a five-year prison term, but released on bail to resume his mayoral campaign, which by then had lost momentum, and he polled a distant second in voting. The sentence was suspended in October 2013, a month after the election.

Over the next three years, Navalny's attempts to form several political parties were denied by the country's Ministry of Justice. Meanwhile he was convicted in 2014 of embezzling funds from the Russian branch of French cosmetics firm Yves Rocher and given a probated sentence. The firm won a judgment from Navalny in 2015, and Kirovies then wiped out his bank account with a successful 2016 suit to recover its embezzled funds, in what Novalny called a "drain-dry strategy."

The country's Supreme Court tossed his Kirovies conviction in 2016, but the trial court quickly found him guilty once again, handing down the same five-year suspended sentence. Of little help was a 2017 decision by the European Court of Human Rights that his convictions in both cases were "arbitrary and unfair."

Ramping up a challenge to Putin for the presidency that same year, Navalny was attacked with a chemical agent, suffering facial burns and significant vision loss in his right eye. He was then barred from the ballot in December 2017, and Putin cruised to reelection the next year.

Companies that Navalny accused of benefitting from government corruption then won more monetary judgments against him in 2018 and 2019. The following year, he became sick on a flight and was hospitalized; when airlifted to a German hospital, it was determined he had been poisoned with the Novichok nerve agent.

Navalny returned to Russia in January 2021 and was imprisoned for violating probation in the Yves Rocher conviction. Another nine years was added to his term in 2022 for contempt and embezzlement, after what Amnesty International called a "sham trial." An August 2023 conviction added 19 more years for "extremism."

Supporters then lost contact with Navalny until December 2023, when he turned up in the IK3 "Polar Wolf" prison camp. Recent releasees told the *New York Times* that the prison is "devised to break the human spirit, by making survival depend on total and unconditional obedience to the will of guards."

Navalny leaves behind a wife and two children. ◆

Sources: *New York Times, Russia Today*

# Is someone skimming money
## or otherwise charging you and your loved ones high fees to deposit money into your account?

*Prison Legal News* (PLN) is collecting information about the ways that family members of incarcerated people get cheated by the high cost of sending money to fund inmate accounts.

Please write to *PLN*, and **have your people on the outside contact us as well**, to let us know specific details about the way that the system is ripping them off, including:

- Fees to deposit money on prisoners' accounts or delays in receiving no-fee money orders
- Costly fees to use pre-paid debit cards upon release from custody
- Fees charged to submit payment for parole supervision, etc.

This effort is part of the Human Rights Defense Center's *Stop Prison Profiteering* campaign, aimed at exposing business practices that result in money being diverted away from the friends and family members of prisoners.



*Friends and families of prisoners can follow this effort, which is part of the Nation Inside network, at*
***WWW.STOPPRISONPROFITEERS.ORG***

Please direct all related correspondence to HRDCLegal@HumanRightsDefenseCenter.org Call (561) 360-2523, or send mail to PLN



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth, Florida 33460

# Oklahoma Jail Withholds Death Records, Fails to Report Five Since 2018

*by Matt Clarke*

Since 2018, at least seven vulnerable detainees have died at the 366-bed Pottawatomie County Public Safety Center, 30 miles east of Oklahoma City. Yet despite state law requiring deaths be reported within five days to the Oklahoma Health Department's jail division, the jail failed to report five of the deaths. Those reports would have triggered a jail safety inspection, which may hint at a reason jail Director Rochelle Thompson had for failing to report them. Adding to the appearance of a cover-up, Thompson and officials with the trust that took over jail operations in 2002 have also stonewalled requests from surviving family members for public records concerning the deaths.

Four deaths were ruled homicides by the county's medical examiner (ME), but not the death of Michael Morton, 67, who suffered from mental illness and was found on his cell floor without a pulse and not breathing in 2018. The ME ruled that his seizure disorder contributed to his death, which is perhaps why it was one of the two the jail reported.

Stacy Garrett, 38, also died at the jail in 2018. The ME ruled that substance abuse contributed to the death but the exact cause was undetermined. It was also unreported by the jail.

In 2019, Ronald Given, 42, died in a hospital a week after struggling with guards during a mental health crisis. The ME ruled his death a homicide, yet the jail did not report it. With the aid of Oklahoma City attorneys Ronald "Skip" Kelly and Kevin R. Kemper, his family filed a suit that is still pending in federal court for the Western District of Oklahoma. *See: Kopady v. Pottawatomie Cty. Pub. Safety Ctr. Trust*, USDC (W.D. Okla.), Case No. 5:20-cv-01280. They also tried for years to get public records that the jail refused to provide. It took a lawsuit by Frontier Media Group and a state appellate court order to finally get them. *See: Frontier Media Grp., Inc. v. Pottawatomie Cty. Pub. Safety Ctr. Trust*, Okla. Civ. Appeals (Div. II), Case No. 119.952 (Dec. 2022).

Cindy Salazar, 39, was being held at the jail for pickup by U.S. Marshals when she had seizures, was transported to a hospital, and died in 2021. Hers was the other death the jail reported.

## Four More Deaths

Kelly Wright, 50, died the day she was booked into the jail in 2021. She was attending a conference of the Oklahoma Society of Accountants, as the group's education chair, at the Grand Casino Hotel and Resort in Shawnee when she suffered a mental health crisis in the hotel lobby. When her wife, Shelly Cailler, found her at the St. Anthony Hospital in Shawnee, Wright was on life support, with five broken ribs and covered in unfamiliar bruises. Doctors told Cailler that Wright was brain dead after suffering a series of cardiac arrests in the ambulance that brought her from the jail to the hospital.

Wright had a history of alcohol abuse, hypertension, and depression. She had also been treated for delirium in 2020, which Cailler said was pandemic related. However, she had been stable for nearly a year, and none of this history explains her injuries. Body-cam video of her arrest showed Wright in crisis and combative, but police exercised restraint and did nothing that would have caused more than very minor injuries. Cailler tried to get any video, medical records, or reports pertaining to the injuries from the jail, without success. With the help of attorney Dan Smolen, she filed a lawsuit in federal court, alleging that jail staff ignored Wright's mental health crisis and failed to evaluate or treat her. A magistrate recommended dismissal of Defendant's motion to dismiss that suit



**NOBLE KNIGHT GAMES**

*Complete Your Quest!*

We have the world's largest selection of RPGs, CCGs, board games, war games, miniatures, and collectibles!

A free copy of our most popular books and games catalog is available for first time customers!

Orders can be placed through mail, phone, and directly through our website!

We accept institutional checks, money orders, credit cards, forever stamps (at 75% of the stamp's value), and payments through friends and family.

Before placing your order, we recommend that you review the policies of your institution regarding what you are allowed to receive, and any restrictions on what payment methods are allowed.

Questions? Contact us via mail, email, or phone.

608-758-9901
nobleknight@
nobleknight.com

Noble Knight Games
2835 Commerce Park Dr
Fitchburg, WI 53545

# CENTURION
### seeking freedom for the innocent in prison

**Centurion is an investigative and advocacy organization that considers rape or murder cases of factual innocence nationwide.**

Centurion does not take on accidental death or self-defense cases or any cases where the defendant had any involvement whatsoever in the crime. In cases involving sexual assault, a forensic component is required.

For cases of factual innocence, send a 2-4 page summary letter outlining:

- the crime you were convicted of
- the evidence against you
- why you were arrested

**SEND TO**
Centurion
1000 Herrontown Road
Clock Building 2nd Floor
Princeton, NJ 08540

You will receive a return letter of acknowledgment. If you meet our initial criteria, we will provide instructions for further review.

on March 5, 2024, and the case remains pending. *See:Callier v. Pottawatomie Cty. Pub. Safety Ctr. Trust*, USDC (W.D. Okla.), Case No. 5:23-cv-00594.

In 2022, Carrie Stewart, 48, died of infections caused by IV drug usage.

Jerry Gage, 78, also died in 2022, but of a quite different cause—his cellmate beat him to death. Jailers did not even notice the fatally injured prisoner until his assailant pointed it out. After Gage died in the hospital, the cellmate was deemed incompetent to stand trial for murder. Attorney Roland Skip Kelly is representing the Gage family in a lawsuit against jail officials, who have resisted producing public records in this case, too. *See: Gage v. Pottawatomie Cty. Pub. Safety Ctr. Trust*, USDC (W.D. Okla.), Case No. 5:23-cv-00889.

### Death Reporting Loophole

State Representative Dell Kerbs (R-Shawnee) noted the argument put forward by some—he didn't say who—that jailers don't need to report a death that occurs offsite, such as in a hospital. He said the law needs clarification.

Regardless of the law's clarity, the jail clearly uses this supposed loophole to avoid reporting prisoner deaths, especially those in which jailers might be complicit. As Gage lay unconscious and dying in the hospital, jail officials asked a county judge to release him. The judge did so on the condition that Gage agree to appear at his next court date. But as Kelly pointed out, the release should have been denied because Gage was unconscious and could not agree to anything. Yet the same thing happened with Stewart. Attorneys Smolen and Kelly say that Oklahoma jails often use such medical release bonds to deflect responsibility and medical costs for the sickest and most vulnerable prisoners.

Dr. LaTrina Frazier, head of the state health department's quality assurance and regulatory division, said the department was unaware of the unreported deaths. Pottawatomie County prosecutor Adam Painter, who was elected in November 2022, after the unreported deaths, agreed that they "raise serious concerns" and were being investigated.

It is a pity that the refusal to disclose public information is not also investigated. Cailler, for instance, knows from the ME report that her wife's body registered less than half the legal limit of alcohol and no drugs for which she did not have a prescription. That puts the lie to claims that Wright was suffering drug-induced agitation when booked into the jail. But it does not tell Cailler anything about what actually happened to Wright. She is left to imagine how her wife's injuries came about and fight in court for disclosure of the information.

"When you take the least of us and you treat them with the kind of disrespect to the point that it leads to their demise, that's just inhumane," said Kelly. "I have never experienced the kind of ruthless disrespect for families I've seen from this jail. If there was ever a jail that needs to be under investigation by the U.S. Department of Justice, it's that one."  ◾

Additional source: *Oklahoma Watch*

# $8.5 Million Settlement After Pretrial Detainee Suffocated by Guards and Medical Staff at Virginia Psychiatric Hospital

*by David M. Reutter*

On September 19, 2023, the Commonwealth of Virginia, the County of Henrico and its Sheriff Alisa A. Gregory agreed to pay $8.5 million to settle claims arising from the death of Ivo Otieno, 28, at Central State Hospital (CSH) in Petersburg.

As *PLN* previously reported, Otieno was arrested for stealing solar lights from a neighbor's yard just three days before his death on March 6, 2023. He was taken to the Henrico County Jail, where surveillance footage showed him naked in his cell with his hands shackled when he was pepper sprayed in the face by guards, who also beat him, the family lawyer said.

Otieno, who had been brought to the U.S. from Kenya at age four, was an aspiring musician and former high school football star who founded a Bible study group with friends after developing mental health issues that ended his football scholarship in California. At HCJ, he was allegedly denied medications before guards found him in the cell, surrounded by his own feces. They carried him out by his limbs, claiming he was "unruly," and sent him to CSH.

Video surveillance from CSH shows county Sheriff's Deputies enter Otieno's cell, dragging him and forcing him to the floor before a group of 10 Deputies and medical staffers piled onto him and held him to the floor for 11 minutes. As a result, Otieno died of asphyxiation.

In March 2023, Dinwiddie County prosecutor Ann Cabell Baskervill charged seven deputies and three CSH employees with second degree murder. Charges were dropped against two of the medical staffers in June 2023, when Baskervill also resigned to study in Paris. She said Otieno "was not agitated and combative." A grand jury indicted the remaining eight defendants, whose trials are scheduled later in 2024.

The settlement accepted by Otieno's family provided for a $2.5 million payment each to Otieno's mother, Caroline Akiniyi Ouko, and his brother, Leon Dennis Ochieng. A $21,500 payment went to each of four other siblings. Attorney fees of $1,691,000 and $1,665,000, respectively, were provided to attorneys representing Plaintiffs from the Crump Law Firm in Washington, D.C. and the Krudys Law Firm in Richmond. See: *Ochieng v. Commonwealth*, Va. 14th Jud. Cir. (Cty. of Henrico), Case No. CL23-6331.  ◾



### Surrogate Sisters
**Services For The Incarcerated For 20 Years**

We Offer….
- Sexy Photos
  - Non-Nude/Nude, Male/Female
- Gifts For Loved Ones
- Erotic Stories
- Pen-Pal Services
- Bi-monthly Specials

…. And More

For Free Info Send A Self Addressed Stamped Envelope To:

Surrogate Sisters
P.O. Box 95043, Las Vegas
NV 89193

Service@Surrogatesisters.com

# $11.6 Million Settlement Reached in HRDC Debit Release Card Case in Washington; California Victory Remanded

On December 19, 2023, the federal court for the Western District of Washington granted final approval to an $11.6 million settlement between Rapid Investments, Inc. and a class of prisoners released from over 1,500 lockups around the U.S., which forced them to accept return of money confiscated during their incarceration on a debit card issued by the firm. Heavy fees then ate into their balances—sometimes leaving them nothing.

The settlement follows a decision by the U.S. Court of Appeals for the Ninth Circuit that upheld the district court's refusal to enforce the cardholder agreement which Rapid Investments attached to the cards to force the former prisoners' disputes into individual arbitration—a "divide and conquer" strategy businesses employ to avoid expensive class-action litigation.

The case is one of several class-actions against debit-release cards being pursued by *PLN*'s nonprofit publisher, the Human Rights Defense Center (HRDC). In another, the federal court for the District of Oregon in July 2023 certified a national class of prisoners given debit-release cards issued by NUMI Financial, a subsidiary of Stored Value Cards, Inc. The lower court said that merely accepting the card did not constitute consent to the attached cardholder agreement by former Portland jail detainee Danica Love Brown, so the agreement's mandatory arbitration clause was ruled unenforceable. A three-judge panel of the Ninth Circuit—consisting of Judges Richard R. Clifton, Patrick J. Bumatay and M. Miller Baker—then affirmed that decision in December 2022. [See: *PLN*, Oct. 2023, p.12.]

In still another of the cases, a different panel of the same appellate court arrived at the opposite conclusion. The federal court for the Central District of California had also refused to compel arbitration under the cardholder agreement attached to a debit-release card issued by prison financial services giant JPay, when Adam Cain was released from state prison. But like Stevenson's *Dr. Jekyll and Mr. Hyde*, the Ninth Circuit panel that heard Brown's appeal was better to the former prisoner than the panel that weighed JPay's appeal.

Instead, Judges Carlos T. Bea, Milan D. Smith, Jr. and Lawrence J.C. VanDyke said on December 13, 2023, that lead Plaintiff Cain could have silently rejected the card agreement by withdrawing his balance before fees exhausted it; since he didn't, he accepted the agreement, the Court held, so the arbitration clause is enforceable, and the case was remanded.

The panel apparently ignored an admission during oral argument by JPay that the card was activated when Cain got it—so there was no way he could retrieve his funds without incurring a fee. A request for rehearing before the entire Ninth Circuit *en banc* was denied on January 23, 2024, when the same judges who ruled the month before voted against rehearing and noted that "no judge of the court has requested a vote on it." See: *Cain v. JPay, LLC*, 2023 U.S. App. LEXIS 32908 (9th Cir.); and 2024 U.S. App. LEXIS 1524 (9th Cir.).

# PLN & CLN Subscription Bundles
## STAY INFORMED AND SAVE MONEY
### *Pricing Effective as of 6/30/2023*

☐ 1 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $74.00 ($10.00 Savings), Professionals/Entities - $170.00 ($22.00 Savings)

☐ 2 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $148.00 ($20.00 Savings), Professionals/Entities - $338.00 ($46.00 Savings)

☐ 3 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $222.00 ($30.00 Savings), Professionals/Entities - $508.00 ($68.00 Savings)

☐ 4 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $296.00 ($40.00 Savings), Professionals/Entities - $676.00 ($92.00 Savings)

Name: _____ Amount enclosed: _____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

It's frankly hard to believe the judges who reached the opposite conclusion in Brown's case wouldn't want the full Court to resolve the glaring discrepancy between the two rulings. Fortunately for Jeffrey Reichert and Gary Moyer, lead plaintiffs in the Washington case, they got one of the Ninth Circuit's Dr. Jekyll panels when their case came up.

Moyer was held at Kitsap County Jail three times between 2017 and 2018. Each time he was released, his funds were returned on a prepaid debit card issued by defendants Cache Valley Bank and Rapid Investments, Inc. He had no option to receive his funds except on the card, so he argued that the fees he was charged violated the Electronic Funds Transfer Act and Washington state law. Reichert also received his release funds on a debit card after leaving the jail.

Defendants moved to compel arbitration under the cardholder agreement, making the same argument that JPay and Stored Value made before: The agreement was attached to the debit card that Plaintiffs received, and they didn't object to it, so they must have accepted it. The district court disagreed, finding silence did not constitute assent to an agreement under Oregon law, so the arbitration clause was unenforceable.

After Defendants appealed, the Ninth Circuit vacated the order in 2020 and remanded the case for the district court to make sure whether a contractual agreement existed between the parties. But on remand, the lower court stuck to its guns, ruling that "Moyer's use of the card did not constitute assent to [the cardholder] contract." Once again it denied the motion to compel arbitration. Another appeal followed.

### Return to the Ninth Circuit

Taking up the case again at the Ninth Circuit, Judges Marsha S. Berzon, Morgan Christen and Frederic Block noted that the cardholder agreement specified a $2.50 weekly "maintenance" fee plus a $2.95 fee for each ATM withdrawal. Moreover, the process for avoiding fees—by receiving the card balance by check—was ambiguous and did not include a timeframe.

Under the Federal Arbitration Act, arbitration claims are a matter of contract, the Court wrote; so an arbitration clause cannot be enforced absent a contractual agreement. To determine whether an agreement exists, "federal courts 'apply ordinary state-law principles that govern the formation of contracts,'" the Court said. Relying on Washington law, it found Moyer's acceptance of the card did not constitute assent, nor did using the card to obtain his own money.

