UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**HUMAN RIGHTS DEFENSE CENTER,**
a not-for-profit corporation,

    Plaintiff,

    v.                                  Case No. 24-CV-981

**MILWAUKEE COUNTY, WISCONSIN;**
**DENITA R. BALL,** Sheriff, individually and in
her official capacity; and **JOHN AND JANE**
**DOES 1-10,** Staff, individually and in their
official capacities,

    Defendants.

---

### DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

The Human Rights Defense Center ("HRDC") in a not-for-profit charitable organization that provides incarcerated persons with publications about their legal and civil rights. HRDC sues Milwaukee County and Milwaukee County Sheriff Denita R. Ball (collectively, the "Defendants") alleging Defendants' policies and practices frustrate HRDC's mission by unconstitutionally prohibiting delivery of its publications to prisoners housed in the Milwaukee County Jail (the "Jail") in violation of the First and Fourteenth Amendments. (Docket # 1.) HRDC moved for a preliminary injunction pursuant to Fed. R. Civ. P. 65, enjoining Defendants from unconstitutionally censoring HRDC's publications sent to incarcerated persons. (Docket # 3.) Subsequent to the filing of this lawsuit, the County changed its policies and then contended that HRDC's motion was moot. (Docket #

19.) HRDC continued to object, arguing that the policy change was insufficient to secure protection of its constitutional rights. (Docket # 21.)

I concluded that the Defendants' policy change did not moot HRDC's motion; however, I called upon the parties to provide supplemental briefing on the preliminary injunction motion given the policy change. (Docket # 23.) The parties have now provided the supplemental briefing. For the reasons further explained below, HRDC's motion for a preliminary injunction is granted.

## BACKGROUND

HRDC is a not-for-profit charitable organization whose purpose is to educate prisoners and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons to society. (Compl. ¶ 7.) HRDC accomplishes its missions through advocacy, litigation, and the publication and distribution of books, magazines, and other information concerning prisons and prisoner rights. (*Id.*) HRDC has thousands of customers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and members of the general public. (*Id.* ¶ 15.) Since its creation in 1990, HRDC has sent its publications to prisoners and librarians in more than 3,000 correctional facilities located across all fifty states, including the Federal Bureau of Prisons and various facilities within the State of Wisconsin, such as FCI Oxford, the Taylor County Jail, and numerous prisons run by the Wisconsin Department of Corrections. (*Id.*) HRDC publishes and/or distributes dozens of different softcover books about the criminal justice system, legal reference books, and self-help books of interest to prisoners. (*Id.* ¶ 18.) Their books are designed to foster a better understanding of criminal justice policies to allow prisoners to

educate themselves about related issues, such as legal research, how to write a business letter, health care issues, and similar topics. (*Id.*)

As of July 25, 2024, Milwaukee County had the following mail policy posted on its website:

> Occupant Mail
>
> Occupants are permitted to receive letters, non-Polaroid photographs (4 x 6 or less), cashier's checks, and money orders through the United States Postal Service.
>
> Incoming occupant mail must be addressed as follows:
>
> Full name of the occupant, booking number, housing unit, cell number 949 N. 9th Street Milwaukee, WI 53233
>
> All incoming occupant mail must meet the following criteria:
>
> 1. Must have a return address including full name and full address, apartment number if applicable. Any mail that does not include this information will be returned to sender or confiscated.
> 2. Sent utilizing UPS, Federal Express or the United States Postal Service.
> 3. Publications or newspapers shall be accepted only if they are mailed directly from the authorized publishers or approved vendors to a named occupant. Pornographic and weapons related magazines are contraband, and delivery will be refused.
> 4. Books must be mailed from the following approved publisher only: Penguin Random House.
> 5. Any material sent that is deemed inappropriate will be considered contraband and will be destroyed.
> 6. Greeting cards of any kind are not permitted. If a greeting card is received, the occupant will receive a copy of the greeting card and then the greeting card will be secured in the occupant's property.
> 7. No packages will be accepted from online shopping stores.
> 8. Mail received for an occupant no longer in custody will be returned to the sender.
>
> All incoming mail will be scanned for contraband prior to delivery.