The Ninth Circuit went through the details that form a contract, questioning whether Moyer received "benefit" from the debit card—unlike Rapid Investments, which used the cards to "levy significant maintenance and user fees" on prisoners upon release. Finding that Moyer had not assented to receiving the card, the Court said no contract was ever formed. It therefore affirmed denial of the motion to compel arbitration on December 30, 2022. *See: Reichert* v. *Rapid Investments, Inc.,* 56 F.4th 1220 (9th Cir. 2022)

Meanwhile, the parties reached a settlement agreement covering a class of prisoners given Rapid Investments' debit cards upon release from some 1,500 jails and prisons. Under its terms, Rapid Investments agreed to pay up to $11.6 million to reimburse any fees deducted from their card balances at triple the rate charged; so, if a prisoner's balance was debited $20 in fees, he was eligible to receive $60 under the settlement. Plus each claimant was entitled to a flat fee of $15 on top of that. The period to file claims was extended to March 1, 2024, and the first checks started going out in February 2024.

Some former prisoners were reimbursed fees charged on Rapid Investments' cards under two other settlement agreements in Washington and Nevada; however, to the extent they recovered less than they would have under this agreement, they were eligible for payments to make up the difference.

The settlement fund was far less than the estimated $24 million total grabbed by Rapid Investments from Class members. Nevertheless, the district court was sufficiently impressed to award $3,596,000 in fees and $1,080,844.47 in reimbursed costs to be paid from the fund to Class Counsel, Seattle attorneys Chris R. Youtz, Richard E. Spoonemore and Eleanor Hamburger with Sirianni Youtz Spoonemore Hamburger, as well as HRDC. Named Plaintiffs Moyer and Reichert each received another $11,000 from the fund for their contributions to the case. *See: Reichert* v. *Rapid Investments, Inc.,* USDC (W.D. Wash.), Case No. 3:17-cv-05848.* ⬛

# Georgia Sheriff Resigns After Groping TV Judge's Breast

Nearly two years after Sheriff Kris Coody of Georgia's Bleckley County publicly groped television Judge Glenda Hatchett's chest, he pleaded guilty to misdemeanor sexual battery in state court on August 21, 2023. Coody, 59, was then sentenced to 12 months of probation and ordered to pay a $500 fine, plus complete 40 hours community service and undergo an alcohol and drug evaluation. In a letter addressed to Gov. Brian Kemp (R) the same day, the Sheriff resigned from his second term, after first taking office in January 2017.

The incident unfolded at a state Sheriffs' convention in January 2022, where Hatchett, 72—a presiding state judge who also stars in TV Shows *Judge Hatchett* and *The Verdict With Judge Hatchett*—was introduced to Coody by U.S. Marshal Thomas Brown. Testifying at Coody's plea hearing, Brown recalled spying Coody's hand rubbing Hatchett's breast and said he intervened immediately, demanding to know what was going on.

At a post-hearing news conference, Hatchett described her trauma as a "scar" Coody inflicted. "And I was angry," Hatchett said, adding that she could not stop crying and needed therapy after the incident. The TV judge also called the 20-month delay in the case intentional, accusing Coody and his attorney, Joel Pugh, of "manipulat[ing] the system so he could hold onto not only his salary but also his pension." She criticized Kemp for not suspending Coody, too, though the governor said he could not suspend Coody because the crime happened off-duty.

Pugh insisted that the former Sheriff "has a distinguished career in law enforcement." But he added, "Unfortunately, that's over, and I don't know what he plans to do next." ⬛

Sources: *CNN, WGXA*

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 44 of 74    Document 4-1

# North Carolina Court of Appeals Reinstates Parolee's Parental Rights, Says Parole Conditions Barred Him from Visiting Minor Daughter

*by Matt Clarke*

On September 5, 2023, the Court of Appeals of North Carolina reinstated a parolee's parental rights that had been stripped for lack of contact with his minor daughter, after finding it was conditions of his parole which had prevented him from contacting her.

Crystal was born to the Respondent-Father (RF) parolee and her mother, Petitioner (P), in 2010. The couple separated in December 2010 and executed a Consent Order in May 2011 granting them joint custody, though the mom had primary and physical custody and the dad was required to pay $400 monthly in child support. He exercised weekend visitation rights with Crystal and remained current on his child support payments until March of 2014, when he was convicted of two felonies related to sexual misconduct with a 14-year-old minor in Indiana.

During 38 months of his incarceration, the dad's calls to his daughter were answered only once by her mother, who refused to let him speak with Crystal. He was then released on parole subject to restrictive conditions, including a prohibition on any contact or communication with minors without the prior consent of parole authorities. The conditions included specific prohibitions on touching, photographing, conversing with, or being in a vehicle or residence with a minor or communicating with a minor directly or through a third party, to include correspondence via letter, email, text message, internet communications or otherwise. Any inadvertent contact with a minor was to be reported to his parole officer.

"Following his release on 3 July 2017, [the father] completed and passed the Abel Assessment and a lie-detector test, both of which were required by Indiana authorities before any modifications to his parole conditions would be considered," the Court recalled. He sought to have his parole conditions modified to allow contact with Crystal in December 2017, and again in 2019 and 2021, after the child's mother filed the petition to terminate his parental rights on June 2, 2021. Each time parole officials denied the request. Nonetheless, he remained current on his child support obligation.

The mother's petition alleged that the father "willfully abandoned Crystal pursuant to N. C. Gen. Stat. § 7B-1111(a)(7) (2021)." Despite being jailed and awaiting trial on charges of First-Degree Sexual Offense, he opposed the petition and appeared in person at the termination hearing. A Guardian ad Litem appointed by the court to represent Crystal's interests declined to testify because she was "torn between what [she believed] the law is and what [her] wishes are…." Nonetheless, the trial court found the father had willfully abandoned Crystal and terminated his parental rights.

Aided by attorney Garron T. Michael, he appealed, challenging two of the trial court's findings of fact. The Court of Appeals upheld the finding that he "failed to make reasonable efforts, even annually, to request approval from the Parole Board to allow contact with Crystal since his release from prison in July 2017" despite holding that it was an ultimate finding and looking beyond the determinative six-month period preceding the filing of the petition.

The Court disregarded another finding that the father "failed to send any cards, letters, gifts or tokens of affection, nor did he send any birthday or Christmas gifts or otherwise acknowledge any of these events for" Crystal. Though factually accurate, the statement falsely implied that he could contact her without a real danger of criminal prosecution.

As for the remaining fact findings, the Court found them "insufficient to support the conclusion that [RF's] abandonment of Crystal was willful," and it reversed the termination order. However, it noted that new grounds for termination could be alleged on remand. *See: In re C.J.B.*, 892 S.E.2d 216 (N.C. Ct. App. 2023). ◾

## The Keleher Appellate Law Group, LLC

**Need a federal appellate attorney? We can help.**

Christopher Keleher is a former federal appellate judicial clerk with 20 years of experience in federal appeals courts nationwide. The Seventh Circuit Court of Appeals recently recognized his efforts for an incarcerated client in *Conner v. Reagle.* A tenacious litigator, he will seek justice for you, no matter the odds.

Reasonable flat rates for direct criminal and habeas appeals.

**The Keleher Appellate Law Group, LLC**
**1 East Erie, Suite 525-4635, Chicago, Illinois 60611**
**Phone: 312-448-8491**
**ckeleher@appellatelawgroup.com**
**www.appellatelawgroup.com**



## PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW

# THEY'RE THE MONSTERS WHO DESTROYED YOUR CHILDHOOD DREAMS.

# WE'RE THE LAWYERS WHO WILL GIVE THEM NIGHTMARES.

People told you monsters weren't real. They were wrong. Those tasked with your protection stole your future, and we're the bogeymen who will make them pay for the damage they have done.

Darrell Cochran and the attorneys at PCVA are passionate advocates for survivors of sexual abuse and believe abusers should be held accountable for the lifetime of pain and suffering they cause.

If you or someone you know has been abused in a group home, contact Darrell to learn how we can fight for you or your loved one.

**We have worked with victims from:**
The Catholic Church
The Church of Jesus Christ of Latter-day Saints
Big Brothers
Seventh Day Adventist
Kiwanis-sponsored group homes
State-licensed foster homes
State-licensed group foster care homes
J-Bar D Ranch
O.K. Boys Ranch
Toutle River Boys Ranch
Boys Village
Secret Harbor Group Home

## Catastrophic Injury • Medical Malpractice • Sexual Abuse


ATTORNEYS AT LAW

**PCVA Law, Attn: Dept. DCPLN**
**909 A Street, Suite 700, Tacoma, WA 98402**
**Email: pln@pcvalaw.com   •   Phone: (888) 303-9045**
www.pcva.law

# Finding Indiana Grievance Process "Unavailable," Federal Judge Grants Summary Judgment to 22 Prisoners on Same Day

In a remarkable series of rulings on August 15, 2023, U.S. District Court Judge Robert L. Miller, Jr. granted summary judgment in favor of 22 Indiana state prisoners who had filed separate lawsuits alleging unconstitutional conditions of confinement at the Miami Correctional Facility (MCF). Each plaintiff raised similar claims, naming MCF Warden William Hyatte as lead Defendant.

In one representative complaint, Evan Rollins alleged that he was held for 23 to 24 hours a day in restrictive housing—solitary confinement—in a cell with a broken light and a window covered with sheet metal. The prolonged stay in extreme darkness caused him "both physical and psychological injuries," he wrote. Prison officials argued that his suit should be dismissed because he had not exhausted the prison's grievance process, as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

The Court then examined the grievance procedure available to Indiana state prisoners in detail, including the process for appealing grievances that are denied. Rollins claimed he filed multiple grievances but received a response to only one— and when he tried to appeal that, he again received no response. Testimony by MCF grievance specialist Michael Gapski revealed there was no process to verify whether grievances given to guards in restrictive housing units were in fact forwarded to grievance officials.

Further, Gapski described "an extra unofficial step" at MCF that required prisoners to return a form indicating they wanted to appeal an initial grievance response before they were given an appeal form, State Form 45473, which they then must use to file an appeal. Also, other prison officials—including the director of the state Department of Corrections Ombudsman Bureau—attested that numerous other MCF prisoners had complained they never received responses to their grievances.

Citing *Ross v. Blake,* 578 U.S. 632 (2016), the Court noted that PLRA requires prisoners to exhaust administrative remedies, but only those remedies that are available. Rollins argued that because prison officials had consistently failed to respond to his grievances, they rendered the grievance process unavailable to him. Judge Miller agreed, noting that the process for grievance appeals "makes little sense" as it requires prisoners to appeal the *lack* of a grievance response, then appeal the *lack* of response to that appeal.

Moreover, they can appeal only using Form 45473, but the "unauthorized step" described by Gapski requires them to return a separate "grievance response form" in order to obtain a Form 445473—and prisoners can't return the response form if they never receive it, which is a "dead end." Defendants failed to explain how prisoners, especially those in restrictive housing, can obtain a Form 45473 if they don't receive responses to their grievances.

In summary, the Court wrote, the grievance policy's "rules about appeals are 'based on the assumption that the prisoner has received a response to his original grievance,' and doesn't account for non-responses." Consequently, "there is no adequate appeals process."

Rejecting Defendants' argument that Rollins' sworn declaration was self-serving, the Court credited his testimony that a prison employee had misled him about grievance procedures and noted that he had presented additional evidence from Gapski and the Ombudsman Bureau in support of his claims. Finding Defendants' arguments unpersuasive, the Court said that Rollins had presented "a genuine dispute of fact as to exhaustion."

True, the Court allowed, just because prison officials had no record of the grievances or appeals which Rollins swore he submitted did not create a genuine issue of material fact. But noting a "prisoner's word might be all that he has," Judge Miller explained that if "a prison loses grievances before they're filed"— or if a guard simply throws them away— "a plaintiff often has only the lack of records and his own word to show exhaustion of remedies."

Thus, Defendants' argument that "the absence of evidence [of exhaustion] is the evidence of absence doesn't contradict Mr. Rollins's evidence that administrative remedies weren't available." Accordingly, Defendants' motion for summary judgment was denied and Rollins' cross-motion for summary judgment granted as to the issue of exhaustion. Neither party had requested a *Pavey* hearing to resolve factual disputes related to administrative exhaustion, as laid out in *Pavey v. Conley,* 544 F.3d 739 (7th Cir. 2008).

The rulings in the other 21 cases issued by the Court involved the same unavailability of the grievance process at MCF, although the prisoners' claims varied slightly. All other plaintiffs also alleged

## A Jailhouse Lawyer's Manual
Twelfth Edition (Fall 2020)

First published in 1978, *A Jailhouse Lawyer's Manual (JLM)* is a practical legal resource that provides incarcerated people with the information they need to exercise their rights across a range of issue areas. The *JLM* has over 40 chapters on topics ranging from challenging unlawful convictions to securing medical care while in prison.

To order by mail, send a letter with your shipping information, shipping restrictions, and what you are ordering with a check or money order to:
Columbia Jailhouse Lawyer's Manual
Attn: JLM Order
435 West 116th Street
New York, NY 10027

You can order the *JLM* online at: https://jlm.law.columbia.edu/order-the-jlm/

The cost for incarcerated people, and their family/friends is:
A Jailhouse Lawyer's Manual (2020): $30
Louisiana State Supplement (2018): $25
Texas State Supplement (2013): $20
Immigration & Consular Access Supplement (2018): $15

**Please note we do not accept stamps as payment. Do not send us stamps in the mail requesting the *JLM*.**

Resources for Indigent People: if you are indigent and cannot afford a manual, please send us a letter letting us know you are requesting a free manual. We have limited resources to send free manuals to people who cannot afford them, so cannot guarantee a copy, but please ask.

--------------------------------------------------------

For more information on A Jailhouse Lawyer's Manual, please contact us at:

*A Jailhouse Lawyer's Manual*
435 West 116th Street
New York, NY 10027
Email: JLM.board.mail@gmail.com

broken lights and sheet metal covering the windows in their restrictive housing cells, resulting in extremely dark living conditions. Prisoners Joe E. Jackson, Jr., Brandon Owen, Isaac Lukes, Gerald Reed, Anthony Parish, Jeffrey Wagner, Evan Sapp, De'Shay Hackner, Cameron Werden and Latroy Maxwell additionally claimed live electrical wires were hanging from the ceiling in their cells, sometimes resulting in electrical

shocks and in one case starting a fire. Jackson, Vincent Thompson, Theothus Carter and Mastafa Nur also alleged their cells were contaminated with feces and urine. Reed said a 100-pound light fixture had fallen on his head, while Joseph Campbell reported his cell had a broken toilet and no drinking water.

The 22 cases had been consolidated for pre-trial, non-dispositive matters. Eight

other MCF prisoners filed similar lawsuits, including four released before filing their complaints who were thus not subject to the PLRA's exhaustion requirement. All Plaintiffs were represented by attorneys Kenneth J. Falk and Stevie J. Pactor from the American Civil Liberties Union of Indiana. See: *Rollins v. Hyatte*, USDC (N.D. Ind.), Case No. 3:21-cv-00767. 🔥

# Massachusetts Prisoners Again Stage Hunger Strike Against Solitary Confinement

At Massachusetts' maximum-security Souza-Baranowski Correctional Center (SBCC), 19 prisoners held in the Secure Adjustment Unit (SAU) began a hunger strike in October 2023, alleging conditions like solitary confinement despite state law reforms limiting its use.

The protest began with a letter to Attorney General Andrea Campbell (D) on October 18, 2023, in which prisoners described "dire" conditions in SAU, with limited out-of-cell time and restricted activity. They requested an investigation into use of solitary confinement and said officials with the state Department of Correction (DOC) "have made little effort to ameliorate the conditions" in SAU. Ironically, many prisoners were transferred to SBCC after the June 2023 closure of MCI-Cedar Junction, a prison notorious for use of solitary.

After the prisoners' letter, 20 legal and advocacy groups also wrote the Attorney General on November 3, 2023, to support the hunger strikers' request for an investigation into the legality of DOC practices at SBCC. Prisoners' Legal Services of Massachusetts reported that several state lawmakers advocated on behalf of the striking prisoners. State Rep. Erika Uyterhoeven (D-Middlesex) said she was one of "over 15 state legislators" who had met directly with strikers Tykorie Evelyn and Elosko Brown.

"We have heard them loud and clear," she added, "[that] they are regularly confined in some kind of cell, cage, or shackled for over 22 hours per day with no end date in sight for when they will be released from solitary confinement." Uyterhoeven called herself "deeply concerned" that this violates protections in the Criminal Justice Reform Act of 2018 for state prisoners held in Restrictive Housing.

DOC denies using solitary confinement, but advocates like the Boston College Law School Civil Rights Clinic remain unconvinced. They point to the conditions at SBCC and a lawsuit dropped against MCI-Cedar Junction due to the transfer of prisoner plaintiffs, who now seemingly face similar privations at SBCC.

"The conditions are horrific and oppressive," declared Clinic Director Reena Parikh. "Our clients are being subjected to indefinite solitary confinement." Parikh added that further litigation is possible if conditions do not improve at SBCC. 🔥

Source: *WBUR*

# Alabama Denies Parole to Former Sheriff Convicted of Corruption

Once Alabama's longest-serving sheriff, Mike Blakely, 72, will continue serving a three-year sentence for corruption handed down in August 2021, after the state Board of Pardons and Paroles (BOPP) deadlocked over his parole application on March 7, 2024. The 1-to-1 tie vote meant no parole for Blakely, who has so far served a little over a year in prison.

Blakely had been Limestone County Sheriff for 38 years when he was removed from office, after a jury found him guilty of taking $29,050 in interest-free personal loans from a safe holding money for detainees at the county jail, as well as misdirecting $4,000 in campaign funds through a Huntsville consulting firm that funneled them to him for personal use.