(*Id.* ¶ 19.) HRDC asserts that by restricting all books and magazines not sent by publisher Penguin Random House or approved vendors, Defendants ban books and magazines sent

by HRDC to prisoners at the Milwaukee County Jail. (*Id.* ¶ 20.) Thus, HRDC alleges that Defendants' publication policy and practice violates HRDC's rights under the Free Speech Clause of the First Amendment. (*Id.*) HRDC further alleges that Defendants engage in policies and practices that fail to provide senders of censored mail notice and opportunity to appeal the censorship of the mail to the intended prisoner, violating HRDC's Fourteenth Amendment rights to due process. (*Id.* ¶ 21.)

HRDC alleges that between January 10, 2021 and July 23, 2024, it sent books, magazines, court rulings, informational brochures, and correspondence to individuals confined at the Milwaukee County Jail. (*Id.* ¶ 22.) Between May 14, 2022 and April 9, 2024, fifty-eight of those items were returned to the HRDC by the Jail. (*Id.* ¶ 23.) The items returned were addressed to individuals confirmed to still be in custody of the Jail on the day HRDC received the returned mail. (*Id.*) The fifty-eight returned items consisted of: fifty-two books (forty-three *Protecting Your Health and Safety*, eight *Prisoners' Guerilla Handbook*, and one *Prisoner's Self-Help Litigation Manual*); two copies of *Prison Legal News*; one copy of *Criminal Legal News*; two Info Packs (brochures about HRDC, magazines, and books); and one piece of correspondence inquiring about potential censorship. (*Id.* ¶ 24.) HRDC alleges Defendants failed to provide it any notice of opportunity to appeal these decisions. (*Id.* ¶ 26.) HRDC alleges that it has suffered damages and will continue to suffer damages based on Defendants' actions. (*Id.* ¶ 27.)

Joshua Briggs, Commander of the Milwaukee County Jail, avers that as of October 3, 2024, the occupant mail policy was updated and the website now reads as follows regarding occupant mail:

Occupant Mail

Occupants are permitted to receive letters, non-Polaroid photographs (4 x 6 or less), cashier's checks, and money orders through the United States Postal Service.

Incoming occupant mail must be addressed as follows:

Full name of the occupant, booking number, housing unit, cell number
949 N. 9th Street
Milwaukee, WI 53233

All incoming occupant mail must meet the following criteria:

1. Must have a return address, including the sender's full name and full address, including apartment number, if applicable. Any mail that does not include this information will be returned to sender or confiscated.
2. Must be sent utilizing UPS, Federal Express or the United States Postal Service.
3. All periodicals, including newspapers and magazines, will be accepted only if they are mailed directly from the publisher to a named occupant.
4. Only books mailed directly from the publisher to a named occupant will be accepted. In addition, for a book to be accepted, the publisher must be confirmed by the Jail to be a bona fide book publisher, and books sent by a publisher with a confirmed history of sending contraband into custodial settings will be rejected.
5. All periodicals and books must be in soft cover to be accepted.
6. Any mail that is deemed to jeopardize the safety of staff, visitors, or occupants or otherwise pose an unreasonable disruption to the orderly operation of the Jail, including but not limited to any publications or books that contain pornographic or weapons-related content, will be rejected.
7. Greeting cards of any kind are not permitted. If a greeting card is received, the occupant will receive a copy of the greeting card, and the greeting card will be secured in the occupant's property.
8. No packages will be accepted from online shopping stores.
9. Mail received for an occupant no longer in custody will be returned to the sender.
10. When a book or periodical is rejected under this policy, notice will be sent both to the intended recipient and the publisher, notifying the intended recipient and the publisher of the reason or reasons for the rejection and that the publisher has the right to appeal the rejection in writing within fourteen (14) days to the Jail Commander or his or her designee. The intended recipient retains the right to appeal any such rejection of a book or periodical under the occupant grievance process.

> The Jail will hold any rejected book or periodical pending such an appeal.