As *PLN* reported, amended ethics disclosures filed after Blakely became the target of a 2018 investigation revealed $350,000 in previously unreported gambling winnings. An attempt to have the state supreme court invalidate the ethics law under which he was indicted then failed in February 2023, as did a last-minute attempt to disqualify the judge presiding over his case. [See: *PLN*, Nov. 2023, p.51.]

About 30 supporters of the former Sheriff, who won 10 elections as a Democrat, showed up at the BOPP hearing to argue that he was sufficiently remorseful to qualify for parole. But a representative of state GOP Attorney General (AG) Steve Marshall, who prosecuted Blakely's case, said "this inmate has shown little remorse and now apologizes to suit his own needs."

BOPP has been harshly criticized for granting parole to just a fraction of those eligible—about 10% in fiscal year 2022—in turn driving overcrowding blamed for horrific violence and deaths in state prisons. BOPP said one member was absent and wouldn't say how the other two members present voted on Blakely's petition. However, one of them, Leigh Gwathney, formerly worked in the AG office, and an analysis of 10 hearings in 2023 by the American Civil Liberties Union found she voted against release 100% of the time when the AG office opposed parole. Blakely's next parole hearing is currently scheduled for April 11, 2024. 🔥

Source: *Birmingham News*

 Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 48 of 74    Document 4-1

# Eleventh Circuit Calls Georgia Prisoner's Dismissed Suit Outside PLRA "Strike Zone"

*by David M. Reutter*

In an *en banc* ruling on February 1, 2023, the full U.S. Court of Appeals for the Eleventh Circuit held that a Georgia prisoner's case dismissed for failure to exhaust administrative remedies might amount to dismissal "for failure to state a claim"—an enumerated ground for a "strike" under 28 U.S.C. § 1915, as amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e—but only if the exhaustion failure "appears on the face of the prisoner's complaint." The Court's decision thus reversed a district court's finding that Georgia prisoner Jeremy John Wells had three "strikes," meaning he is not yet barred from claiming indigent status to have filing fees waived and proceed *in forma pauperis* (IFP).

Wells alleged that while housed at Augusta State Medical Prison on May 29, 2020, he complained to a prison official that "two gang members" were "extorting, selling drugs," and "beating inmates," the Eleventh Circuit recalled. Within the week, Wells followed up with a letter "reporting the gang activity" to the warden on June 5, 2020. "Nine days later, on June 14, 2020, Wells was 'beaten' by the two gang members," the Court continued, leaving his left ear drum "busted" and "burns to both eyes," plus "a contusion to [his] right eye" and an "abrasion to the inside back of [his] throat," along with bumps and bruises on his "head, shoulders, and hands." After the beating, a prison guard "started laughing" at Wells, who said he then endured "a sixteen-hour delay before he received medical treatment."

Wells filed suit *pro se* against various prison officials, alleging violation of his Eighth Amendment rights. He sought IFP status, triggering a PLRA screening process. As amended by PLRA, § 1915 bars a prisoner from claiming IFP status if he has previously "brought" three actions in federal court that were then dismissed upon a finding that "(1) the case is frivolous, (2) the case is malicious, (3) the complaint fails to state a claim, or (4) the plaintiff seeks monetary relief from a defendant who is immune from such relief." The U.S. District Court for the Southern District of Georgia found Wells had three such "strikes" and denied his IFP motion, dismissing the complaint without prejudice. Wells appealed.

The Eleventh Circuit "agree[d] with our sister circuits" that have applied "to the three-strikes rule" the screening requirements laid out in *Jones v. Bock*, 549 U.S. 199 (2007). Like other affirmative defenses, though, failure to exhaust administrative remedies or state a claim "depends on whether the allegations in the complaint suffice to establish that ground," the Court continued. Backing off its holdings in *Rivera v. Allin*, 144 F.3d 719 (11th Cir. 1998) and *White v. Lemma*, 947 F.3d 1373 (11th Cir. 2020), the Court declared that "dismissal for failure to exhaust administrative remedies is *not* always a dismissal for failure to state a claim."

The Court then turned to determine whether Wells had three strikes. In *Daker v. Comm'r., Ga. Dep't of Corr.*, 820 F.3d 1278 (11th Cir. 2016), the Court cautioned that "the dismissing court does not need to invoke any magic words or even use the word 'frivolous,' although such language certainly aids our review." However, in that same ruling the Court said the dismissal order "must give some signal" that it found "the action or appeal was frivolous."

In two of Wells' prior dismissals, the district court clearly indicated that dismissal was on grounds constituting a strike. The third action, however, was a summary judgment motion that relied on facts outside the complaint to dismiss it. So that dismissal was not based upon facts appearing on the face of the complaint and therefore didn't count as a "strike," the Court concluded, vacating the district court's order and remanding the case. Before the Court, Wells was represented by attorneys with the Roderick and Solange McArthur Justice Center in Washington, D.C. *See: Wells v. Brown*, 58 F.4th 1347 (11th Cir. 2023).

Back at the district court, Wells was granted IFP status. But his complaint was quickly dismissed again on April 28, 2023; following the recommendation of a magistrate judge made four weeks earlier, the district court said no accusation Wells made against prison officials rose to the level of deliberate indifference to his serious need. *See: Wells v. Philbin*, 2023 U.S. Dist. LEXIS 75371 (S.D. Ga.); and 2023 U.S. Dist. LEXIS 74381 (S.D. Ga.).

Sadly for Wells, that might be the end of his case; a copy of the district court's order that was mailed to him was returned marked "deceased" on May 16, 2023. But he leaves an important lesson for prisoners filing suit not to detail administrative remedies on the face of their complaint. While it may be rare for prison officials to neglect raising failure to exhaust remedies as an affirmative defense, this oversight has resulted in several otherwise barred claims proceeding to judgment.



# ONE GOD – ONE MESSAGE

## ISLAM - The way of Noah, Abraham, Moses, Jesus and Mohammed
*Peace be upon them*

MISCONCEPTIONS
WHAT IS ISLAM?
ABOUT ALLAH
ABOUT MUHAMMAD
ABOUT QURAN
ABOUT JESUS
BECOMING MUSLIM
ANSWER TO RACISM & INJUSTICE
FREE ONLINE & LITRETURE RESOURCES

Who is the Creator?

What is the Purpose of Life?

Which guidance to follow?

How to succeed in the hereafter?

Watch www.Peacetv.tv or on YouTube: TheDeenShow or ThePeaceTalk with Dr Sabeel Ahmed

## GOT QUESTIONS?

## GET ANSWERS

**GAINPEACE**
1S270 Summit Ave, Suite 200
Oakbrook Terrace, IL 60181
1-800-662-ISLAM *(4652)*

Visit www.GAINPEACE.com

# THE PLRA HANDBOOK

## Law and Practice under the Prison Litigation Reform

### By John Boston

### Edited by Richard Resch



*The PLRA Handbook* is the best and most thorough guide to the PLRA in existence and provides an invaluable roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.

Anyone involved in federal court prison and jail litigation needs *the PLRA Handbook* – lawyers, judges, court staff, academics, and especially, pro se litigants.

Although *the PLRA Handbook* is intended primarily for litigators contending with the barriers the PLRA throws up to obtaining justice for prisoners, it'll be of interest and informative for anyone wishing to learn how the PLRA has been applied by the courts and how it has impacted the administration of justice for prisoners. It is based primarily on an exhaustive review of PLRA case law and contains extensive citations. John Boston is best known to prisoners around the country as the author, with Daniel E. Manville, of the *Prisoners' Self-Help Litigation Manual* – commonly known as the "bible" for jailhouse lawyers and lawyers who litigate prison and jail cases. He is widely regarded as the foremost authority on the PLRA in the nation.

*"If prisoners will review The PLRA Handbook prior to filing their lawsuits, it is likely that numerous cases that are routinely dismissed will survive dismissal for failure to exhaust."*

*— Daniel E. Manville, Director, Civil Rights Clinic*

---

## THE PLRA HANDBOOK

Paperback, 576 pages

**Prisoners: $84.95**

**Professionals: $224.95**

*(includes shipping)*

**Order by mail, phone, or online.** Amount enclosed _____

By: ☐ check ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

# $19.3 Million Awarded to Former Illinois Prisoner Repeatedly Sexually Assaulted by Prison Counselor

*by Matt Clarke*

On September 22, 2023, a jury in federal court for the Central District of Illinois awarded a total of $19.3 million to a former state prisoner who was repeatedly sexually assaulted by a counselor with the state Department of Corrections (DOC).

Identified as "Jane Doe," the prisoner—a gymnastics instructor with a young daughter—started serving a sentence at Logan Correctional Center (LCC) in 2015. In August 2016, Richard MacLeod was assigned as Doe's counselor. To receive her court-ordered biweekly phone call with her child, Doe needed to visit MacLeod. She was also scheduled for multiple rehabilitation program classes, two of which MacLeod taught.

MacLeod asked if he could summon Doe to his office to make the call without anyone else knowing. Doe agreed and visited secretly. After making the call, MacLeod kissed her. Within a month, he progressed to vaginal intercourse in one of the classrooms where he taught. That happened at least three times; MacLeod also made her perform oral sex on him at least twice between August 2016 and April 2017. Several times while she was in his office and on the phone with her daughter, he took out his penis and masturbated in front of her.

MacLeod threatened harsh punishment should Doe report the abuse. He claimed to have a close personal relationship with Todd Sexton, an Internal Affairs lieutenant at LCC, shielding him from discipline for abusing Doe.

In December 2016, a prisoner reported that Doe had revealed her sexual relationship with MacLeod. Sexton investigated the allegation by interviewing Doe and asking whether she had anything she wanted to talk about. But he never asked directly about MacLeod, nor did Doe volunteer any information, fearing the relationship between the two DOC employees. Meanwhile Sexton reported the allegations to Warden Margaret Burke, who had him collect more evidence.

Sexton tried hiding out a few times in hopes of catching MacLeod with Doe, but he failed. He did not take other basic investigatory steps such as interviewing MacLeod, checking his scheduling logs, or attempting to collect physical evidence.

On August 4, 2017, Doe reported the abuse to Sexton and was transferred the same day to another prison where she was no longer able to call her daughter nor continue any rehabilitation programs. Over the LCC assistant warden's objection, MacLeod was transferred into the prison's administration, where he continued working another 13 months before being placed on paid administrative leave. He earned over $97,500 plus benefits in 2019.

With the assistance of Chicago attorneys Alan Mills, Sarah Blair and Nichole Rae Schutt of the Uptown People's Law Center; Brittany Cramer, Christina Elaine Sharkey, Claire Elizabeth Stephens, Diego Jorge Martinez-Krippner, Nick Franklin Wasdin, Scott W. Fowkes and Shannon Lee Gonyou of Kirkland and Ellis LLP; as well as Elizabeth N. Mazur of Hughes Socol Piers Resnick and Dym Ltd., Doe filed a federal civil rights lawsuit pursuant to 42 U.S.C. § 1983 against MacLeod, Burke and Sexton. Numerous other DOC officials were also named but dismissed on March 29, 2023, due to lack of personal knowledge or involvement in the complained-of actions. *See: Doe v. MacLeod*, 2023 U.S. Dist. LEXIS 53838 (C.D. Ill.).

The lawsuit noted that Logan was converted from a men's prison to a women's prison but retained its mostly male staff, with numerous complaints and rumors of staff-on-prisoner sexual assault, some substantiated. Therefore, as soon as the other prisoner reported that MacLeod was having sex with Doe, steps should have been taken to keep him away from her. Instead, Sexton's incompetent and incomplete "investigation" let MacLeod continue sexually assaulting Doe.

Perhaps attempting to avoid criminal charges, MacLeod neither contested the allegation nor appeared in court. The Court then entered default judgment against him, finding him liable for the sexual assaults. Jurors next heard that prisoners are incapable of giving consent under state law, so whether Doe "consented" or not was irrelevant. They then found both Burke and Sexton liable, awarding Doe $8,000,000 in compensatory damages. The jury also awarded punitive damages of $10,000,000 against MacLeod,

$500,000 against Burke and $800,000 against Sexton. See: *Doe v. McLeod*, Case no. 3:18-cv-03191-SEM-KLM (C.D. Ill).

"We have heard rumors of this kind of rampant sexual abuse happening at Logan since it became a women's facility," Schutt said. "It is really difficult for women in custody to report sexual assault because of retaliation, and oftentimes, even actual punishments with segregation."

Another "Jane Doe" testified at trial that she was treated in a similar way by MacLeod but cowed from reporting it by fear of retaliation. Schutt warned that the culture at Logan remains unchanged with staff sexual assaults and fear of retaliation still common.

"I would like to say that the things at Logan have changed," she said. "But we still see a lot of women at Logan in our office and I know that it hasn't changed, that it's still happening." ◾

Additional source: *Illinois Times*

## Stop Prison Profiteering:
### Seeking Debit Card Plaintiffs

The Human Rights Defense Center is currently suing NUMI in U.S. District Court in Portland, Oregon over its release debit card practices in that state. We are interested in litigating other cases against NUMI and other debit card companies, including JPay, Keefe, EZ Card, Futura Card Services, Access Corrections, Release Pay and TouchPay, that exploit prisoners and arrestees in this manner. If you have been charged fees to access your own funds on a debit card after being released from prison or jail within the last 18 months, we want to hear from you.

Please contact HRDC Legal Team at HRDCLegal@humanrightsdefensecenter.org
Call (561) 360-2523
Write to: HRDC, SPP Debit Cards,
PO Box 1151, Lake Worth Beach, FL 33460

# Missouri Expands Prison Mail Ban to Include Books Sent by Family, Friends

After banning state prisoners from receiving physical mail the year before, the Missouri Department of Corrections (DOC) extended the ban on September 25, 2023, to include books sent to prisoners from family or friends.

The rule change means the only way to send a book to a state prisoner is by depositing money in his trust account, which the prisoner can then use to purchase a book directly from an approved vendor. Dylan Pyles, who runs a book-distributing nonprofit called Liberation Lit, said the idea that prisoners have enough money to buy books is "pretty ridiculous."

Also ridiculous is this: Before the rule change, those outside prison ordered the same books to be shipped from the same vendors. Noted Missouri Prison Reform Executive Director Lori Curry, "[C]iting drugs as the reason for this new policy… makes no sense unless they're accusing Amazon of, you know, doing drugs and books."

DOC Communications Director Karen Pojmann defended the change, saying prisoners were receiving illegal drugs soaked into the pages of books smuggled inside packages cleverly mimicking those from legitimate vendors. But Curry pointed out that since DOC banned physical mail in July 2022, "overdoses have increased, [and] deaths from overdoses have increased," as *PLN* has also reported. [See: *PLN*, Apr. 2023, p.60.]

So who really benefits from these changes? Securus Technologies provides mail digitization for DOC, forwarding prisoner mail to its Tampa facility for scanning into an electronic file, which is then made available to prisoners on tablets that the company also provides. Though the digitization service is free to prisoners, the company offers other tablet products for a fee, including games, music and email—which, unsurprisingly, delivers messages between prisoners and their loved ones in a fraction of the time as the digitization service. A company subsidiary, JPay, also provides management services for prisoner trust accounts, collecting a fee for each deposit, of which there will now be more under the new rule.

"Who is benefiting from this?" echoed Clinique Chapman, the associate director of another nonprofit, the Restoring Promise Initiative. "The companies. They're capitalizing on the backs of those who are incarcerated." ◾

Sources: *Missouri Independent, St. Louis Public Radio*

### If You Write to *Prison Legal News*

We receive many, many letters from prisoners – around 1,000 a month, every month. If you contact us, please note that we are unable to respond to the vast majority of letters we receive.

In almost all cases we cannot help find an attorney, intervene in criminal or civil cases, contact prison officials regarding grievances or disciplinary issues, etc. We cannot assist with wrongful convictions, and recommend contacting organizations that specialize in such cases – see the resource list on page 68 (though we can help obtain compensation *after* a wrongful conviction has been reversed based on innocence claims).

Please do not send us documents that you need to have returned. Although we welcome copies of verdicts and settlements, do not send copies of complaints or lawsuits that have not yet resulted in a favorable outcome.

Also, if you contact us, please ensure letters are legible and to the point – we regularly receive 10- to 15-page letters, and do not have the staff time or resources to review lengthy correspondence. If we need more information, we will write back.

While we wish we could respond to everyone who contacts us, we are unable to do so; please do not be disappointed if you do not receive a reply.

# Federal Prisoners Released Under First Step Act Show 37% Reduction in Recidivism

*by Matt Clarke*

An analysis published by the Council on Criminal Justice (CCJ) on August 21, 2023, estimated the recidivism rate for federal Bureau of Prisons (BOP) prisoners released under the First Step Act (FSA), finding it 37% lower than the rate for other BOP prisoners with similar risk levels released before the law took effect in 2018.

FSA, Pub. L. No. 115-391, 132 Stat. 5194 (2018), was enacted to reduce recidivism among those being released from BOP, resulting in release of 29,946 federal prisoners between 2020 and January 2023. Their recidivism—defined as any rearrest or return to federal prison for a new crime or technical violation of supervision—was tracked. To make a valid comparison, the analysis estimated the recidivism rate for 29,946 BOP prisoners with similar risk levels and amount of time spent out of prison (the comparison group) after they were released under other mechanisms. The recidivism rate for the FSA releasees was 12.4%. It was 19.8% for the comparison group. Importantly, the report estimated that FSA may have accounted for 2,207 to 3,125 *fewer* arrests during the period.

Among the possible reasons for the dramatic reduction in recidivism was the fact that 54% of FSA releasees had completed at least one evidence-based recidivism reduction program. However, the report's author, Avinash Bhati, Ph.D., founder and CEO of data science company Maxarth, did not believe that programming could entirely account for the large reduction in recidivism. Another possible factor was the COVID-19 pandemic, which resulted in disruptions that slowed down the criminal justice system after March 2020.