All incoming mail will be scanned for contraband prior to delivery.

(Declaration of Joshua Briggs ("Briggs Decl.") ¶¶ 3–6, Ex. 2.) Briggs asserts that with the change in policy, soft-cover books and periodicals published by HRDC are now accepted into the Milwaukee County Jail and if a book or periodical is rejected, the sender will receive notice and an opportunity to appeal. (*Id.* ¶¶ 3–4.)

## ANALYSIS

### 1. *Preliminary Injunction Standard*

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citations omitted) (emphasis in original). Granting a preliminary injunction involves the "exercise of a very far-reaching power" and is "never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted).

To justify a preliminary injunction, HRDC must first make a threshold showing that it has a reasonable likelihood of success on the merits, no adequate remedy at law exists, and it will suffer irreparable harm if a preliminary injunction is denied. *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If HRDC makes this preliminary showing, I will then consider whether the irreparable harm HRDC will suffer without injunctive relief is greater than the harm the defendant will suffer if the preliminary injunction is granted, and whether a preliminary injunction will harm the public interest. *Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000, 1002 (E.D. Wis. 2011). However, if HRDC does not establish a likelihood of success on the merits or that it will suffer irreparable harm if the injunction is

not granted, "then the district court's analysis ends and the preliminary injunction should not be issued." *Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998) (citation omitted).

HRDC can establish that it is likely to succeed on the merits by showing that its chances of prevailing are better than negligible. *Omega Satellite Prods. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982); *see also Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (citation omitted) ("Although the plaintiff must demonstrate some probability of success on the merits, 'the threshold is low. It is enough that the plaintiff's chances are better than negligible . . . .'"). A district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits. *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010); *see also Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings.").

2. *Application to this Case*

As an initial matter, Defendants argue that HRDC does not directly state whether it challenges the Jail's mail policy on its face, or as-applied to HRDC. (Docket # 29 at 12.) Briggs avers that the intent of the Sheriff's Office in instituting the policy change was to allow into the Jail each of the publications identified by HRDC in its complaint and motion for a preliminary injunction. (Second Declaration of Joshua Briggs ("Second Briggs Decl.") ¶ 27, Docket # 30.) This includes *Protecting Your Health and Safety*, despite subsequently learning that HRDC only distributes the publication but does not publish it. (*Id.*) HRDC counters that even if it is added as an "approved sender" of publications, the Jail's revised mail policy continues to "gratuitously censor[ ] materials beyond any legitimate concern of

preventing the introduction of contraband into the Jail." (Docket # 32 at 1.) Thus, even if the Jail allows in all of HRDC's publications as articulated in its complaint, HRDC continues to challenge the Jail's mail policy on its face as overbroad. *See Kraimer v. City of Schofield*, 342 F. Supp. 2d 807, 814 (W.D. Wis. 2004) (finding that "in recognition of the importance of unabridged speech and the self-censorship that can result from unconstitutionally restrictive regulation, the law allows litigants to challenge a statute even if their own rights of free expression are not violated, if they have reason to believe that the statute is overly broad or acts as an impermissible prior restraint"). In the First Amendment context, a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotations and citations omitted).

      2.1    Likelihood of Success on the Merits

In First Amendment cases, the likelihood of success on the merits will often be determinative because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (internal quotation and citation omitted). Furthermore, in such cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy." *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982). Thus, "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a [policy] that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90.

HRDC argues that the Jail's revised mail policy continues to violate HRDC's First and Fourteenth Amendment rights. When a prison regulation restricts a prisoner's First Amendment right to free speech, it is valid only if it is reasonably related to legitimate penological interests. *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). There are four factors that courts consider in determining whether a prison regulation is constitutional: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; and (4) whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Id.*