Dr. Bhati emphasized that a more thorough comparison between people released under FSA and those released under other mechanisms was necessary to provide a definitive determination of FSA's impact on recidivism. It makes sense to pursue better data, since the cost of incarceration due to recidivism is very high both in terms of dollars and the toll it takes on human beings, not only the recidivist but also any possible victims. *See: First Step Act: An Early Analysis of Recidivism*, CCJ (Aug. 2023). ◾

# Washington DOC Outfits Guards with Narcan

On August 31, 2023, the Washington State Department of Corrections (DOC) completed implementation of a new policy permitting staffers to carry naloxone, an opioid overdose antidote, while on duty. But allowing guards to carry the life-saving drug—used to counteract the effect of a prisoner's overdose—doesn't mean that many will do so.

Some guards expressed moral objections, citing the debunked belief that giving prisoners naloxone, the generic name for Narcan, enables their drug habits. However, the federal Food and Drug Administration granted approval to sell Narcan over the counter on March 29, 2023, adding approval for a second naloxone product, RiVive, on July 28, 2023, about the time of DOC's policy change.

Though Narcan kits have been in DOC prisons since 2018, they were kept in secure locations inaccessible to most staffers. In April 2023, many guards at Washington Corrections Center in Shelton reported that they didn't know where kits were located. Others expressed reluctance to use them; despite mandatory training, some did not know how to use Narcan properly, and some discouraged each other from learning. Prisoners, on the other hand, could benefit enormously from access to the life-saving treatment.

The policy change allows only DOC staff to carry Narcan, but prisoners could be trained to administer it. The change was suggested by a guard at Washington State Penitentiary, as an augment to staff Personal Protective Equipment (PPE). The proposal was then reviewed by Washington's Statewide Security Advisory Committee, following the same process that introduced Narcan kits in 2018. Ultimately, DOC authorized all employees and contract staff to carry personal Narcan supplies while on duty.

Among the reasons some guards offered for carrying Narcan was that they need it in case of exposure to fentanyl while conducting pat-down searches. However, the risk of secondhand fentanyl exposure causing an overdose is widely considered a myth, and it certainly cannot lead to overdose so long as a guard remains conscious to self-administer Narcan.

While allowing guards to carry Narcan is a positive step, making it accessible to prisoners would be even more effective in reducing fatal overdoses, especially in maximum-security units. Prisoners in these units often have limited interaction with staff and can respond more quickly to emergencies involving fellow prisoners.

Source: *Filter Magazine*

# Arizona Supreme Court Reverses Summary Judgment for Corizon Health in State Prisoner's Death from Untreated Diabetes

### by Matt Clarke

On October 11, 2023, the Supreme Court of Arizona reversed a grant of partial summary judgment to Corizon Health, the former private medical contractor for the state Department of Corrections, Rehabilitation and Reentry (DCRR), in a suit filed over a state prisoner's death from allegedly untreated diabetes.

In its ruling, the Court agreed that Plaintiffs' medical experts did not satisfy requirements for those testifying against a licensed health professional; under state law, ARS § 12-2604, such testimony can be offered only by experts whose credentials and experience align with those of the provider being sued for malpractice. However, the Court said that "an institution cannot be a licensed health professional because an institution is not a natural person," so those heightened requirements did not apply to Plaintiffs' experts when testifying against Corizon Health.

Importantly, the Court also beat back a craven attempt by Corizon Health to say on the one hand that it was forced to let underqualified nurses provide care in the absence of more qualified doctors and then on the other hand argue that Plaintiffs' expert was underqualified to critique the higher level of care that they tried to provide.

The case was filed on behalf of the estate of David Windhurst. Incarcerated at Arizona State Prison in Florence in December 2015, he was paraplegic and suffered from various chronic illnesses, including diabetes, so he was housed in the prison infirmary. He was also stable until Corizon Health took over providing his healthcare.

In February 2016, he went into diabetic septic shock and was hospitalized over a month. Then he was sent to a prison in Tucson where he was once again housed in an infirmary under Corizon Health. In November 2016, he went into diabetic septic shock again and was taken to a hospital, where he died on December 25, 2016.

Windhurst's widow filed a medical malpractice lawsuit against Corizon Health, also alleging vicarious liability on the part of DCRR, its director and the state. To support her claims she relied on reports from three experts: Dr. Zachary Rosner, M.D., the chief of medical services for the New York City jail system; Nurse Practitioner (NP) Tara Hood, who had worked in prisons for over a decade; and Registered Nurse (RN) Denise Panosky, a professor who had taught about nursing in jails and prisons for 14 years.

Corizon Health filed a motion for summary judgment alleging there was no

## Federal Post-Conviction and Habeas

- Resentencing
- Motions for new trial
- Rule 35

Pro Bono not accepted. Serious financial inquiries only. Send financial info and inquiries to:

**The Law Offices of Patrick F. McCann**
700 Louisiana, Ste 3950
Houston, Texas 77002
713-223-3805
writlawyer@outlook.com

*Not board certified by the Texas Board of Legal Specialization

evidence that it violated a standard of care because the experts' opinions failed to link specific violations to specific providers. Further it alleged that a nurse was not qualified to give testimony on cause of death. The state Superior Court for Pima County granted partial summary judgment, dismissing the medical negligence claim, agreeing that the medical expert testimony failed to link everything up. In a motion for reconsideration, Plaintiff pointed to evidence that Corizon Health failed to properly treat Windhurst's wounds or care for his catheter, also failing to follow treatment recommendations from the specialist who diagnosed his sepsis. The motion was denied and the case appealed.

The Court of Appeals found that all three witnesses gave sufficient testimony about the standards of care for Corizon Health and its personnel and sufficient testimony about causation. It also held that Panosky met required expert qualifications and could testify regarding cause of death. The Arizona Supreme Court then granted review because the case presented recurring issues of statewide concern. Representing the widow before the Court were Tucson attorneys Nathan S. Rothschild and Bernardo M. Velassco of Mesch Clark Rothschild, along with Michael Crawford of Crawford Law.

In its ruling, the Court agreed with them that a healthcare institution has a standard of care independent from the medical practitioners it employs, pointing to *Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597 (1984). "Because § 12-2604(A) is not applicable to a claim for institutional negligence," the Court said, "an expert on this issue need only satisfy Rule 702, which requires that the witness have 'specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'" So when the trial court went looking to align credentials of Plaintiffs' experts with those of the Corizon Health staffers who provided Windhurst's care, it was off-course, the Court said.

Moreover, what Corizon Health argued was that Hood and Panosky could not testify that Corizon Health NPs or RNs caused the death because they weren't doctors, and Rosner was credentialed only to testify that death was caused by a company doctor, but there wasn't one. That left a jury impermissibly to infer causation, Corizon Health said, pointing to *Sampson v. Surgery Center of Peoria, LLC*, 251 Ariz. 308 (2021). But the Court wasn't buying that.

Instead it quoted Dr. Rosner, who broke down the inadequacies at the heart of Corizon Health's system. When (a) there is no physician on site and (b) none available to come in on call nor even (c) provide remote advice to lesser qualified onsite providers, then the "system cannot be said to have provided or 'arrange[d]' for the provision of physician services 24 hours a day," he said, under standards of care set by the federal Centers for Medicine and Medicaid Services. "Contrary to Corizon's claims," the Court said, "Windhurst presented sufficient expert causation evidence to satisfy *Sampson*." It thus vacated the court of appeals' ruling and remanded the case. *See: Windhurst v. Ariz. Dep't of Corr.*, 536 P.3d 764 (Ariz. 2023).

Centurion Health took over DRCC healthcare in July 2019. As *PLN* reported, Corizon Health is attempting to dodge settlements in dozens of prisoner cases by shuffling the liabilities into a separate firm and declaring it bankrupt. [See: *PLN*, Jan. 2023, p.29.] ◢

# CLASS ACTION LAWSUIT CHALLENGING THE HIGH PRICES OF PHONE CALLS WITH INCARCERATED PEOPLE

Several family members of incarcerated individuals have filed an important class action lawsuit in Maryland. The lawsuit alleges that three large corporations – GTL, Securus, and 3CI – have overcharged thousands of families for making phone calls to incarcerated loved ones. Specifically, the lawsuit alleges that the three companies secretly fixed the prices of those phone calls and, as a result, charged family members a whopping $14.99 or $9.99 per call. The lawsuit seeks to recover money for those who overpaid for phone calls with incarcerated loved ones.

### If you paid $14.99 or $9.99 for a phone call with an incarcerated individual, you may be eligible to participate in this ongoing lawsuit.

Notably, you would not have to pay any money or expenses to participate in this important lawsuit. The law firms litigating this case—including the Human Rights Defense Center—will only be compensated if the case is successful and that compensation will come solely from monies obtained from the defendants.

If you are interested in joining or learning more about this case, please contact the Human Rights Defense Center at (561)-360-2523 or info@humanrightsdefensecenter.org.

***ADVERTISING MATERIAL***

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 54 of 74    Document 4-1

# Class-Action Lawsuit Challenges Use of Presumptive Drug Tests by Washington DOC

A suit filed in Washington state court on September 22, 2023, challenges disciplinary sanctions imposed on prisoners by the state Department of Corrections (DOC) based on presumptive drug test results.

DOC uses inexpensive colorimetric drug tests to examine incoming mail and other paper items, turning them a certain color if an illicit substance is detected. Results are often inaccurate, though, so kit manufacturers DetectaChem and MMC International caution they should be deemed "presumptive," or merely indicative of the possible presence of drugs until the findings are verified by lab testing.

However, DOC uses a positive result to impose harsh disciplinary sanctions without confirmation tests. According to DOC policy 460.050, sanctions include placement in solitary confinement—called "administrative segregation" (ad-seg)—as well as loss of good time and delayed release dates, removal from jobs or program assignments, and loss of visitation, recreation, phone, commissary, television, package and library privileges.

Columbia Legal Services (CLS) wrote DOC on August 29, 2023, challenging the use of these unreliable tests without confirmation testing. CLS cited a preliminary injunction granted by a Massachusetts state court on November 30, 2021, which prohibited that state's DOC from imposing discipline based on presumptive drug test results; in that case, the court determined the NARK II tests produced by Sirchie and used in state prisons had a false positive rate of 38%, making their accuracy "only marginally better than a coin flip." *See: Green v. Mass. Dep't of Corr.*, 2021 Mass. Super. LEXIS 521.

CLS invited Washington DOC officials to meet and discuss the problematic tests, noting that DetectaChem's operating manual warns "there is no guarantee that positive results are ultimately defining" and that some colorimetric drug tests have returned false positives mistaking bird droppings, donut crumbs and cotton candy for illegal drugs. Test results are also subject to misinterpretation because color results for drug and non-drug substances are easily confused.

DOC responded in early September 2023 by "discontinu[ing] the use of presumptive drug test results as a sole basis for disciplinary action." It also promised to develop "a process to identify individuals who have lost good/earned time due to discipline based solely on presumptive drug test results, and to restore the good time to those individuals." However, CLS called that "insufficient to protect the rights of those in custody," adding it doesn't "compensate those in custody (and those now released) who were punished because DOC used these unreliable tests."

Prison officials also declined to engage in mediation. CLS then filed its suit, alleging that DOC officials "knew or should have known that these tests often return false positive results" before taking unwarranted disciplinary action against four named plaintiffs.

Clifton Bell was put in ad-seg after paper found in his cell tested presumptively positive for synthetic cannabinoids (K2). His request for a confirmation lab test was denied, and he was sanctioned with loss of visitation, recreation, phone, written communication and commissary privileges, plus loss of 75 days good time. He also was placed in a more restrictive custody level. Bell received another disciplinary infraction after postcards sent to him directly from a third-party postcard vendor tested presumptively positive for drugs. A confirmation test later conducted by state police showed the initial test had returned a false positive. But he spent four months in ad-seg.

Garrison Schrum went to ad-seg after paper scraps in his locker tested presumptively positive for drugs. His requests for a confirmation test and urinalysis test—to prove he was not using drugs—were refused. He lost 30 days of good time, spent over a month in isolation and was transferred to a more restrictive facility. He also lost his institutional job.

Gregory Hyde's elderly father and stepmother mailed him word puzzle books that tested presumptively positive for K2. He was held in ad-seg for almost five months pending a disciplinary hearing, after which his visitation privileges were suspended for six months, his phone privileges restricted, he lost 75 days of good time and was removed from work and program assignment waiting lists. He was also transferred to another facility. Ironically, the puzzle books that had tested positive were later returned to him.

A handwritten letter in Matthew Ross' property also tested presumptively positive for K2, for which he was held in ad-seg for 30 days, lost 45 days of good time, received 40 hours of extra work duty and lost package privileges for six months. His appeal was denied and his release date delayed by the disciplinary conviction. Ross' cell was later searched again and two more documents—his immunization records and high school transcript—tested presumptively positive. After CLS contacted prison officials on his behalf to challenge the drug testing, he was abruptly released from prison, though five days after his originally scheduled date. Prison officials then returned the documents that had tested positive for drugs.

The suit filed by these four seeks declaratory relief; an injunction to prohibit DOC from imposing disciplinary sanctions based on presumptive drug tests and requiring it to expunge all related disciplinary records; as well as monetary damages for class members and legal fees and costs for CLS attorneys as their counsel. See: *Bell* v. *State Dep't of Corr.,* Wash. Super. (Thurston Cty.), Case No. 23-2-03083-34. ◼

Additional source: *Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse,* National Institute of Justice (NCJ 183258).

## COLLEGE DEGREES FROM PRISON

**Earn an Associate's, Bachelor's, Masters, or Doctoral Degree in Christian Counseling. Ordination services also available**

### Tuition as Low as $12.95 per month

**Scholarships available. To see if you qualify, send a self-addressed, stamped envelope to P.O. Box 530212 Debary, FL 32753.**

## INTERNATIONAL CHRISTIAN COLLEGE & SEMINARY

**ICCSCAMPUS.ORG**

# Fifth Circuit Finds Louisiana Prisoner's Solitary Confinement Not Sufficiently "Atypical" to Violate the Constitution

*by David M. Reutter*

On September 25, 2023, the U.S. Court of Appeals for the Fifth Circuit affirmed dismissal of Louisiana prisoner Brandon LaVergne's Eighth Amendment claim, finding the alleged restrictions on his visitation and email access while in "restricted custody"—solitary confinement—were not so bad that they were unconstitutional.

The Court began its analysis by noting that LaVergne has "filed a stream of state and federal lawsuits" since he was convicted of two counts of first-degree murder in 2012 and sentenced to life imprisonment at Louisiana State Penitentiary (LSP). He was initially assigned to "restricted custody," which provided limited access to the law library, legal materials and counsel. In 2017 LaVergne was moved to general population, where he alleged conditions were intolerable, including prisoner drug use, overcrowding and uncleanliness. A 2018 escape attempt landed him back in restrictive custody.

There he was once again confined to a cell 23-hours per day. He was "permitted two contact visits per month," the Court recalled, and "was able to make phone calls, cook food, or exercise" an hour per day. In addition, he "was permitted outdoor recreation for three hours per week, albeit in a limited space," and he was not "deprived of conversation or communication with other" prisoners.

When he filed suit *pro se* over his conditions of confinement, a magistrate judge for the U.S. District Court for the Middle District of Louisiana dismissed the case. LaVergne appealed, and the Fifth Circuit partially reversed the decision, remanding the case for consideration of claims against James LaBlanc, Secretary of the Louisiana Department of Public Safety and Corrections, and former LSP Warden Burl Cain.

On remand, a magistrate judge examined LaVergne's conditions of confinement under *Sandin v. Conner*, 515 U.S. 472 (1995), to see whether his life in solitary confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Finding no such hardship, the lower court said that LaVergne's restrictive custody violated neither the Eighth or Fourteenth Amendment because conditions were not "sufficiently severe to give rise to a liberty interest" protected by the constitution.

But how could that be so? Like most U.S. prisoners held in solitary confinement, LaVergne was isolated in a cell the size of a parking space almost all day, every day for over five years. The district court, though, focused on that daily hour he was allowed out of his cell, plus three hours each week he could go outside. Moreover, he wasn't prohibited from talking with other prisoners, even if they couldn't see one another. Given that, the lower court said that LaVergne was not deprived of "the minimal civilized measure of life's necessities," so prison officials could not be liable for deliberate indifference to his serious needs.

The Fifth Circuit found no reversible error in this rationale. Specifically it refused to set a threshold duration for solitary confinement beyond which it is always unconstitutional. Instead, quoting *Sandin*, it opted to "apply a nuanced analysis looking at the length and conditions of confinement on a case-by-case basis"—at least as much nuance as can be found in an opinion of less than 1,500 words, including footnotes. The district court's dismissal was affirmed, with prejudice. A request for rehearing before the entire Fifth Circuit *en banc* was also denied on November 14, 2023. *See: LaVergne v. Stutes*, 82 F.4th 433 (5th Cir. 2023); and 2023 U.S. App. LEXIS 30492 (5th Cir.).

### *Disciplinary Self-Help Litigation Manual, Second Edition,* by Dan Manville

By the co-author of the *Prisoners' Self-Help Litigation Manual,* this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court.

*Now available from Prison Legal News Publishing.*
**$49.95**, *shipping included*

**DISCIPLINARY SELF-HELP LITIGATION MANUAL**
Second edition
BY DANIEL MANVILLE

**Order by mail, phone or on-line.**

By: ☐ check  ☐ credit card  ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**

PO Box 1151 • Lake Worth Beach, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

# Connecticut DOC Held Liable for Failure to Treat Transgender Prisoner's Gender Dysphoria

*by Douglas Ankney*

On September 15, 2023, the U.S. District Court for the District of Connecticut granted a transexual prisoner's motion for summary judgment in a suit accusing the state Department of Correction (DOC) of violating her Eighth Amendment rights by failing to treat her gender dysphoria (GD).

Veronica-May Clark is serving 75 years without parole for the fatal 2006 bludgeoning of 26-year-old Erich Tabert, after Clark, then 30 and still living as Nicholas Clark, broke into the home of his estranged wife, Christa Clark, and found the couple together in bed. In 2016, already living as Veronica-May Clark, she was diagnosed with GD, which the Court defined as "clinically significant distress—i.e., distress that interferes with a person's livelihood— associated with an incongruence between a person's gender identity and assigned sex at birth."