### 2.1.1 Whether the Revised Mail Policy is Rationally Related to a Legitimate and Neutral Governmental Objective

Although all four *Turner* factors are important, "the first one can act as a threshold factor regardless which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). A party who challenges the reasonableness of a prison regulation bears the burden of proving its invalidity. *Id.* And this burden "is a weighty one: 'We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.'" *Id.* (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). The Seventh Circuit, as well as other district courts in this circuit, have concluded that "publishers only" or "commercial source" rules are reasonably related to legitimate penological interests. *See Christopher v. Schwochert*, No. 18-CV-1073, 2021 WL 4263377, at *2 (W.D. Wis. Sept. 20, 2021) (collecting cases). In *Lindell*, the Seventh Circuit considered the

9
Case 2:24-cv-00981-NJ    Filed 01/27/25    Page 9 of 20    Document 33

constitutionality of an institution's mail rule that mimicked the Wisconsin Department of Corrections' administrative regulation on publications, which states that inmates "may only receive publications directly from the publisher or other recognized commercial sources in their packages." Wis. Admin. Code DOC § 309.05(2)(a); 377 F.3d at 658. The court found that:

> There is no question that "publishers only" rules that restrict prisoners from receiving hardcover books from any noncommercial sources are reasonably related to a prison's interest in preventing contraband from being smuggled into the prison. *Bell v. Wolfish,* 441 U.S. 520, 555 (1979). Courts have extended the reasoning in *Bell* to other types of materials from noncommercial sources that could easily conceal smuggled contraband, such as magazines and softbound books.

*Id.* The Milwaukee County Jail's mail policy, however, is stricter than the policy in *Lindell*. While the DOC regulation provides that inmates can receive publications directly from the publisher *or other recognized commercial source*, the Jail only permits inmates to receive publications directly from a bona fide publisher. Thus, an inmate could not order and receive a book from a recognized commercial distributor that is not the publisher.

HRDC argues that this distinction is dispositive and renders cases such as *Lindell* inapplicable. (Docket # 26 at 5.) HRDC argues that the overbreadth of the Jail's revised mail policy is inconsistent with the mail policies found to have satisfied the first *Turner* prong. (*Id.*) Thus, it contends that the Jail's "prohibition of books from commercial sources is an inappropriate attempt to expand a 'publishers only' rule as set forth in cases such as *Lindell* and *Bell*." (*Id.* at 7.)

I agree and find this factor weighs in favor of HRDC. While the Jail has an interest in preventing contraband from entering the facility, the Jail's revised policy restricting materials from *all* commercial sources is overbroad. As the *Lindell* court found, restricting

10

Case 2:24-cv-00981-NJ    Filed 01/27/25    Page 10 of 20    Document 33

publications from non-commercial sources is reasonably related to a prison's interest in preventing contraband from being smuggled into the prison. 377 F.3d at 658–59; *see also Schwochert*, 2021 WL 4263377, at *2 ("There is a rational connection between defendants' security and administrative interests and a policy that lowers the overall number of items being shipped from non-commercial vendors."). Indeed, materials arriving from publishers or other recognized commercial sources are less likely to contain contraband than those sent by family members, friends, or members of the public. *See id.*

But the Jail's mail policy prohibits inmates from receiving materials from *all* commercial sources other than publishers. Although Briggs generally avers that materials from commercial sources other than publishers present security risks, he focuses only on materials originating from Barnes & Noble and Amazon. (Second Briggs Decl. ¶¶ 15–17.) Briggs cites to a November 2021 Situational Awareness Bulletin published by the National Gang Intelligence Center (part of the U.S. Department of Justice Office of Justice Programs) warning that inmates at various institutions across the country have received packages with books purportedly from Barnes & Nobles that instead contained drugs. (*Id.* ¶¶ 15–16, Ex. 2, Docket # 30-3.) Briggs further avers that materials purchased through Amazon present similar risks because products are often sold by third-party sellers utilizing the Amazon platform and an "unscrupulous third-party seller, or individuals using the cover of a third-party seller, could exploit the Amazon platform to attempt to introduce drugs or other contraband into the Jail." (*Id.* ¶ 17.)