In July that same year, Clark made a bloody and painful attempt at self-castration, slowly cutting open her scrotum with a nail clipper over a period of 20 minutes and prying out one testicle before excruciating pain prevented her from continuing. A post-injury report from a DOC psychologist noted that Clark's "high level of psychological distress relative to [her] gender dysphoria clearly motivated" the self-castration attempt.

After discharge from a hospital to Garner Correctional Institution, Clark sought GD treatment beginning in August 2016 from Dr. Gerald Valetta. However, he denied her transition-related healthcare, citing DOC policy that it may have "continued" but not "initiated" in custody. Clark's appeal of the denial was met with the same response.

In November 2016, Clark met with a mental healthcare provider, Advanced Practical Registered Nurse (APRN) Barbara Kimble-Goodman. But with no training in treating patients with GD, the APRN offered only "talk therapy" and prescriptions for antidepressants. She also denied Clark transition therapy because none had begun prior to incarceration.

Clark continued requesting transition treatment in January 2017 because she was "suffering trauma" and could not "overstate just how much emotional and psychological pain [she was] in." In May 2017, students from Columbia University School of Law, under the supervision of Morningside Heights Legal Services, Inc., wrote Dr. Robert Berger—head of DOC's then-provider for medical care, Correctional Managed Healthcare—threatening litigation were Clark not treated for her GD.

In July 2017, a year after Clark's attempted self-castration and in response to the threatened lawsuit, Valetta got Clark to an outside endocrinologist, who recommended hormone therapy and a follow-up visit in three months. But Clark never got the therapy; she filed grievances about that and also because she did not see the endocrinologist again for over a year. Meanwhile her medical records indicated her testosterone level was rising, and she was shaving two and three times per day.

In the summer of 2021—more than four years after Clark's GD diagnosis—DOC began seeking a "gender nonconforming specialist" to treat Clark. Finally, in December 2021, Clark met with Licensed Clinical Social Worker (LCSW) Dayne Bachman, a gender nonconforming specialist. He noted that gender conforming surgery "is a fundamental need and vital to alleviating [Clark's] pain." However, DOC claimed that it was unable to locate a suitable prison facility where the vaginoplasty could be performed.

Clark then filed suit, alleging that DOC Commissioner Angel Quiros, Valetta, Kimble-Goodman, and other DOC employees violated her Eighth Amendment rights by failing to treat her GD. Both parties moved for summary judgment.

The Court began by saying "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone" in evaluating the claim. After "[i]t took years, and this litigation, for DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria," and then another "ten months after her self-castration attempt to receive any care aside from a referral to a mental health provider that had no experience or expertise in treating patients with gender dysphoria," the Court said that DOC still "failed to follow the medical protocol prescribed by [the hormone therapy] specialist and ignored multiple test results." As the Court summed up:

"This is not adequate care."

For the subjective prong of the deliberate indifference standard, the Court pointed to Valetta's delay in requesting an

## Breakoutmediallc.com

Breakout Media provides publishing services exclusively to inmates. We understand the needs and challenges that incarcerated publishers face bringing their work to market. Book Publishing!

- Typing proofreading and cover art.
- Listing books and e-books on Amazon and Barnes and Nobel.
- LLC formation.
- Music and Art

**Insta Pics:** Give us the name of your favorites and we can send you pics through Amazon!
Contact for details!

Breakout Media
PO Box 1157
State College, PA 16804

Email:
admin@breakoutmediallc.com

## Heyinmate.com

### Online social media for inmates:

- **Dating**
- **Pen Pals**
- **Social Media**

$49.00 per year/unlimited content!

Send us your photos and content info and we will scan and upload!

Heyinmate.com
PO Box 1157
State College, PA 16804

Email:
admin@heyinmate.com

endocrinologist—which occurred only after the lawsuit threatened by Columbia—and that Kimble-Goodman did nothing more than offer talk therapy and antidepressants. Because these material facts were not in dispute, Clark was entitled to summary judgment. Accordingly, the Court granted Clark's motion for summary judgment and denied Defendants' motion for summary judgment. Clark was represented by attorneys with the American Civil Liberties Union of Connecticut and Finn Dixon & Herling LLP in Stamford. *See: Clark v. Quiros*, 2023 U.S. Dist. LEXIS 164088 (D. Conn. 2023).

The Court said it would take up the issue of damages next. Defendants announced in October 2023 that they would file an interlocutory appeal at the U.S. Court of Appeals for the Second Circuit. However, a search of that court's docket in March 2024 found no appeal yet filed. Meanwhile the parties reported that they were in settlement negotiations. The district court has stayed the case and given them until at least March 28, 2024, to determine next steps, and *PLN* will update developments as they are available. *See: Clark v. Cook*, USDC (D. Conn.), Case No. 3:19-cv-00575. ◾

# Eighth Circuit Affirms Qualified Immunity for Missouri Prison Chief in Sexual Abuse Claims Against Former Guard

*by David M. Reutter*

On August 23, 2023, the U.S. Court of Appeals for the Eighth Circuit reversed denial of qualified immunity (QI) to Anne Precythe, Director of the Missouri Department of Corrections (DOC), in an Eighth Amendment complaint filed by a state prisoner accusing Precythe of failing to protect her from sexual abuse by Edward Bearden, a former guard at Chillicothe Correctional Center (CCC).

As *PLN* reported five prisoners accused the guard of sexual abuse between 2012 and 2015, and a jury awarded $5 million each in April 2022 to four who consolidated their complaints: Karen Keil, Lyndsey Betz, Ashley Zesser, and Trenady George. [See: *PLN,* May 2023, p.56.]

The fifth prisoner, Teri L. Dean, brought similar claims against Bearden and also against Precythe. Meanwhile a DOC investigation "led to sanctions against [Bearden], including an order prohibiting him from having contact with prisoners," the Eighth Circuit recalled, noting that the guard then "retired just a few weeks later." He was never criminally charged.

Precythe learned about the allegations during the investigation. But she "didn't [personally] take any action," believing others had the situation under control, the Court continued; the prison chief "trusted [her] staff to tell [her] if there was something [she] needed to know." But Dean argued that Precythe should've been more curious and done more. The U.S. District Court for the Western District of Missouri agreed, denying Precythe's motion for summary judgment based on QI. Precythe appealed.

At the Eighth Circuit, Dean argued that "Precythe's failure to 'take any action' after learning about the sexual-assault allegations was deliberately indifferent." But the Court said that "[e]ven if we assume that Precythe should have done more, neither 'controlling authority' nor 'a robust consensus of cases of persuasive authority' required it," citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). As DOC Director, Precythe "would not have known that dealing with sexual-assault allegations by having staff investigate and respond to them was deliberately indifferent under the circumstances" sometimes, the Court added, pointing to *Taylor v. Barkes*, 575 U.S. 822 (2015).

Circuit precedent "suggests that a high-ranking official's deference to the judgment of staff does not generally rise to the level of deliberate indifference, even with 'kn[owledge] of the danger,'" the Court declared, pointing to *Axelson v. Watson*, 999 F.3d 541 (8th Cir. 2021). Since DOC's "established policy and process" places responsibility for investigating prisoner complaints with its Office of Professional Standards, Precythe "had no obligation to do anything more than allow the existing investigation to play out," the Court concluded.

Thus the district court's order was reversed and the case remanded for the entry of partial judgment in Precythe's favor. Before the Court, Dean was represented by counsel from St. Louis University School of Law faculty John J. Ammann and Brendan D. Roediger, along with St. Louis attorney Jenifer C. Snow. See: *Dean v. Bearden*, 79 F.4th 986 (8th Cir. 2023).

Back at the district court, Dean's case against Bearden and other remaining DOC defendants is proceeding toward a trial currently set for May 2024. *PLN* will update case developments as they are available. *See: Dean v. Bearden*, USDC (W.D. Mo.), Case No. 5:19-cv-06022. ◾

# Call for Essays

The American Prison Writing Archive (APWA) is a growing public, internet-based collection of non-fiction writing about direct experience with the U.S. prison system. Anyone who has been incarcerated or has volunteered inside can send handwritten or typed pieces. All writing skill levels are welcome. 5,000 word limit.

Visit us at: Prisonwitness.org

We read and respond to all writing. No reading fees or SASE required. A signed Permissions-Questionnaire (PQ) form is required for writing to be included in the APWA. For more information, or to receive our PQ form, please write to:

American Prison Writing Archive
Johns Hopkins University
3400 N. Charles St.
Baltimore, MD 21218

AMERICAN PRISON WRITING ARCHIVE

# Ninth Circuit Says Federal Prisoner in California May Have *Bivens* Claim for Delays in Medical Care Allegedly to Cover Up Assault by BOP Guard

*by David M. Reutter*

On August 15, 2023, the U.S. Court of Appeals for the Ninth Circuit reversed dismissal of an Eighth Amendment deliberate indifference medical claim by a federal prisoner against officials holding him for the U.S. Bureau of Prisons in California. However, the Court affirmed dismissal of Roscoe Chambers' First Amendment retaliation claim.

Over 50 years ago in *Bivens v. Six Unknown Federal Narcotics Agents*, 488 U.S. 388 (1971), the Supreme Court of the U.S. (SCOTUS) recognized a cause of action for damages against federal officials accused of unreasonable search and seizure in violation of the Fourth Amendment; the high court later expanded that right to include alleged Fifth and Eighth Amendment violations. However, as *PLN* reported, a more reactionary current SCOTUS majority shut down any further expansion with its ruling in *Egbert v. Boule*, 142 S. Ct. 1793 (2022). [See: *PLN*, Apr. 2023, p.22.]

In his *pro se* complaint, Chambers alleged that BOP Lt. Carmen Herrera "repeatedly threatened him, denied him law library access, and assaulted him several times, resulting in a broken wrist," the Ninth Circuit recalled. Chambers also alleged that physician's assistant Jose Esquetini refused to treat his broken bones or take x-rays for six weeks in an attempt to cover up Herrera's assaults. It was further alleged that guard Enrique Velez assaulted Chambers by spraying him in the face and mouth with mace. Finally, Chambers alleged he was subjected to retaliation for filing grievances, resulting in unearned punishment with placement in the Special Housing Unit (SHU)—a nice BOP term for solitary confinement.

Defendants moved to dismiss the suit, arguing it failed to state a recognized *Bivens* claim. The U.S. District Court for the Central District Court of California agreed and granted the motion. Chambers appealed.

At the Ninth Circuit, Chambers conceded that *Egbert* foreclosed his First Amendment claim. The Court then came to the same conclusion regarding his failure-to-protect and excessive-force claims, noting that the only Eighth Amendment violation recognized before *Egbert* was for deliberate indifference to a serious medical need.

But Chambers also raised just such a deliberate indifference medical claim; the Court found his allegations were unclear, but it could not "say at this stage … that more detailed factual allegations could cure the deficiencies in the complaint under *Egbert*." Thus the claim was remanded to determine whether Chambers might still attempt amendment to clarify it. Before the Court, Chambers was represented by Supervising Attorney Carter White and Certified Law Students Christine Hanon, Emily Dennis and Abigail Miles of the University of California at Davis Civil

# Prison Education Guide

## by Christopher Zoukis

This exceptional book is the most comprehensive guide to correspondence programs for prisoners available today. *Prison Education Guide* provides the reader with step-by-step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals.

This guide is the latest and best resource on the market for the incarcerated nontraditional student. It includes a detailed analysis of the quality, cost, and course offerings of all correspondence programs available to prisoners.

*"Education is always important but it is even more so for the more than two million Americans who live behind bars. When one's body is locked up, the freedom and development of one's mind becomes a powerful form of resistance and self-preservation. This book is an invaluable tool in the struggle for knowledge behind bars."*

— Christian Parenti



**Price: $24.95**
*(shipping included)*

**280 pages**

*Order by mail, phone, or online.*

Amount enclosed for *PEG* _____ By: ☐ check ☐ credit card ☐ money order

Name: _____ DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

Rights Clinic. *See: Chambers v. Herrera*, 78 F.4th 1100 (9th Cir. 2023).

Back at the district court, Chambers, now 52, was once again proceeding *pro se*. But the clerk of the court could not find him where he'd last been held, at BOP's U.S. Penitentiary (USP) in Thomson, Illinois. Even after he turned up at USP-Leavenworth in Kansas, Chambers missed an extended deadline to file an amended complaint on December 13, 2023. Just over two weeks later, on December 28, 2023, he was issued an order to show cause why the case should not be dismissed. The reply deadline for that passed on January 23, 2024, and the case was dismissed on February 7, 2024. *See: Chambers v. Herrera*, 2024 U.S. Dist. LEXIS 23326 (C.D. Cal.).

# $2,000 Paid to Former Arkansas Jail Detainees Given Horse Dewormer for COVID-19

### *by Douglas Ankney*

On September 7, 2023, five former detainees at Arkansas' Washington County Detention Center (WCDC) informed the federal court for the Western District of Arkansas that they had accepted payment of $2,000 each to settle claims alleging that a jail doctor without their knowledge or consent dosed them with the anti-parasitic Ivermectin as part of his own experimental COVID-19 treatment regimen.

As *PLN* reported, Edrick Floreal-Wooten, Jeremiah Little, Julio Gonzales, Dayman Blackburn and Thomas Fritch filed suit in January 2022 against county Sheriff Tim Helder, Dr. Robert Karas and his firm, Karas Correctional Health, P.L.L.C., which held the contract for jail healthcare. Proceeding under 42 U.S.C. § 1983, they alleged that when they tested positive for COVID-19 at the jail in August 2021, they were confined to "quarantine barracks" and given a "cocktail of drugs." They said Karas told them that the cocktail "consisted of mere vitamins, antibiotics, and steroids," but he never revealed it also contained Ivermectin. [See: *PLN*, Aug. 2022, p.44.]

Used to deworm livestock, Ivermectin is approved by the federal Food and Drug Administration (FDA) in low dosages—0.2mg per kg of patient's weight—to treat intestinal worms, head lice and rosacea in humans. However, Karas administered Plaintiffs' dosages over six times higher, they said. Furthermore, the FDA and the federal Centers for Disease Control and Prevention had specifically advised against using Ivermectin to treat COVID-19. The American Medical Association, the American Pharmacists Association and the American Society of Health-System Pharmacists also called on physicians in 2021 to stop prescribing and using the drug to treat COVID-19.

Plaintiffs subsequently experienced headaches, stomach cramps, bloody stools and loss of balance—all known side-effects of Ivermectin. To add insult to injury, they were charged medical copays when they sought treatment for these side-effects.

Karas publicly posted on social media that he advocated use of Ivermectin for COVID-19 but prescribed dosages within FDA-approved limits—except for WCDC detainees, to whom he admitted prescribing higher dosages. Plaintiffs eventually found out about the posts and learned they had been guinea pigs of experimental research. At that point jail officials attempted to get them to sign a back-dated consent, but Plaintiffs instead filed their suit.

Making a stab at Judgment on the Pleadings, Defendants argued that because Plaintiffs voluntarily swallowed the pills, they were not "forced," so no rights were violated. But the Court called this argument "absurd," pointing out that "Plaintiffs did not know they were taking Ivermectin, so they did not have the option to refuse it or have it 'forced' upon them."

The Court further found that Plaintiffs' claims, if true, "shock the conscience," since Karas allegedly devised and prescribed a high-dosage protocol of Ivermectin in an experimental treatment of COVID-19 without Plaintiffs' knowledge or consent. Under Arkansas law the Court found that failure to obtain their consent was not merely medical negligence but an intentional tort viable as a medical battery claim. So Defendants' motion was denied on March 26, 2023. *See: Floreal–Wooten v. Helder*, 2023 U.S. Dist. Lexis 44593 (W.D. Ark.).

The parties then proceeded to reach their settlement agreement. Though nominal, the amount represents one of very few instances in which prison or jail officials have been held liable for damages arising from their response to the COVID-19 pandemic. Plaintiffs were represented by attorneys Bourgon B. Reynolds and Ryan Smith of Rose Law Firm in Little Rock. *See: Floreal–Wooten v. Helder*, USDC (W.D. Ark.), Case No. 5:22-cv-05011.

# Great lawyers get results.

Matthew Pinix

## A History of Success in Wisconsin

| | |
|---|---|
| **Appeals:** | Homicide overturned, 2014 |
| **Postconviction:** | 37.5-year sentence vacated, 2015 |
| **Habeas:** | Homicide overturned, 2020 |
| **Civil Rights:** | $2.4 mil on guard's sex assault, 2019 |

**Pinix Law, LLC** | 1200 East Capitol Drive, Suite 360 | Milwaukee, WI 53211 | (414) 963-6164 | info@pinixlaw.com

# At BOP California "Rape Club" Prison: Historic Ruling, FBI Raid, Warden Removed

On March 11, 2024, FBI agents raided the Federal Correctional Institution (FCI) in Dublin, California, the troubled federal Bureau of Prisons (BOP) lockup plagued by staff sexual assaults on prisoners—so many that it has become known as the "rape club." Warden Art Dulgov and Associate Warden Patrick Deveney were walked off the job, along with an unnamed guard captain. For the prisoner victims, the federal court for the Northern District of California then issued an historic ruling four days later, on March 15, 2024, granting class certification to a suit filed on their behalf and appointing a special master to enforce the Court's rulings, the first time that has ever happened in a case against BOP.

Declaring FCI-Dublin "a dysfunctional mess," U.S. District Judge Yvonne Gonzalez Rogers said, "The situation can no longer be tolerated."

As *PLN* reported, the suit was filed in August 2023 by attorneys with Rosen Bien Galvan & Grunfeld LLP in San Francisco, as well as Rights Behind Bars, a non-profit advocacy in Washington, D.C, for the California Coalition for Women Prisoners. [See: *PLN*, Jan. 2024, p.18.] Seeking class-action status for prisoner victims, it is one of over five dozen lawsuits filed over the scandal, which has so far sent seven BOP employees to prison, including the former warden. Trial for an eighth is still pending.

Staying damages claims in the case for those prosecutions until July 19, 2024, the Court said it was primarily concerned with two things: allegations of continuing sexual abuse, as well as reports that prisoners were being subjected to retaliation for participating in legal challenges. To ferret out the truth, Judge Rogers made a surprise visit to the lockup on February 14, 2024.