Defendants' point regarding Amazon is well-taken. Amazon allows third-parties to sell using its platform; thus, non-commercial sources may be able to hide behind the well-known Amazon brand. Or, as one court in this circuit noted, "[m]any people have empty

boxes from Amazon or other common vendors that they could use to ship books containing contraband to prisoners." *Schwochert*, 2021 WL 4263377, at *2. But even in *Schwochert*, the institution at issue did not ban all materials shipped from commercial sources, but required books to be shipped from a recognized commercial source <u>with a receipt</u>. *Id.* ("The receipt requirement provides verification that the book came from a commercial source, and specifically, from the source indicated on the outside of the package."). And Defendants do not speak to the potential dangers of inmates receiving materials from other recognized commercial sources that do not allow third-parties to sell using their platform, such as Ingram Content Group. (Second Declaration of Paul Wright ("Second Wright Decl.") ¶ 6, Docket # 27.) For these reasons, I find the first *Turner* factor weighs in favor of HRDC.

### 2.1.2 Whether There are Alternative Means for Inmates to Exercise Their First Amendment Right

The second *Turner* consideration is whether there are alternative means available for inmates to exercise their First Amendment right. Where "other avenues" remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of deference owed to corrections officials in gauging the validity of the regulation. *See Turner*, 482 U.S. at 90. Paul Wright, the Executive Director of HRDC, avers that the HRDC distributes approximately 35 books which it does not publish. (Second Wright Decl. ¶ 3.) And HRDC is the sole national distributor of *Protecting Your Health and Safety*, which is published by the Southern Poverty Law Center. (*Id.* ¶¶ 4–5.) Wright further avers that most publishers do not send books directly to consumers but instead rely on other commercial sources to distribute the published materials. (*Id.* ¶ 6.) Defendants argue that Wright has no personal knowledge to support this conclusion and that numerous entities serve as both

publisher and distributor of published materials and that numerous publishers routinely allow customers to order books directly from them. (Docket # 29 at 14–15 & n.3.)

Defendants argue that HRDC's argument rests on the false premise that the right at issue is the right to a specific publication. (Docket # 29 at 20.) They contend that the focus must be on the First Amendment right generally, "not alternative means by which plaintiff can send a specific publication to the Jail." (*Id.*) And in this case, Defendants argue that the Jail permits a broad range of publications to inmates at the Jail. (*Id.* at 22.) But courts in this circuit "have not framed the right at this level of generality—that is, simply as a right to read, or as a right to receive news." *Koger v. Dart*, 114 F. Supp. 3d 572, 580 (N.D. Ill. 2015). For example, in *Lindell*, the Seventh Circuit found that a newspaper subscription was not an alternative to newspaper clippings "because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers." *Lindell*, 377 F.3d at 659 (internal quotation and citation omitted). "That suggests that the right at issue is not simply a general right to read or find out about the news." *Koger*, 114 F. Supp. 3d at 580.

Had the Jail not made a specific exception for *Protecting Your Health and Safety*, this is an example of a publication that inmates would be unable to obtain under the Jail's revised policy because HRDC is not the publisher but is the sole distributor of the publication. HRDC avers that it has approximately 35 books it distributes but does not publish. (Second Wright Decl. ¶ 3.) While some materials may be available for direct purchase from the publisher, certainly some publications not available from the publisher will be barred from entering the Jail. Given it is unclear how many publications would face a complete ban under the revised mail policy, this factor weighs only somewhat in HRDC's favor.

### 2.1.3 What Impact Accommodating the Asserted Right Will Have on Guards and Other Inmates

The third *Turner* factor considers the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

Briggs avers that the Jail receives about 70-75 pieces of incoming mail each day intended for Jail occupants and that for books and periodicals, the screening process includes an officer manually inspecting the publication for contraband, screening the content for pornography or weapons-related content, screening for drugs, and ensuring the publication is from a bona fide publisher. (Second Briggs Decl. ¶ 20.) Briggs asserts that if the Jail were required to accept materials from all commercial sources other than publishers, the resources devoted to the process of screening would have to be substantially increased. (*Id.* ¶ 23.) Briggs avers that the "bona fide publisher" search is time-consuming as the officer must look for verifiable information regarding the publisher online and attempt to determine if the publisher has a history of sending contraband into correctional facilities. (*Id.* ¶ 20.) Even accepting that allowing Jail occupants to receive books and publications from recognized commercial sources will take up some additional Jail resources for additional screening, there is no evidence that the impact will significantly burden the Jail. It would seem that verifying a "recognized commercial source" such as Amazon would likely be less time consuming than verifying potentially less well known, but bona fide, publishers. Thus, this third *Turner* factor weighs in favor of HRDC.