What she found corroborated a March 2022 report by the "Dublin Support Team Task Force" that BOP assembled. While finding "the allegation that a 'sexualized environment' persists" to be "exaggerated," Judge Rogers also disbelieved "the government's assertion that it has eradicated the issue of sexual misconduct."

## No "Ability to Manage with Integrity and Trust"

"The truth is somewhere in the middle," Judge Rogers wrote, acknowledging that "allegations of sexual misconduct have lingered but to characterize it as pervasive goes too far." Furthermore, from nine hours with staffers and at least 100 prisoners "who readily approached throughout the day," the judge recalled reports of being strip-searched after meeting with attorneys about the case. Thus because of BOP's "inability to promptly investigate the allegations that remain," as well as "ongoing retaliation against incarcerated persons who report misconduct," the Court determined that "BOP has lost the ability to manage with integrity and trust."

"Resorting to correctional 'policies' that are not evidence-based—such as a visual, or strip, search—only after incarcerated persons started engaging in constitutionally-protected activities, such as meeting with their attorneys to file this suit, are logically viewed as retaliatory by the incarcerated population," the Court declared.

Combined with a "significant lack of communication" between prisoners and staff, this casts a pall in which the prison's dire shortage of medical and mental health staff results in care lapses that appear retaliatory, the Court said—recalling that some prisoners said the only treatment they received was advice to "lose weight and drink water."

The inspection also revealed "dilapidated conditions" and a "lack of programming" that "does not comply with BOP policy," the Court wrote. A report commissioned by BOP from The Moss Group consulting firm blamed senior staff turnover, low staff morale and the high cost of living in the area for a "toxic" working culture, in which guards fear being accused of retaliation by prisoners even when performing ordinary duties.

Granting the request for class certification, the Court then issued a preliminary injunction. Judge Rogers was initially skeptical that prisoners still faced a risk of sexual abuse after so many former staffers had been fired and prosecuted; however, new sexual abuse allegations were filed as recently as November 2023, and another dozen staffers are under investigation. Moreover, the Court said, (1) BOP has churned through wardens without finding one "capable of understanding and responding to the gravity of the situation"; (2) the federal Department of Justice's Office of the Inspector General (OIG) does not "solely investigate" allegations of violations of the Prison Rape Elimination Act (PREA), "as the government claims," leaving prisoner allegations to pass by staffers and risking their retaliation; and (3) "'zero tolerance' is not quite 'zero,'" the Court said, since at least two staffers were not put on leave after allegations were made against them.

The Court concluded that BOP was deliberately indifferent not only to a continued risk of sexual assault but also to the serious health and mental health needs of prisoners, in violation of their Eighth Amendment rights. Understaffing is a huge problem, especially a lack of mental health staffers, with 90% of those held at the prison having mental health needs. Noting that "even in the best of circumstances, FCI Dublin is not equipped to handle some of the chronic or urgent needs" of its prisoners, the Court said that BOP's "remedial measures taken are too little, and too late."

As for allegations that prisoners were subjected to retaliation for making PREA reports, in violation of their First Amendment rights, the Court was again skeptical. However, the totality of alleged retaliations—"transfer to the SHU [Special Housing Unit]; cell searches; loss of privileges like visitation, good time credits, or a coveted job; and, more recently, strip searches and bathroom inspections after a legal visit"—convinced Judge Rogers, who declared that "FCI Dublin's long history of using the SHU to inappropriately quell inmates' First Amendment rights can no longer be countenanced." Using punishments like SHU "to deter false reports will have the perhaps unintended but surely foreseeable consequence of deterring incarcerated persons from making *true* reports," the Court said.

The government claimed short-staffing made SHU a vital tool, insisting that retaliation would not be an ongoing problem because prisoners now had more ways to report it. The Court called that "cold comfort," though, saying it didn't find short-staffing "an excuse for retaliatory conduct."

 Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 61 of 74    Document 4-1

Moreover, BOP's own investigation showed that "staff morale fundamentally stems from a broader distrust" between prisoners and prison officials, yet "[r]emarkably, FCI Dublin has not addressed the issue proactively by communicating more openly with its incarcerated population." With that the Court announced it would appoint a special master to enforce specific relief that it would grant under its injunction—the first time BOP has ever been subjected to that level of judicial oversight. *See: Calif. Coalit'n for Women Prisoners v. United States*, USDC (N.D. Calif.), Case No. 4:23-cv-04155.

### Fourth Warden in Three Years

The Court said it was "compelled to intercede" in part by "repeated installation of BOP leadership who fail to grasp and address the situation," which Judge Rogers said "strains credulity." That was just after Dulgov became the third chief removed from the lockup since BOP investigators found nude photos of prisoners on the phone of former Warden Ray Garcia, 55, who then took an early retirement in 2021. He was convicted of sexual assault and sentenced to 70 months in prison in March 2023.

His first replacement, Thomas Ray Hinkle—who bragged of his role in the "original cowboys" group of guards that abused federal prisoners in Colorado decades earlier—was accused of targeting whistle-blowers, even as he made tone-deaf public references to the sexual abuse Dublin prisoners suffered as "consensual"; he lasted just a few months before he was replaced at the end of February 2022 by Thahesha Jusino. She retired in late 2023, when Dulgov was brought in. For now, he is succeeded on an interim basis by Deputy Regional Director N.T. McKinney, while BOP searches for the prison's fourth permanent warden in three years.

In addition to Garcia, five other former prison staffers have also been sentenced for their roles in the scandal. Former guard and technician Ross Klinger, 38, got a year of home detention on January 24, 2024, for coercing three prisoners to have sex with him, using gifts, money and offers to marry them and father their children. He even stalked one after a transfer to another prison, using an email alias—"Juan Garcia"—to manipulate her with details gleaned from unauthorized access of her prison records. His sentence was lighter than the rest because he cooperated in their prosecution, though Judge Rogers said it was "a particularly difficult case for me" because Klinger's "conduct was particularly horrifying to the victims."

However, he helped secure a 63-month sentence for former guard supervisor John Russell Bellhouse, 40, on December 1, 2023. Former food supervisor Andrew Jones, 36, got eight years on November 15, 2023.

Former kitchen supervisor Enrique Chavez, 49, got 20 months on February 9, 2023. Former Chaplain James Theodore Highhouse, 49, began a seven-year prison term on November 2, 2022. The most recently sentenced was Nakie Nunley, 48, who got six years on March 28, 2024, for sexually abusing seven prisoners he supervised in a call center run by BOP's prison industry subsidiary, UNICOR. After one recalled how Nunley fingered her vagina, calling it "fat and juicy," Judge Rogers called him "cruel," "perverse," and "predatory."

The eighth charged in the scandal faces 12 counts, the most of anyone so far. The indictment against former guard Darrell Wayne Smith, 54, was unsealed on May 11, 2023, the same day that he was arrested at his new home in Florida. His alleged victims, who called him "Dirty Dick," said Smith often sat in the dark and ate bananas while watching them undress.

Just before the FBI raid, on March 7, 2024, Rights Behind Bars attorneys filed 12 more lawsuits on behalf of prisoners claiming they were sexually abused at FCI-Dublin. Identified as Z.T.S., R.W., M.L., M.D., K.D., J.H., H.G., F.S., E.S., A.Y., A.L.R. and A.C., the 12 women join the eight named plaintiffs in the class-action, plus at least 43 others who have filed claims in the wake of the scandal. ◾

Additional source: *San Francisco Chronicle*

---

# News in Brief

**Alabama:** On January 11, 2024, two state prison guards at Elmore Correctional Facility (CF) were arrested when their contact information was found in a prisoner's contraband cellphone, *WSFA* in Montgomery reported. Eli Charlie DeRamus, 33, and Bunion Thomas, 24, were then accused of smuggling food items in exchange for bribes of $3,500 and $600, respectively. Both were charged with abusing their official position for personal gain and resigned from the state Department of Corrections (DOC). A week later, on January 18, 2024, Staton CF guard Ebony Breauna Chillous, 28, resigned when she was hit with the same charge for allegedly taking unspecified CashApp payments to smuggle unidentified drugs to an unnamed prisoner in November 2023. She was taken to Montgomery County Detention Facility and held on $50,000 bail. DeRamus and Thomas were booked into the Elmore County Jail and released.

**Alabama:** Five days after he escaped the city lockup in Bessemer and fled in a stolen getaway car, Tyree Chapman, 22, was chased down in Georgia and nabbed on January 17, 2024. The *Birmingham News* reported that he'd been jailed on misdemeanor charges on December 29, 2023, and jailers said his escape was "not dramatic." But the drama escalated when he stole an Infiniti from a Planet Fitness parking lot and drove it to Atlanta, where a police helicopter later spotted the car and tracked it to a convenience store. From there Chapman fled on foot into a residential neighborhood, where the chopper again spotted him hiding in a garbage can. He was taken into custody, along with a handgun that a K-9 dog sniffed out of another trash can.

**Alabama:** On January 22, 2024, Lawrence County Jailers caught Kirk D. Muckenfuss, 43, "in the act" of cutting through the jail fence, allegedly to reach a broken window through which he planned to smuggle 32.5 ounces of meth they found on him. The *Birmingham News* reported that he was arrested and jailed at the lockup on a $1.578 million bond.

**Arizona:** Heather A. Neff, 38, a former guard at the Federal Correctional Institution (FCI) in Safford, was sentenced on February 13, 2024, for having a sexual affair with an unnamed prisoner. The federal Department of Justice (DOJ) said that she resigned from the Bureau of Prisons (BOP) after she was caught in 2019. According to her August 2023 guilty plea, Neff took bribes to smuggle the prisoner contraband, including nutritional supplements, loose tobacco, hygiene

 Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 62 of 74    Document 4-1

items and rum. She also mailed his letters and provided "non-public" information from BOP's SENTRY database about other prisoners—one of whom was later assaulted. She will spend 18 months in federal prison followed by 36 months of post-release supervision. *See United States v. Neff*, USDC (D. Ariz.), Case No. 4:23-cr-00204.

**California:** The *Sacramento Bee* reported that state prisoner Albaro Amaral was shot and killed on January 25, 2024, by High Desert State Prison guards who saw him stabbing a fellow prisoner with a homemade weapon. Amaral's unnamed victim survived and was in fair condition at a hospital, the state Department of Corrections and Rehabilitation (CDCR) said. Amaral, 33, was serving a life sentence for the June 2020 murder of fellow San Jose gang member Kevin Medina-Lopez, 27. His killing was CDCR's second of the month; Son Tran, 53, was found murdered in his cell at Salinas Valley State Prison (SVSP) on January 6, 2024, the *Orange County Register* reported. Fellow SVSP prisoner John Lydon, 50, was suspected in the killing, though CDCR didn't specify how he did it. Lydon is serving life without parole for murdering two fellow prisoners.

Tran was 23 years into a 50-year sentence for sex crimes.

**California:** Deeming him a flight risk, the Los Angeles Superior Court denied bail on January 24, 2024, to actor Danny Masterson, 47, while he appeals his conviction for raping two women in 2003. *USA Today* reported that the co-star of *That 70s Show* will remain in CDCR custody serving a term of 30 years to life handed down for the rapes in September 2023. His wife, *Almost Famous* actress Bijou Phillips, 43, filed for divorce about a week later, giving Masterson "every incentive to flee," Judge Charlaine Olmedo ruled. He is held at the Men's Colony in San Luis Obispo.

**Florida:** Calling it an "act of betrayal," Hillsborough County Sheriff Chad Chronister announced the arrest of a five-year-veteran Facilities Technician at the county's Faulkenburg Road jail on January 31, 2024, for allegedly ripping off 210 pounds of copper and 183 pounds of brass worth over $3,000. *WFLA* in Tampa said that Rodgers Ruiz, 45, is accused of fencing the material to a recycling company and pocketing the cash. Chronister knows a thing or two about betrayal, having turned on his "good friend" Andrew Warren, the

county's then-State Attorney, when he was removed in 2022 by Gov. Ron DeSantis (R), in a blatantly political stunt that the federal court for the Northern District of Florida said it was nevertheless powerless to redress. The U.S. Court of Appeals for the Eleventh Circuit disagreed, though, and sent the case back to the district court on January 11, 2024, saying it looked like DeSantis punished Warren for voicing progressive opinions that are protected by the First Amendment. *See: Warren v. DeSantis*, 90 F.4th 1115 (11th Cir. 2024). If the governor is forced to reinstate Warren, Sheriff Chronister may once again have to work with his former "good friend" rather than Warren's appointed replacement, Suzy Lopez, a DeSantis toady who named her own dog "Rhonda Santis."

**Florida:** After a video posted to social media showed two Hamilton Correctional Institution guards striking a prisoner in a "power slap" competition, they were fired by the state DOC on February 9, 2024, the *Tampa Bay Times* reported. Neither the prisoner nor the guards were named. In 2022, three former guards at the lockup were sentenced for beating a restrained prisoner unconscious, as *PLN* reported. [See: *PLN*, May 2022, p.34.]

# Special Offer for 1st Time Criminal Legal News Subscribers

## A 6-Month Subscription for $14.00 (That's 50% off the cover!)

Are you reading someone else's CLN? You don't want to risk missing a single issue.
For over 30 years, we have been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to CLN. All orders are subject to approval. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 CLN's annual renewal rate is $48.00, plus sales tax where applicable).

**Act now as this offer is only valid through 6/30/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____

**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

**Georgia:** The state DOC arrested two prison guards for smuggling at separate lockups on back-to-back days, beginning on January 7, 2024, when a search of Nicholas Grindle's locker at Hays State Prison turned up contraband that included seven vape pens, a vape bottle, wireless earbuds, 20 charging cables, five charging blocks, 14 cell phones, 222 grams of marijuana and 760 grams of methamphetamine, *WSB* in Atlanta reported. The day after his arrest, when Hancock State Prison guard Jehan Landau arrived for work, she was found carrying a hidden supply of men's street clothing, including underwear, shorts, socks and a sweatshirt. She was arrested and placed in the Hancock County Jail. Grindle, 31, was being held in the Chatooga County Jail.

**Georgia:** A week after boarding his kid's school bus to threaten other Northside Elementary School students that he accused of bullying his child, Coweta County Correctional Institution guard Kristopher D. Elder, 37, was arrested on January 12, 2024. The *Newnan Times-Herald* reported that Elder flashed his state DOC badge at the students and threatened to handcuff them before the unnamed bus driver booted him from the bus. While the driver had to pull over and calm the frightened students, Elder went to meet with school Principal Amy Addison, who promised to investigate the bullying claims. She pulled security camera footage from the bus and discovered Elder's behavior, saying it left her "appalled." Elder was charged with disruption of public schools.

**Georgia:** Almost halfway through a 33-month sentence for threatening to blow up the White House in a March 2021 letter to Pres. Joseph R. Biden, Jr. (D), BOP prisoner Travis L. Ball, 56, pleaded guilty to mailing more threatening communications on January 19, 2024. The *Atlanta Journal-Constitution* said that sharp-eyed FBI agents noticed the letters were handwritten on jail-issued legal paper. Another tip-off: They were stamped "Inmate Mail" and sent from the Upson County Jail while Ball was incarcerated there. In one March 2023 letter, Ball pretended to be a Secret Service agent who investigated the threat earlier mailed to Biden and demanded Ball's release. In two others sent that month and in May 2023, Ball signed his cellmate's name to threats to burn down the federal courthouse in Valdosta. He sent a fourth letter in July 2023, claiming to be an FBI agent working a "top-secret" case and demanded that jail records be scrubbed of Ball's name and photo. This is Ball's third conviction for mailing threats; he finished a two-year federal prison term in 2019 for mailing phony anthrax to the state Bar Association and Atlanta newspapers in 2016.

**Illinois:** Over the objection of Dekalb County prosecutors, pretrial release was granted on January 30, 2024, to retired BOP guard Joe D. Reamy, Jr., 50, who was arrested the day before on kiddie porn charges. The *Dekalb Daily Chronicle* reported that Reamy admitted sending two videos depicting child sex abuse via the Kik Messager app to an unnamed recipient. Judge Joseph Pedersen of the state's 23rd Circuit Court put Reamy on electronic monitoring and ordered him to keep away from children and off the internet.

**Indiana:** Two Hoosier State jail guards were arrested for smuggling in 11 days, beginning on January 13, 2024, when Lincoln County Jail guard Shayna Haynes, 29—who had just been hired in June 2023—was accused of slipping K2 to an unnamed detainee three times over the previous month; she was booked into the jail on a $100,000 cash bond, *Lincoln News Now* reported. Then on January 24, 2024, Wayne County Jail guard



# FEDERAL PRISON HANDBOOK

### BY CHRISTOPHER ZOUKIS

**THE DEFINITIVE GUIDE TO SURVIVING THE FEDERAL BUREAU OF PRISONS**

**Price: $74.95** *(shipping included)*

This handbook teaches individuals facing incarceration, prisoners who are already inside, and their friends and family everything they need to know to protect themselves and their rights. The thorough information was compiled by someone who has first-hand experience with the federal prison system.

Name _____

DOC/BOP # _____

Institution/Agency _____

Address _____

City _____

State _____ Zip _____

**Prison Legal News • PO Box 1151 • Lake Worth Beach, FL 33460**
**Tel. 561-360-2523 • www.prisonlegalnews.org**

# PLN Needs Your Photos, Videos, Verdicts and Settlements!

We are expanding the multimedia section on PLN's website, and need more prison and jail-related content! We know many of our readers have pictures and videos related to prison and criminal justice topics, and we'd like to post them on our site. We are seeking *original* content only – photos or video clips that you have taken yourself.

Please note that we are *not* seeking articles, editorials, poems or other written works; only photos and videos. They can be taken inside or outside of prison, but must relate to prisons, jails or criminal justice-related topics. By sending us multimedia content, you are granting us permission to post it on our website. Please send all submissions via email to:

**CONTENT@PRISONLEGALNEWS.ORG**

Please confirm in your email that the photos or videos are your original content, which you produced. Also please provide some context, such as where and when they were taken. Your name will not be posted online or otherwise disclosed. Please spread the word that PLN needs photos and videos for our website.