### 2.1.4 Whether There are Obvious Alternatives that Show the Mail Policy is an Exaggerated Response

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation, while the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90. This is not a "least restrictive alternative" test; however, if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.* at 90–91.

I find that there is an obvious alternative in this case—to follow the Wisconsin DOC's regulation that allows inmates to receive publications directly from the publisher or other recognized commercial sources in their packages. *See* Wis. Admin. Code DOC § 309.05(2)(a). Courts in this circuit have generally found that the risk of contraband entering prisons comes from *non-commercial* mail, not from recognized commercial sources. And the Jail already has a comprehensive procedure for screening books and periodicals and for verifying bona fide publishers. (*See* Second Briggs Decl. ¶ 20.) It is unclear how the screening process would change for recognized commercial sources, other than replacing the step of verifying the publisher with verifying the commercial source. Which again, if the commercial source is truly "recognized," it is likely more easily verifiable than a bona fide publisher. For example, whether a book comes in a box from Penguin Random House or from Amazon, it will require an officer to manually inspect the publication for contraband, screen the contents for pornography or weapons-related content, and run it through a drug detection machine. But it is highly likely Amazon is more readily identifiable and verifiable

to the average individual than Penguin Random House. For these reasons, I find the final *Turner* factor weighs in favor of HRDC.

Again, when a prison regulation restricts an inmate's First Amendment rights, courts look to the *Turner* factors to determine whether the restriction is reasonably related to a legitimate penological interest. In this case, I find HRDC has established that its chances of prevailing are better than negligible. Thus, HRDC has established that it is likely to succeed on the merits on its First Amendment claim. Further, because the Jail's revised policy only gives the recipient and the publisher notice of rejection and a right to be heard, HRDC has also established a likelihood of success on the merits of its Due Process claim.

### 2.2  No Adequate Remedy at Law and Irreparable Harm

To receive a preliminary injunction, HRDC must also demonstrate that it has no adequate remedy at law and that it will suffer irreparable harm if an injunction is denied. As stated above, in the First Amendment context, the likelihood of success on the merits is often the determinative element as "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Alvarez*, 679 F.3d at 589. Further, "the quantification of injury is difficult and damages are therefore not an adequate remedy." *Petitte*, 685 F.2d at 195. While Defendants acknowledge this caselaw, they argue that the Jail's revised mail policy protects the inmates' rights and otherwise stand on their arguments that the policy does not violate the First Amendment. (Docket # 29 at 27–30.)

However, as explained above, HRDC has demonstrated a likelihood of success on the merits of its First Amendment and Due Process claims. Thus, the revised policy, being overbroad in disallowing publications from commercial sources other than publishers, does

16
Case 2:24-cv-00981-NJ    Filed 01/27/25    Page 16 of 20    Document 33

not adequately protect the inmates' constitutional rights. For these reasons, HRDC has established that it has no adequate remedy at law and that it will suffer irreparable harm if an injunction is denied.

### 2.3 Balance of Harms

As HRDC has made the requisite preliminary showing for a preliminary injunction, I must consider whether the irreparable harm HRDC will suffer without injunctive relief is greater than the harm Defendants will suffer if the preliminary injunction is granted, and whether a preliminary injunction will harm the public interest.