_____

We also need verdicts and settlements in cases won by the plaintiff. Note that we are *only* seeking verdicts, final judgments or settlements – not complaints or interim orders in cases that are still pending. If you've prevailed in court against prison or jail staff, please send us a copy of the verdict, judgment or settlement and last complaint so we can post them on our site and potentially report the case in PLN. If possible, please e-mail your submissions; we cannot return any hard copy documents. Send to:



**Prison Legal News**
P.O. Box 1151
Lake Worth, FL 33460
content@prisonlegalnews.org

Adrian Jo Blanton, 24, was charged with taking a $2,000 bribe to smuggle drugs to detainee Shawn Christopher Lee Farrow, 30. The *Richmond Palladium-Item* said that Farrow was found with 64 suboxone strips in August 2023, after which investigators discovered incriminating recorded phone conversations with the guard. Blanton now faces up to six years in prison for felony trafficking with an inmate.

**Indiana:** After finding Orange County Jail detainee Jeanne Ross dead in her cell on December 30, 2023, investigators issued an arrest warrant for one of the 54-year-old's visitors. Sarah Shipman, 31, was accused of smuggling the drugs that caused Ross' fatal overdose. *WAVE* in Louisville, Kentucky, said that Shipman turned herself in on January 23, 2024, and she is being held on a $500,000 bond.

**Kentucky:** State DOC guard Amanda Kulka, 42, was arrested on February 14, 2024, for allegedly having sex with an unnamed prisoner and smuggling him drugs at Green River Correctional Complex. The *Lexington Herald* said that Kulka admitted the sexual relationship but denied drug-smuggling. State police arrested her on a third-degree sodomy charge. She was being held in Muhlenberg County Detention Center on a $5,000 bond.

**Louisiana:** On August 15, 2023, a former state prisoner exonerated a year earlier filed for $480,000 in state compensation—$13,000 for each of the 36 years he spent wrongfully incarcerated. However, the *New Orleans Times-Picayune* reported that Sullivan Walter, 53, must first convince a state judge that he is "factually innocent" of the 1986 rape for which he was convicted at age 17—a legal bar crossed just 30 times in the past decade. The judge presiding at his August 2022 exoneration called it "horrible" when prosecutors admitted asking criminologist Harry O'Neal to "fudge" testimony at Walter's trial about blood tests that in fact cleared him. "I'm at a loss of words to express the sorrow and the anger I have," Judge Darryl Derbigny said. Walter's wrongful imprisonment was one of the longest for any teenage convict in U.S. history.

**Louisiana:** The *Baton Rouge Advocate* reported that Ascension Parish Jail guard Andrew R. Wheeler, 36, was arrested and fired on February 4, 2024, after he admitted smuggling unidentified contraband to unnamed detainees. He was hired less than a year earlier. Sheriff Bobby Webre said the investigation would continue after detainee Peggy Valentine, 45, was rushed to a hospital with a fentanyl overdose on February 15, 2024. She was treated and returned to the lockup, where she is awaiting sentencing after being convicted of breaking into the home of her ex-fiancée's girlfriend and stabbing the woman's 55-year-old mother with a boxcutter.

**Maryland:** Former Department of Public Safety and Correctional Services (DPSCS) guard Ajee X. Meyers, 29, was charged on January 12, 2024, with carrying on a months-long sexual affair with an unnamed prisoner assigned to work in the kitchen that Meyers supervised at Maryland Correctional Institute for Women. The *Annapolis Capitol Gazette* said that DPSCS investigators found over 700 recorded phone calls between Meyers and the prisoner, to whom she also allegedly sent lewd selfies and money. In addition, Meyers was accused of threatening another prisoner who was the woman's girlfriend.

**Mississippi:** East Mississippi Correctional Facility guard Justin Whipps, 30, had just been promoted to captain when he was fatally shot by fellow guard Caboris McAfee on December 27, 2023. *WTVA* in

# Special Offer for First Time Prison Legal News Subscribers

## A 6-Month Subscription for $10.00 (That's 50% off the cover!)

Are you reading someone else's PLN? You don't want to risk missing a single issue.
For over 30 years, PLN has been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to PLN. All orders are subject to approval. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 PLN's annual renewal rate is $36.00, plus sales tax where applicable).

**Act now as this offer is only valid through 06/30/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____



**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

Tupelo said both guards were on duty when they got into an argument in the prison parking lot that led to the shooting. The lockup is operated for the state DOC by Utah-based private prison contractor Management & Training Corp. McAfee was being held at the Lauderdale County Jail.

**Mississippi:** Former state DOC guard Loomis Muhammad, 41, was sentenced to 10 years in state prison on January 31, 2024, for pistol-whipping his girlfriend while he was off-duty from South Mississippi Correctional Institution in October 2022. The unnamed woman lived with him and his wife in a "throuple," the *Laurel Leader-Call* reported, when an argument erupted with Muhammad, formerly known as Louis Mitchell. He sucker-punched her from behind, beating her with his handgun after she fell to the floor. The live-in mistress managed to escape to a friend's waiting vehicle, which had come to give her a ride to a medical appointment after Muhammad denied her use of his car and sent her walking. Meanwhile Muhammad drove himself to Jones County jail, getting into a scuffle with Sheriff's deputies who demanded he remove his kufi religious headwear.

**Montana:** "I never thought it was something wrong to do, to resell weed," state DOC Sgt. Scott Patrick Elliott told the *Helen Independent Record*. The Montana State Prison guard was charged on February 13, 2024, with taking marijuana that had been legally obtained from a dispensary and illegally reselling it to unnamed fellow employees. Five of them were placed on leave along with the credulous guard. DOC emphasized that no drugs were sold to prisoners.

**New Hampshire:** Former Strafford County House of Correction guard Patrick Schaeffer, 42, was charged on November 7, 2023, with coercing sex from jail detainees with bribes including extra peanut butter. *Foster's Daily Democrat* reported that allegations against Schaeffer went nowhere until former detainee Jennifer Duckworth, 39, went public with her claim in April 2023. That led to an investigation and charges against the former guard, who now lives in Texas. He remained free on his own personal recognizance after arraignment but if convicted could be imprisoned up to 80 years.

**New Hampshire:** Former state DOC guard Matthew Millar, 39, was charged with second-degree murder on February 8, 2024, for kneeling on the neck of a handcuffed and psychotic detainee until he died at the state prison in Concord in April 2023. *AP News* reported that Jason Rothe, 50, was not a prisoner but had been civilly committed in 2020 to the state psychiatric hospital, from which he was transferred to the prison psychiatric unit for the safety of himself and others. Six other unnamed guards were involved in the incident, but the office of state Attorney General John Formella (R) said no charges would be filed against them. As of December 2023, DOC said Millar was no longer an employee, though it was unclear when and how his employment ended.

**New Jersey:** For taking an unspecified cash bribe to smuggle a cellphone to a detainee, Atlantic County jail guard Gerald Oquendo, 35, was sentenced to three years in state prison on January 24, 2024. Altice USA's *News 12 Network* reported that the unnamed detainee was taped discussing the scheme in phone conversations with two family members. The guard was also caught on surveillance video bringing the contraband object to the detainee. Oquendo was convicted of official misconduct and will be parole-eligible in just two years.

**New Jersey:** Passaic County Jail guard Lorenzo Bowden, 39, and two fellow guards, Sgts. Jose Gonzalez, 45, and Donald Vinales, 38, were arrested on January 18, 2024, for allegedly taking an unnamed and handcuffed detainee to an area away from surveillance cameras and beating him in January 2021. The *Patterson Times* said the detainee had reportedly splashed them with urine before they retaliated with the beat-down, sending him to a hospital. None of the guards filed a required use-of-force report after the incident, and all denied it happened when questioned by investigators. They face up to 20 years in prison if convicted of conspiracy to obstruct justice, 10 years for deprivation of rights and five years for making false statements.

**New Jersey:** Five months after failing to show up for jury selection in his September 2023 human trafficking trial, retired Cape May County Jail guard Kurt Young, 56, was declared a fugitive on February 6, 2024, and state officials asked the public's help in tracking him down. The *Cherry Hill Courier Post* said that Young was fingered in 2020 when Tiffany N. Davis, 43, admitted bringing a 14-year-old girl to his home to have sex with him after Young paid her pimp, Derek V. Ross, 30. For her role in the scheme, Davis was sentenced to 15 years in prison in November 2023, when Ross also got a 20-year prison term and a $15,000 fine.

**New York:** Riker's Island detainee Tiequan Ward, 38, jumped into the unmanned driver's seat of an idling New York City DOC bus on January 9, 2024, throwing the gearshift into reverse and immediately smashing into a gray Honda parked nearby, the *New York Daily News* said. No injuries were reported to Ward or anyone else aboard the bus, including two guards and nine other detainees. The unnamed guard who abandoned the driver's seat was suspended.

**New York:** Former Westchester Coun-



**INMATE SHOPPER**

**DON'T WASTE YOUR MONEY! KNOW WHO YOU ARE DEALING WITH! BUSINESS DIRECTORY WITH RATINGS**

**AMERICA'S LARGEST PUBLICATION OF Inmate Resources & Services**

**1000+ LISTINGS:** all businesses and services are reviewed regularly and rated by the publisher based on feedback from inmates. NEW Content every issue.

Pen Pal Resources
Photo Spread (Non Nude)
Catalogs to Order
Magazine Sellers
LGBTQ Section
Criminal Justice News

Sexy Photos Sellers
Social Media/Text/Phone
Major Sport Schedules
Articles, Tips & Facts
Always Up-to-Date
Softcover, 8x10 350+ pgs.

**NEW!! 2024-2025 INMATE SHOPPER**
**$29.99 incl. s/h with tracking**

**PILLOW TALK ★ SOFT SHOTS**
**Non Nude Photo Books**

**FULL COLOR GLOSS PHOTOS**
A Different Photo On Every Page

OVER **$100** WORTH OF SEXY PHOTOS IN **1** BOOK…

**NON NUDE PRISON FRIENDLY**

Each Book Softcover, 6x9", 150+ Gloss Color

**PILLOW TALK or SOFT SHOT**
**$33.99 EACH incl. s/h with tracking**

**Freebird Publishers**
221 Pearl St., Ste. 541
North Dighton, MA 02764
www.FreebirdPublishers.com

Case 2:24-cv-00981-NJ    Filed 08/02/24    Page 66 of 74    Document 4-1    April 2024

ty Jail guard Recaldo Fray, 31, was charged on January 15, 2024, with taking part in a home invasion and robbery of an unnamed couple at their Newburgh residence the month before. The *Westchester Journal News* reported that Fray and co-defendant Kaheem Palmer, 31, allegedly muscled their way into the home on December 4, 2023, robbing the couple at gunpoint of identity documents, marijuana and $4,500 in cash. Fray allegedly then returned 12 days later to threaten the victims with retaliation if they reported the crime. County DOC Commissioner Joseph Spano said Fray's employment was terminated.

**New York:** Already serving 15 years for a 2016 conviction on rape and weapons charges, state prisoner Joseph McCrimmon, 56, is facing another 15 years in prison after a jury convicted him on February 1, 2024, of assaulting two Clinton Correctional Facility (CF) guards. The *Plattsburg Press-Republican* identified the first victim in the May 2022 attack as guard Michael Garrison, whom McCrimmon scalded with hot liquid, leaving burns on Garrison's forehead. The second victim, Justin Mahan, was on the responding cell extraction team; McCrimmon kicked and bit him, striking him with a weapon fashioned from a food can tied in a sock. A search of the prisoner's cell turned up another weapon fashioned from a can lid fitted with a paper handle plus a sharpened toothbrush. Another state prisoner was sentenced on February 16, 2024, for dousing a Collins CF guard with

urine in November 2020. *Chautauqua Today* reported that Calvin Pietri, 30, had 18 to 36 months for that attack added to his current sentence for gang assault and manslaughter. No serious injury was reported to the guard. Pietri was moved to Mid-State CF.

**New York:** A state prison guard fired from Five Points Correctional Facility for obtaining sick leave benefits with forged medical notes was sentenced to five years' probation on February 5, 2024. *WWNY* in Watertown reported that Stephanie Saber, 29, pleaded guilty in November 2023 to the fraud, which lasted from December 2021 to July 2022.

**North Carolina:** *WCTI* in New Bern reported that Carteret County Jail guard Zackery R. Smith was arrested on January 22, 2024, and accused of conspiring to smuggle drugs to detainee James E. White, Jr., muling them from two un-incarcerated accomplices, Octavian Godette and Ksandra Curtis. They were also arrested and charged in the scheme, Godette with no bond, Curtis with a $7,500 secured bond and White, Jr. with a $20,000 secured bond. The guard's unsecured bond was set at $50,000.

**North Carolina:** Five hours after he walked off a work assignment at Marion Correctional Institution on February 7, 2024, Rutherford Correctional Facility prisoner Billy Lee Smith, 42, was back in custody, facing additional charges for the escape and for taking a woman hostage while on the lam. The *Charlotte Observer* reported that Smith forced the unnamed woman to drive

him to Asheville before getting out of her car and heading into the woods where he was found. He may have been missing longer before state Department of Adult Correction guards noticed that the "low level offender" was gone. Smith was serving a 10-year sentence for a 2022 drug trafficking conviction.

**Ohio:** Days before his trespassing charges were dropped, Montgomery County Jail detainee Dejuan Johnson, 25, took a guard's gun and fatally shot himself on January 26, 2024. The *Dayton Daily News* said Johnson was at a hospital for unspecified treatment when he wrestled the gun from the unnamed guard and fled. Responding Dayton cops tracked him to a house where they heard a gunshot, finding Johnson dead of an apparently self-inflicted wound. Residents of the home said they had no connection to him. His earlier charges for trespassing were posthumously dismissed on January 29, 2024.

**Pennsylvania:** Former Blair County Prison guard John Mollica, 24, was arrested on February 7, 2024, after an unnamed 14-year-old confessed that the two had a sexual affair. As if that wasn't enough, the *Altoona Mirror* reported that the guard expressed surprise to discover her age—he thought she was only 11. Cops found text messages on the girl's phone from Mollica, who wrote, "I'm obsessed with you." He also allegedly attempted to buy her silence about their affair with vapes, cash and a new iPhone, though clearly that didn't work.

**Pennsylvania:** Apparently distracted

```
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇
```

# PLN Classifieds

**Bigshot Products**
Vinta ge Adult Novels! 2500 titles and gro wi n g, P $8.99 ea. Free lists.
SASE to: BS PO Box 741176
BOY NTON BEACH, FL 33474

**AN INMATE'S BEST BUDDY!**
Felon's Friend, LLC offers pictures, legal resources, stories, games and more!
Send SASE to Felon's Friend, LLC
PO Box 3161 Carmichael CA 95609

**Beautiful Asian Women**
Desire Penpals, Romance, Friends
Send S.A.S.E. for Free Brochure!
P.I.C. Box 4601-PN
T.O. CA 91362
ww.pacisl.com

**PENPALS.BUZZ**
The Hottest New Pen Pal Site!
Amazing Service, Fast Results.
SASE for Free Info: PenPals.Buzz
859 Washington Street PMB 215
Red Bluff, CA 96080

**USAINMATE / SUBTEXT**
Photo prints, stocks, horoscopes, Google research, and more.
Federal only. FREE trial:
760-421-9913 or www.usainmate.com
P.O. Box 698, Holt, MI 48842

**BEADED BEHIND BARS, LLC**
We purchase or commission Beaded & crafted items. On FB @ Beaded Behind Bars. Send SASE for more info to:
1001 Cooper Pt Rd SW, Ste 140 PMB 116, Olympia, WA 98502
beadedbehindbars@gmail.com

**THE INSIDER PRIZE**
For writers in Texas prisons from American Short Fiction.
Fiction & memoir < 2000 words.
Winners published online.
P.O. Box 4828, Austin, TX 78765
Yearly postmark deadline: 12/31

**Top Notch offers many services:**
Internet searches, shopping services, erotic photos and stories, self-improvement packets, and numerous other services. For a brochure send an SASE to: Top Notch Inmate Service, LLC, PO Box 268, Little Chute, WI 54140

guards at the Luzerne County Prison released the wrong detainee on January 26, 2024, according to *WNEP* in Moosic. After bail was posted by Drake Partington, 21, guards brought half-brother Billy Partington, 30, to be processed and released. Not only did fellow guards then fail to request his prison ID but they also didn't check his face against the photo provided in the discharge request. County Manager Romilda Crocamo blamed human error rather than jail policy, insisting that was sufficient. Yet she didn't explain why it took jailers three days to notice their mistake. The elder Partington was found and placed back in custody on January 31, 2024, claiming he had lost his ID before the mix-up.

**South Carolina:** On February 9, 2024, state DOC officials charged Nasidd Z. Vereen, 22, with throwing two duffel bags stuffed with contraband over the fence around Wateree River Correctional Institution. *WYFF* in Myrtle Beach reported that the bags contained meth, marijuana, Oxycodone, vape pens, cellphones, vodka, lighters, knives and tobacco. Vereen's connection to anyone imprisoned in the lockup wasn't specified.

**South Africa:** Officials are rushing to register 100,000 prisoners to vote ahead of national elections that could happen as soon as May 2024, *AP News* reported. Unlike U.S. prisoners, those held in South Africa's 240 lockups are not disenfranchised. About 15,000 voted in the most recent national elections in 2019.

**Tennessee:** *WKRN* in Nashville reported that Metro-Davidson County Detention Facility guard Bryson Hayes, 31, was placed on administrative leave and arrested on January 30, 2024, for allegedly strangling a detainee the previous month. Hayes was helping remove Franklin Caceres-Ortega from a cell when the detainee spat on Hayes and called him a racial slur. Hayes, who is Black, "violently shoved" other guards aside to punch Caceres-Ortega, taking him to the ground in a chokehold. The detainee was cleared by medical personnel and charged with misdemeanor assault. Hayes was charged with felony aggravated assault and released on a $3,000 bond, but county prosecutors dropped the charge on February 22, 2024. Before Hayes' April 2022 hiring, he was charged with assault while on active duty with the U.S. Army in 2015. Why Sheriff Daron Hall apparently decided to overlook that was unclear.

**Tennessee:** On February 6, 2024, Shelby County Jail guard Akira Jones, 20, was arrested for allegedly having sex with an unnamed detainee. After jail officials received a complaint about the two on December 20, 2023, *WREG* in Memphis reported, they placed her on leave and began investigating. She was fired two days after her arrest.

**Tennessee:** *WMC* in Memphis reported that former state prison guard Sebron Hollands, 33, was sentenced to 15 months in federal prison and two years of supervised release on February 13, 2024, for attempting to cover up a fellow guard's assault on a prisoner at Northwest Correctional Complex in June 2020. He pleaded guilty on October 2, 2023, to writing a false report about the incident, in which former fellow guard Javian Griffin, 38, beat a prisoner identified as "K.W." and broke his jaw.

Griffin pleaded guilty to use of excessive force on October 11, 2023.

**Ukraine:** Russia said that it exchanged 195 prisoners with Ukraine on January 31, 2024. But *Reuters News* reported that Ukrainian Pres. Volodomyr Zelensky claimed his country actually repatriated 207 soldiers. The United Arab Emirates brokered what was the 50th large prisoner exchange of the nearly two-year-old war, after it was delayed a week when a Russian transport plane was shot down, killing 74 aboard. Russia claimed the victims were Ukrainian prisoners bound for another exchange but provided no proof in response to demands from Ukraine.

**Virginia:** On February 9, 2024, New River Valley Regional Jail detainee Shawn M. Tolbert, 43, picked up a fourth sentence from leading cops on a vehicle chase down I-81 in August 2022 until his car crashed and he fled on foot. He was found three weeks later hiding in a school bus parked in a Dublin yard, the *Roanoke Times* reported. A Pulaski County judge sentenced Tolbert to a year in prison after a jury found him guilty of obstructing justice with the chase. Because it ran through Montgomery County, a judge there earlier sentenced Tolbert to a year in prison for his guilty plea to felony eluding. He got another year from a Craig County judge for assaulting a sheriff's deputy when the chase headed there, plus one year more in Roanoke County court

**NEED YOUR MANUSCRIPT TYPED?**
Contact Jane at:
Ambler Document Processing
P.O. Box 938
Norwalk, CT 06852

**Record Your Music while locked up!**
Everything done over the phone. 5 Song Recording kit. Plus, readable material. Send SASE & $199.99
**The Unchained Voices Foundation**
PO Box 10143 Springfield, IL 62791

**PEN PAL PROFILE NOTICED!!**
Catch The Attention You Deserve
Seen Numerous Times By Pen Pals
Use Our Successful Options
Premier Sections & Tab Displays
Your Profile Updated Online/Mail
Send 2 FCS App/Info. Penacon
221 Pearl St. Ste. 553, N. Dighton, MA 02764

**MUSICIANS - WRITERS - AUTHORS**
Free monthly newsletter by mail or tablet Publish and market your magazine, music and books with us.
Cadmus Publishing LLC
PO Box 8664 Haledon, NJ 07538
info@cadmuspublishing.com
PH : 360-565-6459

**WELCOME TO FREEBIRD PUBLISHERS**
See Our Offerings. New Updated Vol. 4-Full Color Catalog-92-pgs. Brand New Books, Gifts, Services
Send $5, Add $5 Track or 15 FCS
Or Send SASE for flyers
Freebird Publishers 221 Pearl St. Ste. 541, Dighton, MA 02764

**A FRIEND ON THE OUTSIDE!**
We Mail Online Research To You
Educational, Legal, Reentry Info
Purchase Amazon Books / B&N Mags
No Hustles … Trustworthy Service
Brochure: Send SASE & 1 Stamp
**Webb Hunter** LLC PO Box 363 Christiansburg, VA 24068

**Offering Life Insurance for Inmates**
Kelly James License #4326402
Family must be payor/owner w/chking or savings acct. Inmate Schedule a call for voice signature and consent.
Contact: Kelly James (661) 689-5791 or Email: info@Final-Arrangements.com

after pleading no contest to another felony eluding charge there.

**Virginia:** Former Coffeewood Correctional Center guard Davey Jonathan Sisk, 29, was arrested on child pornography charges on February 15, 2024, DOJ announced. Using the CashApp handle JAKESMOOT2021, Sisk allegedly paid $465 in 2021 and 2022 to a now-15-year-old in Texas—identified as "MV1"—for homemade videos of the teen having sex with another minor. The young couple promoted and sold the clips on social media apps, including Snapchat, according to *KEYE* in Austin, Texas. It was unclear when Sisk's employment ended with the Virginia DOC.

**Washington:** The *Bellingham Herald* reported that a fire was started in the Watcom County Jail on February 1, 2024, by detainee Benjamin Morgan, 20. An unnamed guard was hospitalized for smoke inhalation, treated and released. When Morgan was evacuated from his smoke-filled cell, he admitted using a paper clip to strike the pried-open battery of a borrowed tablet, sparking the blaze. He was on tablet restriction at the time. County Sheriff's Office spokeswoman Deb Slater said criminal mischief charges will be added to burglary and theft counts Morgan was facing.

**Washington:** Former state DOC guard Danielle A. Lucas, 32, was charged on February 7, 2024, with first-degree custodial sexual misconduct for allegedly carrying on an affair with an unnamed prisoner at Washington Corrections Center for Women. The *Chehalis-Centralia Chronicle* reported that when the affair began in August 2022, Lucas was in a relationship with an unnamed fellow guard, who caught her chatting "giddily" on the phone with the prisoner—just hours after the two had been caught engaging in appropriate behavior in a prison bathroom in September 2022 and Lucas had been walked off the job. A fight with her former partner over that led to a domestic violence arrest for Lucas, who then resigned from DOC in October 2022. State cops completed their investigation about a year later and requested the charges against her.

**Wisconsin:** *WBAY* in Green Bay reported that now-fired DOC guard Shane Nolan, 31, was convicted of felony battery and disorderly conduct by a jury in state court on February 1, 2024, for hurling homophobic slurs at a woman and tossing her into her own fire pit after he got "blind drunk" at a July 2021 party at her home. As *PLN* reported, a judge earlier rejected a plea agreement Nolan tried to enter to drop a hate-crime enhancement for assaulting the victim, Dessiray Koss, who is lesbian. [See: *PLN*, Sep. 2022, p.64.] The jury acquitted Nolan of that charge, though. For his conviction on the other charges, he faces up to 42 months in prison and fines up to $11,000.

**Wisconsin:** "Everybody messes up," Milwaukee County Jail guard Devin McGee told investigators who charged him on February 8, 2024, with taking bribes to smuggle drugs to detainees. The 32-year-old allegedly took $1,000 via CashApp from friends and family of at least six detainees to pass them cigarettes, THC pens and a cellphone, the *Milwaukee Journal Sentinel* reported. McGee, who was hired in January 2023, said he felt pressured to continue the smuggling operation when detainees threatened to report him if he tried to pull out. ◢



# PrisonLegalNews.org

## Dedicated to Protecting Human Rights

>>FREE Data Search |

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**I**f you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

# Human Rights Defense Center Book Store

FREE SHIPPING on all book orders OVER $50 (effective 9-21-2022 until further notice). $6.00 S/H applies to all other book orders.

**Prison Profiteers: Who Makes Money from Mass Incarceration,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. Prison Profiteers is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. **1063**

**Prison Education Guide,** by Christopher Zoukis, PLN Publishing (2016), 269 pages. **$24.95**. This book includes up-to-date information on pursuing educational coursework by correspondence, including high school, college, paralegal and religious studies. **2019**

**The Habeas Citebook: Ineffective Assistance of Counsel, 2nd Ed. (2016)** by Brandon Sample, PLN Publishing, 275 pages. **$49.95**. This is an updated version of PLN's second book, by former federal prisoner Brandon Sample, which extensively covers ineffective assistance of counsel issues in federal habeas petitions. **2021**

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$54.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. **1041**

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$24.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. **1001**

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 16th Ed, Nolo Press, 648 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy-to-understand question-and-answer format. **1038**

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 10th Ed, Nolo Press, 600 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. **1037**

**The Merriam-Webster Dictionary**, 2016 edition, 939 pages. **$9.95**. This paperback dictionary is a handy reference for the most common English words, with more than 75,000 entries. **2015**

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 201 pages. **$19.99**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. **1046**

**Legal Research: How to Find and Understand the Law**, 19th Ed., by Stephen Elias and Susan Levinkind, 368 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. **1059**

**Deposition Handbook**, by Paul Bergman and Albert Moore, 7th Ed. Nolo Press, 440 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed. **1054**

**All Alone in the World: Children of the Incarcerated**, by Nell Bernstein, 303 pages. **$19.99**. A moving condemnation of the U.S. penal system and its effect on families" (Parents' Press), award-winning journalist Nell Bernstein takes an intimate look at parents and children—over two million of them - torn apart by our current incarceration policy. **2016**

**Everyday Letters for Busy People: Hundreds of Samples You Can Adapt at a Moment's Notice**, by Debra May, 287 pages. **$21.99**. Here are hundreds of tips, techniques, and samples that will help you create the perfect letter. **1048**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. **1060**

**Spanish-English/English-Spanish Dictionary**, 2nd ed., Random House. 694 pages. **$15.95**. Has 145,000+ entries from A to Z; includes Western Hemisphere usage. **1034a**

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 303 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. **1035**

**Roget's Thesaurus**, 709 pages. **$9.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. **1045**

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 224 pages. **$14.95**. Beyond Bars is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. **1080**

**Directory of Federal Prisons: The Unofficial Guide to Bureau of Prisons Institutions**, by Christopher Zoukis, 764 pages. **$99.95**. A comprehensive guidebook to Federal Bureau of Prisons facilities. This book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. **2024**

**Merriam-Webster's Dictionary of Law**, 634 pages. **$19.95**. Includes definitions for more than 10,000 legal words and phrases, plus pronunciations, supplementary notes and special sections on the judicial system, historic laws and selected important cases. Great reference for jailhouse lawyers who need to learn legal terminology. **2018**

**The Best 500+ Non-Profit Organizations for Prisoners and Their Families**, 5th edition, 170 pages. $19.99. The only comprehensive, up-to-date book of non-profit organizations specifically for prisoners and their families. Cross referenced by state, organization name and subject area. Find what you want fast! **2020**

**Criminal Law: A Desk Reference**, by Paul Bergman, 5th Ed. Nolo Press, 456 pages. **$44.99**. The book offers clear, plain English explanations of the law accompanied by real-world illustrations. **1101**

**Blue Collar Resume**, by Steven Provenzano, 210 pages. **$16.95**. The must have guide to expert resume writing for blue and gray-collar jobs. **1103**

**Please Note**: Book orders are mailed via the U.S. Postal Service with delivery confirmation. PLN does not assume responsibility to replace book orders once their delivery to the destination address (facility) is confirmed by the postal service. If you are incarcerated and placed a book order but did not receive it, please check with your facility's mailroom before checking with us. If books ordered from PLN are censored by corrections staff, please file a grievance or appeal the mail rejection, then send us a copy of the grievance and any response you received.

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 928 pages. **$69.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Includes detailed instructions and thousands of case citations. Highly recommended! **1077**

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 9th edition, NOLO Press, 411 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents. **1075**

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu-Jamal, 286 pages. **$16.95**. In Jailhouse Lawyers, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned advocates who have learned to use the court system to represent other prisoners—many uneducated or illiterate—and in some cases, to win their freedom. **1073**

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners. **1079**

**Disciplinary Self-Help Litigation Manual**, by Daniel Manville, 355 pages. **$49.95**. By the co-author of the Prisoners' Self-Help Litigation Manual, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court. Includes state-by-state case law on prison disciplinary issues. This is the third book published by PLN Publishing. **2017**

**The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act,** by John Boston, 576 pages. **Prisoners - $84.95, Lawyers/ Entities - $224.95**. This book is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims. **2029**

**Federal Prison Handbook**, by Christopher Zoukis, 493 pages. **$74.95**. This leading survival guide to the federal Bureau of Prisons teaches current and soon-to-be federal prisoners everything they need to know about BOP life, policies and operations. **2022**

**Locking Up Our Own, by James Forman Jr.**, 306 pages. **$19.95**. In Locking Up Our Own, he seeks to understand the war on crime that began in the 1970s and why it was supported by many African American leaders in the nation's urban centers. **2025**

**Win Your Case**, by Gerry Spence, 287 pages. **$21.95**. Relying on the successful methods he has developed over more than 50 years, Spence, an attorney who has never lost a criminal case, describes how to win through a step-by-step process **1092**

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95**. Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members or friends who are facing criminal charges. **1084**

**The Habeas Citebook: Prosecutorial Misconduct**, by Alissa Hull, 300 pages. **$59.95**. This book is designed to help pro se litigants identify and raise viable claims for habeas corpus relief based on prosecutorial misconduct. Contains hundreds of useful case citations from all 50 states and on the federal level. **2023**

**Arrest-Proof Yourself,** Second Edition, by Dale C. Carson and Wes Denham, 376 pages. **$16.95**. What do you say if a cop pulls you s to search your car? What if he gets up in your face and uses a racial slur? What if there's a roach in the ashtray? And what if your hot-headed teenage son is at the wheel? If you read this book, you'll know exactly what to do and say. **1083**

**Caught: The Prison State and the Lockdown of American Politics**, by Marie Gottschalk, 496 pages. **$27.99**. This book examines why the carceral state, with its growing number of outcasts, remains so tenacious in the United States. **2005**

**Encyclopedia of Everyday Law**, by Shae Irving, J.D., 11th Ed. Nolo Press, 544 pages. **$34.99**. This is a helpful glossary of legal terms and an appendix on how to do your own legal research. **1102**

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

---

### To Pay by Credit Card, Go to Our Website: www.prisonlegalnews.org or Call Us at 561-360-2523

## Subscription Rates

| | 1 Year | 2 Years | 3 Years | 4 Years |
|---|---|---|---|---|
| **Prisoners/Individuals** | **$36** | **$72** | **$108** | **$144** |
| **Professionals** (attorneys, agencies, libraries) | **$96** | **$192** | **$288** | **$384** |

<u>Mail Payment and Order to:</u>

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460

Please Change my Address to what is entered below: ☐

**Ship Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

## Subscription Bonuses

**2 year subscription include 2 extra issues**
**3 year subscription include 4 extra issues**
**4 year subscription include 6 extra issues**
(All subscription rates and bonus offers are valid as of *1/1/2022*)

### Subscribe to Prison Legal News

6 month subscription (prisoners only) - $20 _____

1 yr subscription _____

2 yr subscriptions (2 bonus issues) _____

3 yr sub (4 bonus issues) _____

4 yr sub (6 bonus issues) _____

Single back issue or sample copy of PLN - $6.00 _____

### Book Orders

_____ ____ ____
_____ ____ ____
_____ ____ ____
_____ ____ ____

Add $6.00 S/H to BOOK ORDERS under $50 _____
**FL residents ONLY add 7% to Total <u>Book</u> Cost** _____
**TOTAL Amount Enclosed:** _____

**\* NO REFUNDS on PLN subscription or book orders after orders have been placed. \***
**\* We are not responsible for incorrect addresses or address changes after orders have been placed. \***

*Introducing the latest in the Citebook Series from Prison Legal News Publishing*



# The Habeas Citebook: Prosecutorial Misconduct

**By Alissa Hull**

**Edited by Richard Resch**

*The Habeas Citebook: Prosecutorial Misconduct* is part of the series of books by Prison Legal News Publishing designed to help pro se prisoner litigants and their attorneys identify, raise and litigate viable claims for potential habeas corpus relief. This easy-to-use book is an essential resource for anyone with a potential claim based upon prosecutorial misconduct. It provides citations to over 1,700 helpful and instructive cases on the topic from the federal courts, all 50 states, and Washington, D.C.  It'll save litigants hundreds of hours of research in identifying relevant issues, targeting potentially successful strategies to challenge their conviction, and locating supporting case law.

The Habeas Citebook: Prosecutorial Misconduct *is an excellent resource for anyone seriously interested in making a claim of prosecutorial misconduct to their conviction. The book explains complex procedural and substantive issues concerning prosecutorial misconduct in a way that will enable you to identify and argue potentially meritorious claims. The deck is already stacked against prisoners who represent themselves in habeas. This book will help you level the playing field in your quest for justice.*

—Brandon Sample, Esq., Federal criminal defense lawyer, author, and criminal justice reform activist

---

### *The Habeas Citebook: Prosecutorial Misconduct*

Paperback, 300 pages

**$59.95**

*(includes shipping)*

**Order by mail, phone, or online.**  Amount enclosed _____

By: ☐ check   ☐ credit card   ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG  •  WWW.CRIMINALLEGALNEWS.ORG



## Prison Legal News

**PO Box 1151**
**Lake Worth Beach FL 33460**

**Change Service Requested**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

04/24 — **Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News.* Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN,* BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- **Criminal Law & Procedure**
- **Prosecutorial/Police Misconduct**
- **Ineffective Counsel**
- **Militarization of Police**
- **Junk Science**
- **False Confessions**
- **Witness Misidentification**
- **Post-Release Supervision**
- **Due Process Rights**

- **Police Brutality**
- **Habeas Corpus Relief**
- **Sentencing Errors & Reform**
- **Surveillance State**
- **Wrongful Convictions**
- **Search & Seizure Violations**
- **Paid/Incentivized Informants**
- **Police State in America**

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



**Prison Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

RTS

-R-T-S-   530002056-1N                05/03/24

RETURN  TO  SENDER
UNABLE  TO  FORWARD
UNABLE  TO  FORWARD
RETURN  TO  SENDER

P73

RECEIVED

MAY 06 2024

## 04/24 — Subscription Renewal

The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# 🔥 Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights
- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:

Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org