As stated above, in the First Amendment context, if the moving party establishes a likelihood of success on the merits, the balance of harms will also normally favor granting the preliminary injunction "because the public interest is not harmed by preliminarily enjoining the enforcement of a [policy] that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90. Defendants argue that the balance of harms favors Defendants because further revising the Jail's mail policy will hinder the Jail's security and add administrative and financial burdens on the Jail and its staff. (Docket # 29 at 30.) Defendants further argue that the public has a strong interest in promoting and maintaining the safety of jails. (*Id.*)

I find the balance of harms weighs in favor of granting injunctive relief. As explained above, I do not find that allowing inmates to receive publications directly from the publisher *or* other recognized commercial sources in their packages will greatly increase the burden on the Jail. Again, the Jail already has a comprehensive screening process for books and periodicals and having to verify a package from a "recognized commercial source" rather than a "bona fide publisher" will not increase the Jail's burden and will perhaps be easier in those cases. Further, allowing publications from recognized commercial sources will not

increase the risk of contraband entering the Jail at a greater rate than mail from any other commercial source, such as a publisher. Courts have made clear that the increased risk of contraband comes from non-commercial sources and even mail from commercial sources, such as publishers, are screened by Jail staff. Thus, in this case, the public's interest in the safety of jails does not outweigh its interest in protecting inmates' First Amendment rights. For these reasons, HRDC's motion for a preliminary injunction is granted.

### 2.4 Payment of Bond

Fed. R. Civ. P. 65(c) provides that the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Seventh Circuit has noted that "in seeming contradiction of the rule," a number of cases allow a district court to waive the requirement of an injunction bond. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). The court noted that these cases generally fall into two categories—cases where the court is satisfied that there is no danger of the opposing party incurring damages from the injunction and in cases where "a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.*

HRDC argues the Court should waive the bond requirement because HRDC is a small non-profit organization of twelve employees which lacks the funds to post more than a nominal bond. (Declaration of Paul Wright ¶ 34, Docket # 4.) It argues that a bond

18

Case 2:24-cv-00981-NJ   Filed 01/27/25   Page 18 of 20   Document 33

increase the risk of contraband entering the Jail at a greater rate than mail from any other commercial source, such as a publisher. Courts have made clear that the increased risk of contraband comes from non-commercial sources and even mail from commercial sources, such as publishers, are screened by Jail staff. Thus, in this case, the public's interest in the safety of jails does not outweigh its interest in protecting inmates' First Amendment rights. For these reasons, HRDC's motion for a preliminary injunction is granted.

### 2.4 Payment of Bond

Fed. R. Civ. P. 65(c) provides that the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Seventh Circuit has noted that "in seeming contradiction of the rule," a number of cases allow a district court to waive the requirement of an injunction bond. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). The court noted that these cases generally fall into two categories—cases where the court is satisfied that there is no danger of the opposing party incurring damages from the injunction and in cases where "a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.*

HRDC argues the Court should waive the bond requirement because HRDC is a small non-profit organization of twelve employees which lacks the funds to post more than a nominal bond. (Declaration of Paul Wright ¶ 34, Docket # 4.) It argues that a bond

requirement would effectively deny it access to judicial review and that Defendants will incur no damages if an injunction is issued. (Docket # 3 at 21.) Defendants do not address HRDC's argument regarding bond.

I agree that in this case, there is no danger of Defendants incurring damages from the injunction. Again, Defendants already have a comprehensive screening process in place and Defendants have not shown that adding recognized commercial sources to the screening process will cost the Jail more than a *de minimis* increase in costs. For these reasons, I agree that the bond should be waived in this case.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Plaintiff's Motion for a Preliminary Injunction (Docket # 3) is **GRANTED**.

**IT IS FURTHER ORDERED** that the bond requirement under Fed. R. Civ. P. 65(c) is waived.

**FINALLY, IT IS ORDERED** that during the pendency of this litigation, Defendants are enjoined from preventing inmates at the Milwaukee County Jail from receiving publications directly from the publisher or other recognized commercial sources in their packages. Furthermore, when a book or periodical is rejected, Defendants must send notice to both the intended recipient and the publisher or recognized commercial source, whichever is applicable. The publisher or recognized commercial source, whichever is applicable, must be given the right to appeal the rejection.

Dated at Milwaukee, Wisconsin this 27th day of January, 2025.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge